# 13-3357-cv

## United States Court of Appeals
for the
## Second Circuit

▸▸◂◂

YUKOS CAPITAL S.A.R.L.,

*Petitioner-Appellee,*

— v. —

OAO SAMARANEFTEGAZ,

*Respondent-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF RESPONDENT-APPELLANT
## OAO SAMARANEFTEGAZ

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Matthew D. Slater
2000 Pennsylvania Avenue, NW
Washington, DC 20006
202-974-1500

Attorneys for Respondent-Appellant

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Respondent-Appellant OAO Samaraneftegaz states that it is an open joint stock company organized and existing under the laws of the Russian Federation and is wholly owned by OOO Neft-Aktiv.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ..................................... i

TABLE OF AUTHORITIES ............................................................... iv

JURISDICTIONAL STATEMENT ........................................................ 1

ISSUES PRESENTED .................................................................... 2

STATEMENT OF THE CASE ............................................................ 4

      A.    Nature Of The Case .................................................... 4

      B.    Statement Of Facts ................................................... 6

SUMMARY OF ARGUMENT ........................................................... 19

ARGUMENT ........................................................................... 22

    I.    THE DISTRICT COURT SHOULD HAVE DISMISSED THIS
         CASE ON THE BASIS OF FORUM NON CONVENIENS ........... 22

    II.   THE DISTRICT COURT LACKED PERSONAL
        JURISDICTION ................................................................ 27

      A.    The Power Of Attorney Is Void Under Russian Law ............. 28

      B.    Mr. Godfrey's Execution Of The Addenda Constituted
          An Abuse Of Right Rendering The Addenda Void ................ 32

      C.    Mr. Godfrey Breached His Fiduciary Duty To
          Samaraneftegaz ....................................................... 37

      D.    The Addenda Did Not Satisfy The Loan Agreements'
          Formal Requirements For Amendment ................... 40

    III.  THE AWARD SHOULD NOT BE ENFORCED BASED ON
        ARTICLES V(1)(B) AND V(2)(B) OF THE NEW YORK
        CONVENTION ................................................................ 42

      A.    The District Court Should Have Applied Issue Estoppel
          To Facts Found In The Russian Proceedings .......... 43

B.      The Award Is Not Enforceable Because Samaraneftegaz Did Not Receive Adequate Notice Of Key Steps Of The Arbitration Proceeding ............................................................. 46

C.      Enforcement Of The Award Would Violate U.S. Public Policy ...................................................................................... 52

IV.    THE DISTRICT COURT ERRED IN CONVERTING THE JUDGMENT FROM RUBLES TO DOLLARS ............................... 58

CONCLUSION ...................................................................................... 62

CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)(7)(C) ........................... 63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Bank of N.Y. v. First Millenium, Inc.,
  607 F.3d 905 (2d Cir. 2010) ............................................................43

Blanco v. Banco Indus. de Venezuela, S.A.,
  997 F.2d 974 (2d Cir. 1993) ............................................................26

Buckeye Check Cashing, Inc. v. Cardegna,
  546 U.S. 440 (2006)........................................................................54

Carlisle Ventures, Inc. v. Banco Español de Crédito, S.A.,
  176 F.3d 601 (2d Cir. 1999) ............................................................28

Changzhou AMEC E. Tools & Equip. Co. v. E. Tools & Equip., Inc.,
  No. EDCV 11-00354 VAP, 2012 WL 3106620 (C.D. Cal. July 30,
  2012) ...............................................................................................53

Competex, S.A. v. Labow,
  783 F.2d 333 (2d Cir. 1986) ............................................................60

Conte v. Flota Mercante Del Estado,
  277 F.2d 664 (2d Cir. 1960) ............................................................60

Devlin v. Transp. Commc'ns Int'l Union,
  175 F.3d 1212 (2d Cir. 1999) ..........................................................58

Diorinou v. Mezitis,
  237 F.3d 133 (2d Cir. 2001) ............................................................43

Exxon Shipping Co. v. Baker,
  554 U.S. 471 (2008)........................................................................59

Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru,
  665 F.3d 384 (2d Cir. 2011) ..........................................22, 23, 25, 26, 27

Gross v. British Broad. Corp.,
  386 F.3d 224 (2d Cir. 2004) ............................................................22

iv

Guang Dong Light Headgear Factory Co. v. ACI Int'l, Inc.,
  No. 03-4165-JAR, 2005 WL 1118130 (D. Kan. May 10, 2005)........................47

In re Arb. between Monegasque De Reassurances S.A.M. v. Nak
  Naftogaz of Ukraine,
  311 F.3d 488 (2d Cir. 2002) .................................................................22, 23, 24

India.Com, Inc. v. Dalal,
  412 F.3d 315 (2d Cir. 2005) ...................................................................58

Indu Craft, Inc. v. Bank of Baroda,
  87 F.3d 614 (2d Cir. 1996) .....................................................................61

Iran Aircraft Indus. v. Avco Corp.,
  980 F.2d 141 (2d Cir. 1992) ...................................................................46

Julen v. Larson,
  25 Cal. App. 3d 325 (Cal. Ct. App. 1972) .........................................51

Laminoirs-Trefileries-Cableriesd e Lens, S. A. v. Southwire Co.,
  484 F. Supp. 1063 (N.D. Ga. 1980).....................................................53

Manley v. AmBase Corp.,
  337 F.3d 237 (2d Cir. 2003) ...................................................................58

Mathews v. Eldridge,
  424 U.S. 319 (1976).........................................................................46, 52

Miller v. Wolpoff & Abramson, L.L.P.,
  321 F.3d 292 (2d Cir. 2003) .............................................................27, 43

Munafo v. Metro. Transp. Auth.,
  381 F.3d 99 (2d Cir. 2004) .....................................................................58

Nat'l Petrochem. Co. of Iran v. M/T Stolt Sheaf,
  930 F.2d 240 (2d Cir. 1991) ...................................................................56

In re Oil Spill by Amoco Cadiz,
  954 F.2d 1279 (7th Cir. 1992) ...............................................................60

Overseas Media, Inc. v. Skvortsov,
  277 F. App'x 92 (2d Cir. 2008) .............................................................24

Paddington Partners v. Bouchard,
    34 F.3d 1132 (2d Cir. 1994) ................................................................58

Parklane Hosiery Co. v. Shore,
    439 U.S. 322 (1979) ............................................................................44

Parsons & Whittemore Overseas Co. v. Societe Generale de
    L'Industrie du Papier (RAKTA),
    508 F.2d 969 (2d Cir. 1974) ........................................................46, 57

Pasquantino v. United States,
    544 U.S. 349 (2005) ............................................................................56

Piper Aircraft Co. v. Reyno,
    454 U.S. 235 (1981) ............................................................................23

Qingdao Free Trade Zone Genius Int'l Trading Co. v. P&S Int'l, Inc.,
    No. 08-1292-HU, 2009 WL 2997184 (D. Or. Sept. 16, 2009) ............51

Republic of Ecuador v. Chevron Corp.,
    638 F.3d 384 (2d Cir. 2011) ...............................................................43

Robert Lewis Rosen Assocs., Ltd. v. Webb,
    473 F.3d 498 (2d Cir. 2007) ...............................................................59

Rutkin v. Reinfeld,
    229 F.2d 248 (2d Cir. 1956) ...............................................................56

Sea Dragon, Inc. v. Gebr. Van Weelde Scheepvaartkantoor B.V.,
    574 F. Supp. 367 (S.D.N.Y. 1983) .....................................................53

Sea Hope Nav. Inc. v. Novel Commodities SA,
    No. 13 Civ. 3225(LAK)(GWG), 2013 WL 5695955 (S.D.N.Y. Oct.
    21, 2013) .............................................................................................49

Sea-Roy Corp. v. Parts R Parts, Inc.,
    173 F.3d 851, 1999 WL 111281 (4th Cir. 1999) ................................59

Sesostris, S.A.E. v. Transportes Navales, S.A.,
    727 F. Supp. 737 (D. Mass. 1989) ......................................................47

Shaw Savill, Albion & Co. v. The Fredericksburg,
    189 F.2d 952 (2d Cir. 1951) .........................................................60, 61

Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.,
    549 U.S. 422 (2007)..........................................................................27

Spiegel v. Schulmann,
    604 F.3d 72 (2d Cir. 2010) ............................................................27

Telenor Mobile Commc'ns AS v. Storm LLC,
    584 F.3d 396 (2d Cir. 2009) ..........................................................44

Tillman v. Russo Asiatic Bank,
    51 F.2d 1023 (2d Cir. 1931) ..........................................................60

United Paperworkers Int'l Union v. Misco, Inc.,
    484 U.S. 29 (1987)..........................................................................56

United States v. $15,270885.69 Formerly on Deposit in Account No.
    8900261137,
    No. 99 Civ. 10255 (RCC), 2000 WL 1234593 (S.D.N.Y. Aug. 31,
    2000) ..............................................................................................56

United States v. A.L. Burbank & Co.,
    525 F.2d 9 (2d Cir. 1975) ..............................................................57

United States v. Stuart,
    489 U.S. 353 (1989)........................................................................57

United States v. Trapilo,
    130 F.3d 547 (2d Cir. 1997) ..........................................................56

Vishipco Line v. Chase Manhattan Bank, N.A.,
    660 F.2d 854 (2d Cir. 1981) ..........................................................60

VRG Linhas Aereas S.A. v. MatlinPatterson Global Opportunities
    Partners II, L.P.,
    717 F.3d 322 (2d Cir. 2012) ..........................................................43

**Federal Rules**

Fed. R. Civ. P. 44.1 ............................................................................27

Fed. R. Civ. P. 55(b)(2)......................................................................52

**Other Authorities**

21 Williston on Contracts § 57:85 (4th ed.)...............................................47

The Convention Between the United States of America and The
    Russian Federation For the Avoidance of Double Taxation and the
    Prevention of Fiscal Evasion With Respect to Taxes on Income
    and Capital, U.S.-Rus., June 17, 1992, S. Treaty Doc. No. 102-39 .................57

Convention of the Recognition and Enforcement of Foreign Arbitral
    Awards, June 10, 1958, 330 U.N.T.S. 38 ........................... 4-5, 42, 45-47, 53-54

Gary B. Born, International Commercial Arbitration (2009)..................................47

ICCA's Guide to the Interpretation of the 1958 New York
    Convention: A Handbook for Judges (2011)......................................47

Restatement (Third) of Foreign Relations Law of the United States,
    § 481 cmt. c (1987) ..................................................................44

The Secretariat's Guide to ICC Arbitration: A Practical Commentary
    on the 2012 ICC Rules of Arbitration from the Secretariat of the
    ICC International Court of Arbitration (2012) ...................................48

W. Laurence Craig, William W. Park & J. Paulsson, International
    Chamber of Commerce Arbitration (3d ed. 2000) .............................................51

Yves Derains & Eric A. Schwartz, A Guide to the ICC Rules of
    Arbitration (2005) ................................................................50

## JURISDICTIONAL STATEMENT

The District Court (Crotty, J.) had subject matter jurisdiction under 9 U.S.C. § 203. The District Court entered a final judgment on August 9, 2013, and a supplemental final judgment on October 3, 2013. Samaraneftegaz timely filed a notice of appeal on September 4, 2013, and an amended notice of appeal on October 11, 2013. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 and 9 U.S.C. §§ 16(a)(1)(D), (a)(3).

# ISSUES PRESENTED

1.  Whether the District Court, after finding that the relevant factors favor dismissal on the basis of *forum non conveniens*, erred in declining to dismiss the petition.

2.  Whether the District Court erred in finding the amended arbitration agreements, on which the Award and personal jurisdiction rest, are valid and binding under applicable Russian law.

3.  Whether the District Court erred in declining to apply issue estoppel to the facts found in Russian litigation between the parties.

4.  Whether the District Court erred in finding that notice to Samaraneftegaz of the arbitration proceedings satisfied New York Convention standards.

5.  Whether the District Court erred in finding that enforcement of the arbitration award does not violate U.S. public policy against fraud and tax evasion.

6.  Whether the District Court erred in entering the supplemental final judgment in the absence of clear error or manifest injustice.

7.  Whether the District Court erred in entering the supplemental final judgment to convert the currency of the arbitration award, Russian rubles, into U.S. dollars.

8.     Whether the District Court erred in applying the exchange rate on the date of

the arbitration award rather than the date of judgment.

## STATEMENT OF THE CASE

**A.     Nature Of The Case**

This is an appeal from a judgment granting recognition and enforcement of an international arbitration award (the "Award") under Chapter 2 of the Federal Arbitration Act and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention").  The Award was made in August 2007 in favor of Appellee Yukos Capital S.a.r.l. ("Yukos Capital") and against Appellant OAO Samaraneftegaz ("Samaraneftegaz").  The Award concerns loan agreements that provided for dispute resolution before an arbitral institution in Russia, under Russian law, and in the Russian language.  The arbitration, however, was conducted in New York, in English, applying New York law, based upon purported amendments to the arbitration agreements (the "Addenda") whose validity Samaraneftegaz at all times has disputed.

Nearly three years later, in July and August 2010, Yukos Capital brought parallel enforcement proceedings in New York and Russia.  Because Samaraneftegaz has no connection with New York (or the United States), and because the only basis alleged for personal jurisdiction was the disputed Addenda, whose validity is governed by Russian law, Samaraneftegaz moved to dismiss based on a lack of personal jurisdiction or *forum non conveniens*.  The District

Court (Crotty, J.) found that all *forum non conveniens* factors supported dismissal, including that Russia is an adequate forum and is favored by public and private factors, such as the presence of the relevant evidence and witnesses in Russia and the central role of Russian law in the dispute. It nevertheless declined to dismiss on that basis, which forced Samaraneftegaz to litigate in the United States, limited Samaraneftegaz's use of Russian witnesses, and required the District Court to apply unfamiliar Russian law. Based on its own misinterpretation of Russian law, the District Court held the Addenda to be valid and allowed personal jurisdiction over Samaraneftegaz.

In the meantime, after fully contested proceedings that Yukos Capital brought in Russia, the Russian court declined enforcement of the Award under the New York Convention. First, the court found as fact that Samaraneftegaz was not notified of key events necessary for its defense in the arbitration, such as deadlines for submissions and hearing dates, and on that basis held the Award unenforceable under Article V(1)(b) of the Convention. Second, it held that the loan agreements were used to launder funds wrongfully taken from Samaraneftegaz to implement a tax-evasion scheme orchestrated by and for the then-parent of Yukos Capital and Samaraneftegaz. It accordingly declined enforcement on public policy grounds under Article V(2)(b) of the Convention.

5

Notwithstanding these rulings, the District Court held that notice to Samaraneftegaz was sufficient and that the United States has no relevant public policy against foreign tax evasion and fraud, and it granted recognition to the Award in a final judgment for Yukos Capital. Without explanation, the District Court later amended the judgment on a Rule 59(e) motion, converting the Award from rubles to dollars at an exchange rate as of the date of the Award.

This appeal therefore concerns errant decisions concerning *forum non conveniens*, personal jurisdiction based on the application of Russian law, New York Convention defenses to recognition and enforcement, and post-judgment amendment and currency conversion.

## B.    Statement Of Facts

### 1.    The Parties, Related Entities, And Individuals

Samaraneftegaz is a former subsidiary of Yukos Oil Company ("Yukos Oil"), incorporated in Russia. JA-187; JA-378, ¶ 4; JA-492, ¶¶ 1, 3; JA-2112, ¶4. It produces crude oil in the Samara region of the Russian Federation. JA-492, ¶ 1. Yukos Oil was Samaraneftegaz's sole shareholder until 2007. JA-187; JA-492, ¶ 3. Samaraneftegaz has no assets in the United States, conducts no business in the United States, and receives no revenue from sales in the United States. JA-199, ¶ 2; JA-492, ¶ 2. Samaraneftegaz conducts its business solely in Russian and has no English-speaking managers. JA-187.

From September 1998 through June 2006, Samaraneftegaz had an executive management agreement with ZAO Yukos Exploration and Production ("Yukos EP"), another company owned and controlled by Yukos Oil. JA-29, ¶ 23; JA-493, ¶¶ 5-6. Victor Grekhov was the president of Yukos EP during the relevant parts of 2005 and early 2006. JA-502, ¶ 43.

Yukos Oil was a large Russian oil company. JA-377, ¶ 3. In late 2003, Russian Federation tax authorities uncovered a massive tax fraud perpetrated by Yukos Oil and assessed back taxes and penalties. JA-377, ¶ 3; JA-1781-1819. Because Yukos Oil failed to pay its debts, its private creditors initiated bankruptcy proceedings in Russia, and Yukos Oil was eventually liquidated. JA-1825, ¶ 269. The Loan Agreements at issue in this case formed a part of the efforts by Yukos Oil managers and beneficial owners to launder the untaxed funds. JA-1698-1699; JA-1715-1718; JA-1721-1722.

Yukos Capital is a Luxembourg-registered company created in January 2003 as an indirect wholly-owned subsidiary of Yukos Oil. JA-23, ¶ 4; JA-28, ¶ 20. Yukos Capital was directly owned by Yukos Finance B.V. ("Yukos Finance"), a wholly-owned subsidiary of Yukos Oil, until April 2005, when Yukos Finance consolidated its holdings, including Yukos Capital, under Yukos International UK B.V. ("Yukos International"), a wholly-owned subsidiary of Yukos Finance. JA-28, ¶ 20.

Following this consolidation, Yukos Finance transferred its shareholding in Yukos International to a Dutch trust-like entity called Stichting Administratiekantoor Yukos International (the "Stichting"). JA-493, ¶ 10. The Stichting was controlled primarily by Yukos Oil executives including senior legal officer David Godfrey. JA-494, ¶ 12. Yukos Oil thus remained, in effect, Yukos Capital's beneficial owner and parent at all relevant times. Yukos Capital delegated its executive management functions to an entity called TMF Corporate Services S.A. ("TMF"), which took its instructions from Yukos managers. JA-28, ¶ 22.

Yukos Capital has no business activities, in the United States or elsewhere, other than conducting Yukos Oil-related litigation under the oversight of the Stichting. JA-632, Tr. 43:18-23.

2.    The July 2004 Loan Agreements

In July 2004, Samaraneftegaz and Yukos Capital executed two loan agreements for a total of 2,415,890,000 rubles (the "Loan Agreements"). JA-494, ¶ 13; JA-653-659; JA-661-666. Yukos Oil owned and controlled (directly or indirectly) both the "debtor" and "creditor" of the Loan Agreements. JA-28, ¶ 21; JA-495, ¶ 15.

The Loan Agreements were substantially identical to each other and were executed in both English and Russian, without specification as to which

8

version would prevail. JA-495, ¶ 16. All performance under the Loan Agreements was to occur within Russia. JA-496, ¶ 20. The Loan Agreements further provided that "[t]he laws of the Russian Federation shall be applicable" to their provisions, and that "[a]ll amendments and addenda hereto shall be valid only if made in writing and signed and sealed by duly authorized representatives of the Parties." JA-496, ¶¶ 18-19.[1] The Loan Agreements also provided for dispute resolution through arbitration applying Russian law, in Russian, before the International Commercial Arbitration Court at the Chamber of Trade and Industry of the Russian Federation in Moscow ("ICAC"). JA-495, ¶ 17.

a) Amendment Of The Loan Agreements To Facilitate Yukos Capital's Claims

As early as April 2005, Yukos Capital expressed the belief that it was "entitled to demand earlier repayment" of the loans by Samaraneftegaz and asked Yukos Oil for permission to send notices of default. JA-497, ¶¶ 21-22; JA-755. Yukos Oil withheld permission at that time. JA-508, ¶ 73; JA-2063. Had Yukos Capital sent a request for arbitration to Samaraneftegaz then (or even in early November 2005 when it again sought such permission, JA-508, ¶ 72; JA-863), the dispute would have been subject to the dispute resolution provisions in the Loan Agreements, *i.e.* arbitration in Russia, in Russian, applying Russian law.

---

[1] The Russian version differs slightly from the English version regarding amendments. See infra p. 40.

Instead, before allowing Yukos Capital to claim breach and initiate dispute resolution, Yukos Oil first sought to modify the dispute resolution process to favor Yukos Capital's ability to bring and win its claims. These modifications were reflected in the Addenda, bilingual amendments that Mr. Godfrey had prepared with language he commissioned from Fulbright & Jaworski LLP, a law firm that represented Yukos Oil. JA-499-500, ¶¶ 32-34; JA-824; JA-826. The proposed Addenda purported to transform the parties' rights radically by requiring arbitration in New York rather than Moscow, under New York rather than Russian law, in English rather than Russian, and under the Rules of Arbitration of the International Chamber of Commerce (the "ICC") rather than the ICAC's rules. JA-24, ¶ 10; JA-499-500, ¶¶ 31, 35-36.

The Yukos Oil management committee discussed the idea of possible amendment of the Loan Agreements in October 2005, and meeting minutes make clear that the purpose was to facilitate Yukos Capital's ability to obtain a "favourable result" against Samaraneftegaz. JA-501, ¶ 38; JA-707.

b) Mr. Godfrey Purported To Act For Samaraneftegaz Under A Backdated Power Of Attorney

As President of Yukos EP, Mr. Grekhov was the only person with authority to sign any amendment to the Loan Agreements for Samaraneftegaz. JA-502, ¶¶ 42-43. Despite pressure from Mr. Godfrey and the Yukos Oil management committee, however, Mr. Grekhov would not agree to amend the dispute resolution

provisions.  JA-502, ¶ 44; JA-834; JA-708; JA-843.  Yukos Capital's witnesses confirmed his consistent unwillingness to do so.  JA-503, ¶ 44(d).  There is no evidence that Mr. Grekhov ever saw the Addenda, and neither he nor any employee of Yukos EP – much less Samaraneftegaz – signed them.

Instead, Mr. Godfrey signed and purported to bind Samaraneftegaz to the Addenda.  JA-503, ¶ 45.  Mr. Godfrey held several positions with various Yukos-group entities, including the entities controlling Yukos Capital that would benefit from any recovery by Yukos Capital.  JA-504, ¶¶ 49-51.  Mr. Godfrey was also a senior legal officer of Yukos Oil and a member of both the Management Committee and the Executive Committee of the Yukos Oil Board of Directors. JA-377, ¶ 2; JA-505, ¶ 52.  Mr. Godfrey did not hold any positions with Samaraneftegaz or its management company, Yukos EP.  JA-504-505, ¶¶ 49-52.

Mr. Godfrey claimed authority to sign the Addenda under a power of attorney (the "Power of Attorney") signed by Mr. Grekhov, a document with no reference to the Loan Agreements or Addenda.  JA-504, ¶¶ 46-48; JA-1319-1321. Moreover, while the Power of Attorney is dated July 26, 2005, JA-1319, it is undisputed that Mr. Grekhov did not sign the Power of Attorney until some unknown date after October 26, 2005, JA-1041, ¶ 55.

c) <u>Mr. Godfrey Signed The Addenda To Help Yukos Capital, Without Consideration Of Samaraneftegaz's Interests</u>

The date when Mr. Godfrey signed the Addenda is unknown. JA-505, ¶ 55. Yukos Capital's management company, TMF, signed the Addenda for Yukos Capital and applied its own corporate seal. JA-507, ¶ 66. Mr. Godfrey did not apply any seal for Samaraneftegaz. JA-507, ¶ 67. Instead, TMF forwarded the signed Addenda to yet another Yukos Oil-controlled entity, Yukos RM (not Yukos EP or Samaraneftegaz), with a request that the Yukos RM General Counsel "arrange for the stamp of" Samaraneftegaz to be applied, JA-507, ¶¶ 67-68, which he did, JA-508, ¶ 69.

In 2005, as now, Samaraneftegaz conducted its business in Russia and in the Russian language. JA-187. Samaraneftegaz had legal staff with knowledge of Russian law and routinely participated in proceedings in Russia. JA-506, ¶ 60. Samaraneftegaz did not employ legal staff with knowledge of New York law or with fluency in English, and it had no experience defending itself in the United States, in English, or under New York law. JA-506, ¶¶ 57-58. Thus, the proposed Addenda would impose greater burdens and expense on Samaraneftegaz. JA-506, ¶ 61.

Mr. Godfrey gave no consideration to these or any other interests of Samaraneftegaz when he signed the Addenda, instead considering only the interests of Yukos Oil and the "group" of Yukos companies. JA-506-507, ¶¶ 62-

12

63; JA-529, Tr. 51:3-6. Indeed, Mr. Godfrey testified that the Addenda's purpose was "to make sure that the money was repaid" to Yukos Capital. JA-534, Tr. 71:15-19. There were no negotiations or consultations with Samaraneftegaz regarding the Addenda's terms. JA-501, ¶ 40. Nor did Samaraneftegaz receive any consideration in exchange for the Addenda.

Samaraneftegaz first became aware of the Addenda when it received them, already signed and sealed, on December 2, 2005. JA-501, ¶ 40; JA-508, ¶ 74. It is doubtful even Yukos EP knew that Mr. Godfrey had signed the Addenda because on December 14, 2005, Yukos EP asked Samaraneftegaz to explain how the Addenda came to be executed. JA-501, ¶ 41; JA-837. The resulting investigation disclosed that the Addenda had not undergone any internal procedures typically required for authorization. JA-841. Demonstrating its ignorance, Samaraneftegaz responded that Mr. Grekhov had signed them, as incorrectly recited in the Addenda's preambles. JA-841.

Following this, Mr. Grekhov wrote to Yukos Capital and Mr. Godfrey, stating that the Addenda were "void and have no legal force," and that the "Powers of Attorney issued to Mr. David A. Godfrey on behalf of OAO 'Samaraneftegaz' and OAO 'Tomskneft' VNK in 2005 are now recalled." JA-867.

In response, Mr. Godfrey re-affirmed his alignment with Yukos Capital against Samaraneftegaz:

13

> Both Tomskneft and Samaraneftegas [sic] are in default under the loan agreements. Every opportunity has been given to them to pay the interest or come to a negotiated settlement, but to no avail. Regrettably, Yukos Capital S.a.r.l. has been left with no alternative but to commence suit against the appropriate parties in international fora.

JA-887.

### d) The Arbitration

On January 17, 2006, with Yukos Oil in control, Yukos Capital filed a demand for arbitration with the ICC, seeking payment under the Loan Agreements. JA-2111-2119. Mr. Godfrey engaged Fulbright & Jaworski to represent Yukos Capital and testified on Yukos Capital's behalf. JA-48-49; JA-499, ¶ 32; JA-509, ¶¶ 79-80; JA-2119.

Yukos EP – also under Yukos Oil's control – disputed the validity of the Addenda and challenged the ICC's jurisdiction to decide the dispute. JA-509, ¶ 81. Neither Yukos EP nor any authorized representative of Samaraneftegaz ever consented to the ICC tribunal's jurisdiction over Samaraneftegaz, and Samaraneftegaz did not participate in the arbitration. JA-510, ¶¶ 82-83.

The "request for arbitration" correctly identified Samaraneftegaz's headquarters in Samara as its address for purposes of arbitration notices and communications. JA-2112. No other address was ever designated for Samaraneftegaz during the arbitration. JA-1673, ¶ 4(d). Nonetheless, after preliminary communications regarding the commencement of the arbitration, JA-

14

1949-1950, ¶¶ 26-30, the ICC Secretariat and the tribunal sent almost all communications to Yukos EP instead of Samaraneftegaz, leaving Samaraneftegaz with no information about important steps in the proceeding. JA-1672, ¶ 4. Even after Samaraneftegaz's management agreement with Yukos EP was terminated in June 2006, the ICC and the tribunal sent over thirty communications to Yukos EP, none of which Samaraneftegaz received. JA-1673-1676, ¶ 4(f)-(g); JA-1695-1697.

During this period, the tribunal sent only one document to Samaraneftegaz's headquarters – draft terms of reference written in English and mailed on October 24, 2006. SPA-28; JA-2290. Yukos Capital knew the ICC and tribunal were sending notifications to the wrong entity but did nothing to correct the error.

As a result, Samaraneftegaz did not receive notice of such key matters as the appointment of arbitrators, the timetable for Samaraneftegaz to make submissions and for hearings, procedural orders, the results of the hearing, and the closure of the proceedings. JA-1672, ¶ 4; JA-1695-1697.

On August 15, 2007, the ICC tribunal issued the Award in favor of Yukos Capital for approximately 3.08 billion rubles plus interest. JA-68-69.

15

3.    Russian Court Proceedings

a)  Pre-Award Neft-Aktiv proceeding

On July 26, 2007, OOO Neft-Aktiv ("Neft-Aktiv") sued Yukos Capital and Samaraneftegaz before a court in Samara, Russia, seeking to have the Loan Agreements declared invalid.  JA-1670, ¶ 8; JA-1726-1751.  Neft-Aktiv was then Samaraneftegaz's sole shareholder, having acquired the company through the Yukos Oil bankruptcy auction.  JA-1670, ¶ 8; JA-1946, ¶ 5; JA-1947, ¶ 11.  After considering evidence submitted and arguments made by all parties, including Yukos Capital, JA-1677, ¶ 9, the Samara court held the Loan Agreements are void, JA-1678, ¶ 10.

The Samara court found that cash flows between Yukos Oil-controlled entities were part of Yukos Oil's scheme to evade payment of taxes, and that this scheme was effected by "siphoning … funds from oil producing entities," including Samaraneftegaz, and subsequently transferring the funds back to the oil producing entities through Yukos Capital, which was established specifically "for legalization (laundering) of money misappropriated through selling the oil stolen, among others, from OJSC Samaraneftegaz … and had no other sources [of funds]."  JA-1716-1718; JA-1721-1722.  Yukos Capital appealed that decision, and the Russian appellate court upheld it on July 20, 2012.  JA-1753-1775.  On Yukos

16

Capital's further appeal, the Supreme Arbitrazh Court of the Russian Federation also upheld the decision on July 8, 2013. JA-3395-3398.

### b) Post-Award Enforcement Proceeding

Shortly after filing the present action, Yukos Capital filed a similar action to enforce the Award in Russia. Yukos Capital lost that proceeding, with the Russian court concluding the Award was unenforceable under the New York Convention both because Samaraneftegaz had not received proper notice of important steps of the arbitration and because the Loan Agreements appeared to be part of Yukos Oil's illegal tax-evasion scheme. JA-1697; JA-1700.

Yukos Capital did not appeal this judgment. JA-1677, ¶ 7.

### 4.  District Court Proceedings And Orders Subject To Review

Yukos Capital filed a Petition to Confirm Arbitral Award on or about July 2, 2010. JA-22. On October 15, 2010, Samaraneftegaz moved for dismissal of the Petition for lack of personal jurisdiction or, in the alternative, on the basis of *forum non conveniens* or, in the further alternative, to stay the proceeding pending resolution of the parallel Russian enforcement action. JA-3, Item 11.

At a hearing on January 7, 2011, the District Court found the *forum non conveniens* factors in favor of Samaraneftegaz, and it stayed the proceeding pending the conclusion of the Russian enforcement proceeding. JA-4, Items 31,

35; SPA-1.  On February 22, 2011, the Samara court held that the Award is not enforceable under the New York Convention as discussed above.

After the time for appeal in Russia passed, and following further submissions by the parties, on May 13, 2011, the District Court denied Samaraneftegaz's motion to dismiss for *forum non conveniens* and ordered discovery on the Addenda's validity.  SPA-2.  This denial of the motion to dismiss is among the orders under review.[2]

Following discovery, the parties cross-moved for summary judgment on personal jurisdiction.  JA-9, Items 61, 69.  On July 24, 2012, the District Court denied Samaraneftegaz's motion and granted Yukos Capital's cross-motion, holding that the Addenda are valid and support personal jurisdiction over Samaraneftegaz.  SPA-5.  This is the second ruling under review.

On September 25, 2012, Samaraneftegaz moved for summary judgment to decline enforcement of the Award because Samaraneftegaz did not receive appropriate notice of key stages of the arbitration and because enforcement would be contrary to U.S. public policy.  JA-13, Item 105.  Yukos Capital cross-moved to enforce the Award.  JA-13, Item 109.

---

[2]  During the course of discovery, the District Court on July 5, 2011, ordered Samaraneftegaz to produce its Russian employees in Helsinki, Finland, for deposition.  JA-489-490.

The District Court denied Samaraneftegaz's motion for summary judgment, SPA-26, granted Yukos Capital's motion, SPA-26, and entered a final judgment on August 9, 2013, SPA-42. Samaraneftegaz filed a timely notice of appeal from the final judgment, as well as from the *forum non conveniens* and personal jurisdiction orders, on September 4, 2013. JA-3481.

On September 6, 2013, Yukos Capital moved the District Court to alter its final judgment to convert the ruble-denominated Award into dollars. JA-17, Item 132. The District Court granted that motion without opinion or explanation and entered a Supplemental Final Judgment on October 2, 2013. SPA-43. Samaraneftegaz filed an amended notice of appeal to encompass the Supplemental Final Judgment and underlying issues on October 12, 2013. JA-3508.[3]

## SUMMARY OF ARGUMENT

This action never belonged in a federal court in New York. The District Court should have dismissed the case on the basis of either *forum non*

---

[3] After entry of the Supplemental Final Judgment, on October 24, 2013, Yukos Capital filed a Motion for Turnover, asking the District Court to compel Samaraneftegaz to remove assets from Russia to satisfy the judgment and to enjoin fraudulent conveyances to corporate affiliates until the judgment is paid. JA-19, Item 148. Samaraneftegaz opposed that motion because using Russian assets as requested would expose Samaraneftegaz's employees to criminal liability in Russia and because the motion was contrary to principles of comity and the framework of the New York Convention. The District Court granted the motion on January 9, 2014, without addressing Samaraneftegaz's arguments, JA-20, Item 161, and entered a corresponding order on January 23, 2014, JA-21, Item 167.

*conveniens* or lack of personal jurisdiction before ever reaching Samaraneftegaz's defenses to enforcement under the New York Convention.

The District Court correctly found that all of the relevant factors weigh in favor of dismissal based on *forum non conveniens*: Yukos Capital's choice of forum is not entitled to deference, Russia is an adequate forum, and the balance of interests favors Russia as the appropriate forum. Indeed, the central importance of Russian law here speaks strongly for dismissal. As post-judgment proceedings have highlighted, the case also implicates important Russian, not U.S., interests. The District Court abused its discretion because it should have dismissed the case, not retain it, much less without explanation.

Alternatively, the District Court should have dismissed for lack of personal jurisdiction. Samaraneftegaz has no assets in or connections with New York or the United States. The only conceivable basis for personal jurisdiction is the notion that Samaraneftegaz consented to litigate here when the Addenda were signed. But Samaraneftegaz did not agree to the Addenda. Moreover, the Addenda are void as a matter of Russian law. First, the Power of Attorney on which the Addenda depend violates the black letter of the Russian Civil Code, which prescribes that a power of attorney that does not bear its date of execution, like this one, is void. Second, even if the Power of Attorney was valid, Mr. Godfrey's reliance on it to execute the Addenda contrary to Samaraneftegaz's

20

interests constituted an abuse of right. Third, Mr. Godfrey represented both sides concurrently – Yukos Capital's owners and Samaraneftegaz – in direct conflict of interest when he signed. Finally, the Addenda did not satisfy the Loan Agreements' requirements for valid amendments. Each of these factors is sufficient to render the Addenda void under Russian law, which eliminates the basis for personal jurisdiction. In ruling to the contrary, the District Court ignored or misapplied Russian law.

Even if the Court has personal jurisdiction, the Award is unenforceable under the New York Convention for two independent reasons. The factual predicate for each of these grounds was established conclusively as between the parties in the Russian enforcement action and the Neft-Aktiv litigation and should not have been the subject of further litigation in the District Court. First, Samaraneftegaz was not given notice of key stages of the arbitration. As a result, it did not have the opportunity to present a defense, and enforcement of the resulting Award should be declined under Article V(1)(b) of the New York Convention. Second, enforcement of the Award should be denied under Article V(2)(b) because it would give effect to the criminal tax-evasion scheme of which the Loan Agreements were a part, contrary to U.S. public policy.

For all these reasons, the judgment should be reversed and the Petition dismissed. But even if the Award were properly recognized, the District Court

21

erred further by converting – without explanation and post-judgment – the ruble-denominated Award into dollars. No conversion was warranted, and the error was worsened by the application of an improper exchange rate that inflated the judgment by over 25%. It should be reversed.

**ARGUMENT**

**POINT ONE**

**THE DISTRICT COURT SHOULD HAVE DISMISSED THIS CASE ON THE BASIS OF *FORUM NON CONVENIENS***

This case should have been dismissed based on *forum non conveniens*. Review of this issue is for abuse of discretion, <u>Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru</u>, 665 F.3d 384, 389 (2d Cir. 2011), which occurs when a district court fails to consider – or, as here, unreasonably balances – all relevant factors, <u>Gross v. British Broad. Corp.</u>, 386 F.3d 224, 230 (2d Cir. 2004).

Dismissal for *forum non conveniens* turns on three factors: (1) the deference owed the petitioner's choice of forum; (2) the adequacy of the alternative forum; and (3) the balance of private and public factors. <u>In re Arb. between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine</u>, 311 F.3d 488, 498-500 (2d Cir. 2002). Here, the District Court correctly found each factor to favor dismissal but inexplicably denied the motion.

First, the District Court found that "Yukos Capital is not entitled to deference for its choice of the New York forum." JA-417, Tr. 31:7-8. That

22

finding was correct; a foreign petitioner's choice to litigate here "deserves less deference" than that of a domestic petitioner.  Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255-56 (1981); see also Monegasque, 311 F.3d at 498.

Second, the District Court found that "the Russian forum is undeniably an adequate alternative forum – indeed, there is already a pending action there, and Russia is a signatory to the New York [C]onvention which requires recognition of arbitration awards like the one at issue here, subject to certain defenses."  JA-417, Tr. 31:12-16.  That finding was likewise correct. Russia is an adequate forum because Samaraneftegaz is "amenable to service of process there, and [Russia] permits litigation of the subject matter of the dispute." Figueiredo, 665 F.3d at 390 (quoting Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 75 (2d Cir. 2003)).  Indeed, Russia is a superior forum because Samaraneftegaz has its records, employees, and assets there – not here.  JA-199, ¶ 2; JA-187.  See Figueiredo at 391.

Third, the District Court found that "the balance of private and public interests clearly favor[s] the Russian forum as most of the relevant witnesses are located in Russia, many of the documents are in Russian, and because Russian law will be applied to the question of the addenda's validity[.]"  JA-417, Tr. 31:17-21. This finding was also correct.

23

As to private interests, retaining this case in New York has caused needless burden, expenditure, and prejudice to Samaraneftegaz. Even though, as the District Court noted, "most of the relevant witnesses are located in Russia," Yukos Capital's counsel was unwilling to travel to Russia for depositions. This led to the District Court's exceptional order compelling Samaraneftegaz to force its employees to travel from Russia to a third country where no party has any presence – Finland – to be deposed. JA-490. Testimony from unwilling Russian witnesses, such as Mr. Grekhov (whose veracity Yukos Capital challenged), could not be obtained at all.

In addition, the parties were required to provide expert evidence to establish Russian law, a step that would not have been necessary before Russian courts. In sum, as in Monegasque, "the entire proceeding would [have] be[en] more easy, expeditious and inexpensive if conducted in [the foreign forum]." 311 F.3d at 500 (internal quotations omitted).

As to public interests, questions of Russian law permeate this case. Here, as in Overseas Media, "because the case presents issues of Russian law, there is a Russian interest in having the matter adjudicated in a Russian forum." Overseas Media, Inc. v. Skvortsov, 277 F. App'x 92, 97 (2d Cir. 2008); see also Monegasque, 311 F.3d at 500 ("[foreign] courts are better suited than United States courts for the resolution of [foreign] legal questions"). For instance, Russian law

24

governs the validity of the Addenda and the Power of Attorney, on which personal jurisdiction over Samaraneftegaz depends.[4]  As explained below, the District Court misapplied Russian law in that analysis.  A Russian court would have had no such difficulties.

The public interest factor further points to Russia because the question whether the Loan Agreements were shams and part of a fraudulent tax-evasion scheme, see JA-171, is bound up with protecting the public fisc against fraud and defeating money laundering.  As in Figueiredo, this public factor "tips the FNC balance decisively against the exercise of jurisdiction in the United States."  665 F.3d at 392.

The District Court's refusal to dismiss has generated exactly the type of collision of public interests that the *forum non conveniens* doctrine should prevent.  The District Court's recent turnover order forces Samaraneftegaz to satisfy the Award by transferring assets from the only place it has any:  Russia.[5]  But that order is incompatible with the Russian courts' binding determinations that the Loan Agreements were part of an illegal scheme and that the Award is not

---

[4]     The foundational dispute in this case is the validity of the Addenda.  New York has no greater interest than Russia in determining the validity under Russian law of a purported agreement between Russian and Russian-controlled parties to change their arbitration agreement and seat of arbitration.

[5]     This Court held in Figueiredo that even the presence of assets in the United States does not justify retention of an arbitral enforcement action when the *forum non conveniens* factors favor dismissal.  665 F.3d at 390, 393.  Dismissal is all the more appropriate when there are no assets here.

25

enforceable in Russia.  Using Russian assets in contravention of those Russian court decisions would expose Samaraneftegaz's employees to the risk of liability in Russia.  Fourth Muranov Decl. ¶ 4, No. 1:10-cv-06147-PAC (S.D.N.Y. Nov. 19, 2013), ECF No. 156.  The recent turnover order implicates questions of Russian criminal law, civil law, and foreign-exchange regulations, id., all of which the District Court should have left to the Russian courts but did not.  See Figueiredo, 665 F.3d at 393.

The District Court's abuse of its discretion was heightened by its failure to explain the basis for retaining the case in the face of the many factors weighing in favor of dismissal.  In lieu of an explanation, it offered only that "this Court is an adequate forum for this action."  SPA-3.  But this Court has instructed that when the factors point to a foreign forum, "the petition should be dismissed on the ground of FNC" and not retained based on merely a "colloquial understanding of the word 'convenient.'"  Figueiredo, 665 F.3d at 393 & n.10. [6]  By improperly retaining the case, the District Court not only imposed unreasonable burdens on Samaraneftegaz, it set itself as arbiter of complicated and important Russian law issues, with the result that it misapplied Russian law and reached conclusions

---

[6]     Reversal is necessary even though the District Court already forced Samaraneftegaz to litigate in an inconvenient forum, both to ensure the efficacy of the *forum non conveniens* defense and to address the prejudice Samaraneftegaz has suffered.  See Blanco v. Banco Indus. de Venezuela, S.A., 997 F.2d 974, 977-78, 983 (2d Cir. 1993) (affirming dismissal after nine years of litigation).

incompatible with decisions of the Russian courts. This Court should reverse the District Court's decision and order the Petition dismissed. See Figueiredo, 665 F.3d at 393.[7]

## POINT TWO

## THE DISTRICT COURT LACKED PERSONAL JURISDICTION

The only basis for the District Court's assertion of personal jurisdiction was its conclusion that Samaraneftegaz consented to litigation here when the Addenda were executed. That was wrong. Samaraneftegaz did not consent to the Addenda, much less to proceeding in New York. The person who purported to act for Samaraneftegaz did so in violation of Russian law, and his acts have no legal effect. Because the Addenda are void, this Court should reverse and dismiss the Petition for lack of personal jurisdiction.

This Court reviews the District Court's summary judgment orders de novo. Spiegel v. Schulmann, 604 F.3d 72, 76-77 (2d Cir. 2010) (personal jurisdiction on summary judgment); Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003). Personal jurisdiction in this case turns on issues of Russian law, which are legal issues, Fed. R. Civ. P. 44.1, subject to de novo

---

[7]     Where, as here, the jurisdictional and substantive challenges to the Award's enforcement are closely intertwined and raise complex questions of Russian law regarding Russian evidence of events in Russia, dismissal on the basis of *forum non conveniens* first is appropriate, without taking up "any other threshold objection." Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 425 (2007).

review.  Carlisle Ventures, Inc. v. Banco Español de Crédito, S.A., 176 F.3d 601, 604 (2d Cir. 1999).

The District Court erred in its failure to recognize the Addenda as void *ab initio* on the following four independent grounds.

## A.     The Power Of Attorney Is Void Under Russian Law

The Power of Attorney is a Russian legal instrument whose validity is determined under Russian law.  The District Court improperly disregarded black letter Russian law, specifically Article 186 of the Russian Civil Code, which states that "[a] power [of attorney] that does not indicate the date of its execution is void."  SPA-11.  Under paragraph 2 of Article 186(1), a power of attorney is void *ab initio* if it does not bear the date when it was signed and all relevant corporate formalities were met.  JA-975, ¶¶ 9-10; JA-917.  Even Yukos Capital's experts admit this requirement.  JA-1116, ¶ 36; JA-1063, ¶ 14.

Here, even though the exact date of execution is unknown, see, e.g., SPA-8, there is no dispute that it was much later than the July 26, 2005 date stated on the Power of Attorney.  JA-505, ¶ 54.  Thus, the Power of Attorney does not bear its execution date, fails the statutory requirement of Article 186, and is void.

The District Court nevertheless held the Power of Attorney valid.  It concluded that "Russian courts do not hold that a discrepancy between the execution date listed on a power of attorney, and the date formalize [sic], voids a

power of attorney," SPA-13, based on a single decision. In that case, a power of attorney bore both the date applied by its signatory (November 25, 2005) and its date of notarization (November 28, 2005). JA-917. Consistent with Samaraneftegaz's interpretation of the phrase "date of execution," the Federal Arbitrazh Court of the Far East District upheld a lower court's conclusion "that the power of attorney was executed on 28 November 2005 (the moment when the principal officially expressed its will to execute the relevant transaction and the date of notarization)." JA-917. That is, the court determined that of the two dates on the face of the document, the relevant one under Article 186 was the date when all corporate formalities were satisfied, and the power of attorney was therefore effective only from that fixed date stated on the document. JA-917; see also JA-1516-1517, ¶ 21; SPA-13.

The District Court's reliance on this decision to disregard Article 186 and hold the back-dated Power of Attorney valid was wrong for several reasons. First, as the District Court noted, the parties together "cited only one Russian case" that related to the efficacy of the date stated on the face of a power of attorney. SPA-13. This single decision cannot, as a matter of Russian law, override the plain language of the Civil Code. In Russia, a civil law jurisdiction, the plain language of the Civil Code governs. Indeed, as noted by Yukos Capital's expert, Mr. Gladyshev, the Russian legal hierarchy establishes the Russian Civil Code as

29

supreme even over conflicting presidential decrees and federal regulations.  JA-1112-1113, ¶¶ 22-24.

Second, the case does not support the District Court's conclusion.  There, the only question for the court was which of two known, accurate, and undisputed dates on the document was the "date of execution" – that is, whether "execution" took place when the principal dated the document, or instead when the document was notarized.  It did not hold that affixing the actual "date of execution" was unnecessary or that "an inaccurate execution date does not void a power of attorney."  SPA-13.  Because in that case notarization was required, the court concluded the "date of execution" was the date of notarization.  In this case, however, the only thing that is known is that the July 26 date on the Power of Attorney has nothing to do with its execution.  As the District Court acknowledged, July 26 "was not the date that Grekhov signed or formalized it [sic] the power of attorney," SPA-13, the date of signature is unknown, and neither signing, stamping, nor anything else that might be argued to be an expression of Grekhov's will occurred until more than three months later – "[i]n or around November 2005."  SPA-8; see also JA-505, ¶ 54; JA-1041, ¶ 54; JA-1124, ¶ 71.  The District Court's apparent conclusion that it suffices to have any date on the Power of Attorney effectively nullifies the Civil Code's requirement of the

"execution" date. This was not the holding of the case on which the Court relied, and it is not Russian law.

Nor could the District Court's holding be supported by Yukos Capital's Russian law arguments, which the court did not adopt. First, Yukos Capital argued that Russian law permits "retroactive" powers of attorney, JA-1118-1120, ¶¶ 44-50; JA-1063-1064, ¶ 17, but this was not a retroactive power of attorney – a proper, currently dated instrument that adopts and ratifies prior conduct – but a false document that was neither currently effective nor a ratification of past conduct, JA-1517-1518, ¶¶ 22-24, a fact which the District Court acknowledged, SPA-13 (noting that that "the principal did not have the ability to . . . retroactively date the power of attorney"). Yukos Capital's second argument, that "date of execution" means date of "effectiveness," JA-1120-1121, ¶ 53, simply attempted impermissibly to rewrite the statute and again confused the type of retroactive instrument Russian law allows with a misdated and ineffective one, JA-1515-1517, ¶¶ 17-21. Third, Yukos Capital's argument that the claim was time-barred, JA-1124-1125, ¶¶ 70-75; JA-1061-1062, ¶¶ 6-10, is wrong. The fact that an instrument is void, and the consequences flowing from that fact, may be raised defensively at any time. JA-1512-1515, ¶¶ 10-16. Finally, the presence of Samaraneftegaz's seal on the Power of Attorney, JA-1125-1126, ¶¶ 76-79, has no

31

significance for the requirement that it also bear the date of execution, JA-1520-1522, ¶¶ 32-37.[8]

Because the Power of Attorney was void, any acts under it, such as the execution of the Addenda, are equally void. JA-976, ¶ 13; JA-1522, ¶ 38. The District Court's contrary holding is not supported by Russian law and should be reversed.

**B.** **Mr. Godfrey's Execution Of The Addenda Constituted An Abuse Of Right Rendering The Addenda Void**

Even if the Power of Attorney was valid, Mr. Godfrey's execution of the Addenda, contrary to Samaraneftegaz's interests, was an abuse of right. Under Article 10(1) of the Russian Civil Code, "[a]ctions by citizens and legal persons carried out solely with the intention of inflicting harm upon another person, <u>as well as an abuse of right in any other form</u>, shall not be permitted." JA-977, ¶ 15 (quoting Article 10(1)) (emphasis added). Under Article 168 of the Russian Civil Code, illegal transactions are void *ab initio*. JA-977, ¶ 14.[9]

---

[8]    Yukos Capital's final argument, that "the relevant rule requiring a date of execution is not one of the requirements as to form," JA-1062, ¶ 13, is contradicted by Yukos Capital's other expert, who conceded that the execution date is one of "the mandatory requirements of Russian law," JA-1117, ¶ 39, a position confirmed by Samaraneftegaz's expert, JA-1519, ¶¶ 28-29.

[9]    The District Court repeatedly, and correctly, held that the validity of the Addenda must be determined under Russian law, as they purported to modify an agreement governed by Russian law that specified that it could be amended only in accordance with its terms. SPA-10-11; <u>see also</u> JA-404, Tr. 18:17-23; JA-407, Tr. 31:20-22.

Article 10(1) is broadly worded and does not limit the scope of what may constitute an abuse of right. Russian courts have applied this provision to invalidate acts carried out with the purpose or principal effect of inflicting harm on or infringing the lawful interests of another person. JA-977-978, ¶¶ 17-18 & nn. 12-14. Such circumstances include causing a subsidiary to harm itself to benefit the parent. JA-979, ¶ 20. Indeed, Russian courts have found an abuse of right in comparable cases involving Yukos Oil and its subsidiaries, including Samaraneftegaz, where Yukos Oil caused those subsidiaries to act against their own interests to benefit Yukos Oil (in those instances, guaranteeing Yukos Oil's obligations under a foreign loan[10]). JA-979, ¶ 20.

Samaraneftegaz was a separate legal entity from Yukos Oil and, under Russian law, was entitled to exercise its own interests and will. JA-979-980, ¶ 22. In executing the Addenda, Mr. Godfrey ignored Samaraneftegaz's interests and will and acted instead for Yukos Oil and Yukos Capital. He testified that he signed the Addenda without considering Samaraneftegaz's interests at all. JA-549, Tr. 132:5-14; JA-568, Tr. 207:12-208:2. It was not Samaraneftegaz that decided to

---

[10]    A panel of eminent arbitrators in London independently confirmed that Yukos Oil's treatment of its subsidiaries was an abuse of right and refused to enforce a guarantee that Yukos Oil had imposed on one of Samaraneftegaz's sister companies for the sole purpose of benefitting Yukos Oil and another Yukos Oil affiliate. See Berger Decl., Ex. AA, ¶ 494, 1:10-cv-06147-PAC (S.D.N.Y. Nov. 8, 2010), ECF No. 28. See also id., ¶¶ 79, 84 (Yukos Oil forced Samaraneftegaz to give an identical guarantee).

33

amend the Loan Agreements, but instead Yukos Oil's management committee (including Mr. Godfrey).  SPA-7.

        The Addenda were, in fact, affirmatively harmful to Samaraneftegaz. They were executed after Yukos Capital (and Yukos Oil) had concluded that Samaraneftegaz was in breach and were created explicitly to help ensure a "favourable result" for Yukos Capital (*i.e.*, a harmful result for Samaraneftegaz) in subsequent arbitration.  JA-707.  They did so by revoking Samaraneftegaz's entitlement to arbitration in Russia, in Russian, and under familiar Russian law and instead selecting dispute resolution in a distant country where Samaraneftegaz did no business, under laws with which it was not familiar, and in a language its employees did not understand.  JA-506, ¶¶ 57-61.  Yukos Capital conceded that, rather than constituting mutually beneficial contract terms, the Addenda reflected "conditions imposed" for its benefit as "lender."  Yukos Capital's Mem. in Supp. of Cross-Mot. for Summ. J. at 24, No. 1:10-cv-06147-PAC (S.D.N.Y. Feb. 17, 2012), ECF No. 70.

        Causing Samaraneftegaz to enter into the Addenda for the benefit of Yukos Capital and Yukos Oil and its beneficial owners and management, and contrary to the interests of Samaraneftegaz, was an abuse of right under Article 10(1).  The Addenda are therefore void *ab initio*.

The District Court's contrary conclusion relied on facts not relevant to the analysis of an abuse of right and disregarded the harm to Samaraneftegaz. First, the Court opined that Mr. Grekhov "would agree to change the arbitration provision to 'US/UK' law and 'to arbitration abroad,' absent 'criminal risks,'" and signed the Power of Attorney for that purpose. SPA-15. Second, the Court observed that Samaraneftegaz has not returned to Yukos Capital the amounts transferred under the Loan Agreements. SPA-16. Finally, the Court noted that "Samaraneftegaz has not cited any Russian statute from which the Court can conclude that a New York forum would be inappropriate for arbitration between these two companies. To the contrary, Russian law recognizes international arbitral fora." SPA-16.

None of these grounds speak to whether there was an abuse of right in binding Samaraneftegaz to the Addenda. Whether Mr. Grekhov was willing to sign an amendment at the instruction of Yukos Oil is disputed but irrelevant; such conduct would have equally violated Russian law. JA-1528-1529, ¶ 51, n.71. If the District Court's analysis were correct, the mere fact that an abusive transaction was performed with required formality would render it non-abusive. That is not Russian law.

Whether Samaraneftegaz returned any money to Yukos Capital also has no bearing on abuse of right. JA-1527-1528, ¶ 48, n.64. If the District Court's

35

reasoning were correct, Samaraneftegaz would have to abandon any defenses to Yukos Capital's claims before it could invoke the abusive nature of the Addenda. The Russian courts have rejected that position. JA-1721-1723. At best, the Court's concern would implicate the remedy for the abuse, but the Russian courts have held that because the funds transferred in the form of loans were actually Samaraneftegaz's own funds, Samaraneftegaz is not required to return them.

The District Court's conclusion is incompatible with one of the "particularly illuminating" Russian cases that it cited. SPA-15; see also JA-2517. In that case, a municipality sought to collect a debt from a local music school and to evict the school. As noted by the District Court, "[t]he Russian Court ordered the children's school to pay its debt, but found that it was an abuse of power [under Article 10] for the municipality to then terminate the lease and evict the school." SPA-15. The District Court appears to have relied on that case to conclude that seeking repayment cannot be an abuse of right and, therefore, there was no abuse of right here. But that conclusion is wrong and misses the point. The issue was not whether Yukos Capital could claim a breach or pursue arbitration – the Loan Agreements provided for arbitration of disputes, but under Russian governing law, in Russian, before the ICAC in Moscow. Instead, the issue was whether Mr. Godfrey could use a power of attorney to sign an agreement for Samaraneftegaz when its purpose and effect were to harm Samaraneftegaz's interests and benefit its

36

counterparty.  The teaching of the case the District Court cited is that such an exercise of a right – the attempted eviction in that case – is contrary to law.

Finally, Russian law's recognition of "international arbitral fora," SPA-16, is irrelevant.  As Dr. Lomakin noted, "[t]his case is not about an abstract situation where two independent companies freely decided to submit their dispute to an international arbitral tribunal and chose foreign law to apply."  JA-1524, ¶ 42.  Rather, an existing agreement to arbitrate in Russia under Russian law was manipulated to aid Yukos Capital without regard for the resulting disadvantage to Samaraneftegaz.  The implication of the District Court's holding is that only transactions specifically prohibited by Russian law can constitute an abuse of right, but Article 10(1) of the Civil Code is not so narrow.  The case study on which the District Court relied proves the point; evicting a tenant is not prohibited by Russian law but was proscribed as an abuse of right on the facts of that case.

Because the execution of the Addenda constituted an abuse of right, they are void, and the judgment should be reversed.

## C.    Mr. Godfrey Breached His Fiduciary Duty To Samaraneftegaz

Even if the Power of Attorney were valid, the District Court also erred in finding that Mr. Godfrey did not breach his fiduciary duty to Samaraneftegaz by signing the Addenda.  This breach encompasses two distinct issues.  First, Articles 182(2)-(3) and 183(1) of the Russian Civil Code require a representative to act in

37

good faith and solely in the interests of the represented party (here, Samaraneftegaz). JA-983, ¶ 31. But as discussed supra, the Addenda were contrary to Samaraneftegaz's interests and were meant to serve the interests of Yukos Capital and the "group." Mr. Godfrey therefore violated his fiduciary duty to Samaraneftegaz by signing them. To get around this clear violation, the District Court relied on Article 105 of the Russian Civil Code, under which "a parent corporation has the authority under Russian law to direct a subsidiary's actions." SPA-13. Based on Article 105, the Court asserted Samaraneftegaz had an "interest in complying with Yukos Oil's directive to execute the Addenda," from which it concluded that "Godfrey's execution of the Addenda was, at least in one important sense, in Samaraneftegaz's interest," and therefore no breach of fiduciary duty. SPA-13.

The District Court's interpretation of Russian law is flawed and unsupported by either side's submissions. Under Russian law, a legal entity is entitled to its own interests and will, which it may express in opposition to those of its shareholders or parent. JA-979, ¶ 22. The District Court's view would eliminate those rights. Moreover, a parent company could not rely on Article 105 to cause a subsidiary to act against its own interests, JA-1528-1531, ¶¶ 49-56, and neither of Yukos Capital's experts suggested that Article 105 is relevant to a

breach of fiduciary duty.[11]  The District Court left the bounds of Russian law in relying on that Article to disregard this clear breach of Mr. Godfrey's fiduciary duty.

Second, Article 182(3) of the Civil Code prohibits acts under a power of attorney when there is a conflict of interest between the represented party and the other party to the transaction.  JA-984-986, ¶¶ 34-38.  At the time he signed the Addenda, Mr. Godfrey was not only a member of Yukos Oil's management committee and the executive committee of its board of directors, he was also a board member of the Stichting, which was owned by Yukos Finance.  He was also then or shortly thereafter a director of both Yukos Finance and Yukos International (which owned Yukos Capital).  JA-493-494, 504, ¶¶ 8-10, 49-51.  That is, he held a position in every entity in the chain of ownership of Yukos Capital, and necessarily acted in their interests, when he entered this transaction with Yukos Capital, purportedly representing Samaraneftegaz.  The conflict of interest was clear, but Mr. Godfrey failed to cure it.  That failure was a further and independent breach of his fiduciary duty to Samaraneftegaz, and the District Court's failure to recognize that breach was a further reversible error.

The District Court also wrongly concluded there was no breach of fiduciary duty because "Samaraneftegaz has not shown that Godfrey had the

---

[11]    Mr. Holiner did not address Article 105 at all, and Mr. Gladyshev did so only in the context of his analysis of the separate issue of abuse of right.

39

authority, by virtue of his positions in the Yukos Oil organization, to sign the Addenda on behalf of Yukos Capital." SPA-18. But whether Mr. Godfrey had authority to execute the Addenda for Yukos Capital is not the issue.

Under the first sentence of Article 182(3),[12] the issue is whether Mr. Godfrey had obligations to act in the interests of the entities controlling Yukos Capital (he did, through his positions with those entities), JA-1535, ¶ 70, at the same time he was bound to act in Samaraneftegaz's interest (he was, because of the Power of Attorney). The District Court failed to address this question, opining only that "Godfrey's indirect relationship to Yukos Capital is much more attenuated" than the relationships at issue in the cases presented by Mr. Gladyshev – those not applicable to the provision at issue here but instead interpreting the second sentence of Article 182(3) – and finding that Samaraneftegaz's arguments were therefore "without merit." SPA-18. Because the District Court failed to apply Russian law, its holding must be overturned.

**D.  The Addenda Did Not Satisfy The Loan Agreements' Formal Requirements For Amendment**

Finally, the District Court erred in ignoring the Loan Agreements' binding, formal requirements for effective amendments. Those requirements are in

_____

[12]  Article 182(3) reads: "A representative cannot perform transactions in the name of the person represented in relation to himself personally. He cannot enter into transactions with another person whom he at the same time represents, except for cases of commercial representation." JA-984, ¶ 34.

40

the Agreements' Clause 6.2, which differs between the Russian and English versions respecting how an amendment must be signed and sealed as part of an effective execution.  The District Court did not hold that <u>either</u> version's requirements were met.  Instead, it effectively held that the sealing requirements were irrelevant.

Under the English version, Samaraneftegaz's seal could only properly be applied by a "duly authorized representative[]."  JA-496, ¶ 19.[13]  There is no record of any authorization to apply Samaraneftegaz's seal to the Addenda, and the District Court did not find any such authorization.  SPA-19-21.  Instead, the District Court concluded that because Clause 6.2 "adds another requirement to the agreement—i.e., that only an authorized employee of the duly authorized representative of the contracting party has the authority to affix the seal," it "contradicts Yukos EP's normal practice," and so no such authorization was actually required.  <u>Id</u>.[14]  That was a mistake under Russian law.

---

[13]    There is no doubt that the Russian version's requirement that the signing representative apply its own seal was not met for Samaraneftegaz.  Mr. Godfrey did not apply a personal seal or the seal of Yukos EP by whose authority he purported to act as representative, and the District Court did not hold otherwise. SPA-20.

[14]    The District Court based its conclusion on testimony about the sealing of the Power of Attorney, not the Addenda.  SPA-20-21.  The Power of Attorney was not an amendment of the Loan Agreements, so the "normal practice" used in sealing that document – or others like it – has no bearing on whether the Addenda met the different requirement of Clause 6.2.

With respect, the District Court's deference to "normal practice" turns Russian law on its head. Paragraph 3 of Article 160(1) of the Russian Civil Code explicitly empowers parties to impose requirements beyond "normal practice" to enter a binding contract, such as those in Clause 6.2, and such provisions have the effect of law. JA-989, ¶ 50. Rather than being a "hypertechnical" argument, as the District Court criticized, Samaraneftegaz's insistence on compliance with Clause 6.2's requirements is based on the parties' agreement to make amendment of the Loan Agreements difficult, as Russian law allows them to do. The disregard Yukos Oil and Mr. Godfrey showed for those requirements, just like their disregard for Samaraneftegaz's rights and interests more generally, is emblematic of their high-handed approach and should be rejected. Indeed, the ability to adopt and then insist upon such formal requirements for amending a contract as in Clause 6.2 is a check against such conduct and should be enforced by declaring the Addenda void and dismissing for lack of personal jurisdiction.

## POINT THREE

## THE AWARD SHOULD NOT BE ENFORCED BASED ON ARTICLES V(1)(B) AND V(2)(B) OF THE NEW YORK CONVENTION

The Award is not enforceable for two independent grounds under Article V of the New York Convention. First, it is unenforceable because the arbitration was tainted by the failure to give Samaraneftegaz adequate notice of

key stages of the proceeding.  Second, enforcing the Award would give effect to a criminal tax-evasion scheme and be contrary to public policy.

This Court reviews the District Court's summary judgment orders *de novo*.  Bank of N.Y. v. First Millenium, Inc., 607 F.3d 905, 919 (2d Cir. 2010) (issue estoppel); Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003); Diorinou v. Mezitis, 237 F.3d 133, 138-40 (2d Cir. 2001) (deference to foreign tribunal's findings).  Defenses under the New York Convention are legal issues subject to *de novo* review.  VRG Linhas Aereas S.A. v. MatlinPatterson Global Opportunities Partners II, L.P., 717 F.3d 322, 325 (2d Cir. 2012).

## A.     The District Court Should Have Applied Issue Estoppel To Facts Found In The Russian Proceedings

As a threshold matter, the District Court erred by failing to give collateral estoppel effect to the findings of the Russian courts regarding the notice that Samaraneftegaz received during the arbitration and the fact that the Loan Agreements were intertwined in Yukos Oil's illegal tax-evasion scheme. Collateral estoppel bars a party from re-litigating an issue where:  "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits."  Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 400 (2d Cir. 2011) (internal quotation marks omitted); see also

<u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 326 n.5 (1979). Estoppel may arise from foreign judgments. <u>See</u> Restatement (Third) of Foreign Relations Law of the United States, § 481 cmt. c (1987). All of the prerequisites for collateral estoppel on facts established in the Russian enforcement and Neft-Aktiv proceedings are met here.

First, the facts in question are identical. Yukos Capital's Russian enforcement action involved the exact same Award and arbitration proceeding. The Neft-Aktiv proceeding involved the exact same Loan Agreements.[15]

Second, the issues in question – lack of notice to Samaraneftegaz and the role of the Loan Agreements in Yukos Oil's tax-evasion scheme – were actually litigated before the Russian courts. The decisions in each case describe in detail the evidence and facts considered and determined. JA-1695-1699; JA-1716-1718; JA-1720-1723.

Third, Yukos Capital had a full and fair opportunity to litigate the issues. It was able to present evidence and argument in both proceedings. Indeed,

---

[15]     The District Court's accusation that the Neft-Aktiv proceeding was initiated to circumvent the arbitration, SPA-38, is unfounded and unsupported. Neft-Aktiv, which is not a party to the Loan Agreements or Addenda, lawfully commenced that proceeding against both Yukos Capital and Samaraneftegaz shortly after acquiring Samaraneftegaz and before the tribunal rendered the Award. Yukos Capital's active participation in that proceeding (including multiple appeals) and its receipt of full due process rights easily distinguishes <u>Telenor Mobile Commc'ns AS v. Storm LLC</u>, 584 F.3d 396, 402 (2d Cir. 2009), where the claimant was not even informed of the litigation.

it commenced the enforcement action, and it pursued the Neft-Aktiv case through all levels of appeal.

Finally, resolution of these issues was necessary to the Russian courts' judgments.  In particular, in the enforcement action, the court made specific findings about the failure to notify Samaraneftegaz of various critical steps in the arbitration.  JA-1695-1697.  Those findings grounded its decision to deny enforcement of the Award under Article V(1)(b) of the New York Convention.  In that same proceeding, the court made factual findings about the role that Yukos Capital and the Loan Agreements played in the Yukos Oil tax-evasion scheme, which grounded its decision to deny enforcement under Article V(2)(b) of the New York Convention.  JA-1699-1700.  Similarly, in the Neft-Aktiv proceeding, the Russian court made factual findings that the Loan Agreements were part of an "unlawful" scheme of financing in which "the relevant funds were taken away through transfer prices and only then repaid in the form of loans advanced to finance the activities of various entities."  JA-1716.  The court also observed that Yukos Capital's goal was "legalization (laundering) of money misappropriated through selling the oil stolen, among others, from OJSC Samaraneftergaz [sic] in 2001-2003."  JA-1717.  Those findings were part of the court's final decision to declare the Loan Agreements void under Russian law.

Both judgments are final. Yukos Capital chose not to appeal the judgment in the Russian enforcement action, JA-2496, ¶ 7, and it exhausted its appeals in the Neft-Aktiv proceeding through Russia's highest commercial court, JA-3394-3398.

In these circumstances, it was error for the District Court to allow Yukos Capital to relitigate the Russian courts' factual findings, which should be taken as final and binding for purposes of this appeal.

**B.**      **The Award Is Not Enforceable Because Samaraneftegaz Did Not Receive Adequate Notice Of Key Steps Of The Arbitration Proceeding**

The scant notice that Samaraneftegaz received of the course of the arbitration proceedings was insufficient as a matter of law. Adequacy of notice under the New York Convention is evaluated according to "the forum state's standards of due process." Iran Aircraft Indus. v. Avco Corp., 980 F.2d 141, 145 (2d Cir. 1992) (quoting Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (RAKTA), 508 F.2d 969, 975-76 (2d Cir. 1974)). In the United States, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).

The District Court was wrong to conclude that this standard was met simply because Samaraneftegaz was aware of the "existence" of the arbitration and

that it was "proceeding." SPA-33-35. Due process under the Convention includes

receipt of notice of each significant stage of the proceedings so that the party has

meaningful knowledge of when, where, and how to present its case. See New

York Convention Art. V(1)(b); Guang Dong Light Headgear Factory Co. v. ACI

Int'l, Inc., No. 03-4165-JAR, 2005 WL 1118130, at *8-9 (D. Kan. May 10, 2005)

(denying summary judgment, holding "[e]ven if the Court concludes that

[respondent] was provided with notice of the proceeding itself, there is a genuine

issue of material fact with regard to notice of the appointment of the arbitrator, and

whether [respondent] was provided a reasonable opportunity to present its case");

Sesostris, S.A.E. v. Transportes Navales, S.A., 727 F. Supp. 737, 742 (D. Mass.

1989) (finding notice inadequate, despite party's knowledge of ongoing

proceedings, where it was not notified of the procedures used, schedule set, or

other key aspects of the ongoing arbitration).[16]

---

[16]    See also 21 Williston on Contracts § 57:85 (4th ed.) ("The rule about proper
notification applies not only to the first meeting, but to all subsequent meetings or
hearings, unless a party authorizes the arbitrators to proceed in that party's
absence."); Gary B. Born, International Commercial Arbitration 2750 (2009) ("If a
party is not provided notice, or is provided inadequate notice, of hearings or other
important steps in the arbitral process, this will be grounds for denying recognition
to the resulting award."); ICCA's Guide to the Interpretation of the 1958 New
York Convention: A Handbook for Judges 90 (2011) ("In proceedings where the
respondent defaults, on the other hand, proof of notice must be given serious
attention at all stages…. [T]he arbitrators and the claimant in the arbitration should
do all that is reasonably possible to bring the existence of the arbitration and the
appointment of the arbitral tribunal to the attention of the respondent and to have
independent evidence of such efforts. If they fail to do so, enforcement of the

Samaraneftegaz did not receive adequate notice to allow meaningful participation in the arbitration.  The record here is undisputed that, with the exception of preliminary correspondence concerning the notice of arbitration and a single piece of correspondence in October 2006, the subsequent correspondence concerning the arbitration was sent to Yukos EP, <u>not</u> to Samaraneftegaz.  JA-1949-1955, ¶¶ 26-58; JA-2175-2340.  Moreover, the undisputed record establishes that correspondence sent to Yukos EP was not received by Samaraneftegaz.  JA-2447-2452.  At virtually every key stage of the process, Samaraneftegaz was left in the dark, including:

- Yukos Capital's response to the jurisdictional objection raised in Yukos EP's April 6, 2006 letter and the ICC's decision provisionally overruling Samaraneftegaz's objection;

- The appointment of the tribunal's chairman;

- The selection and appointment of an arbitrator for Samaraneftegaz *in absentia*;

- A request for proposals from the parties with respect to the Terms of Reference;

- The schedule for hearings with respect to the Terms of Reference and the Procedural Schedule;

- Requests from the ICC for changes to the Terms of Reference;

---

resulting award may be denied.").  Indeed, proper practice in the ICC requires ensuring that an absent respondent receive "all correspondence including procedural orders, hearing dates, deadlines for the submission of documents, etc." <u>The Secretariat's Guide to ICC Arbitration: A Practical Commentary on the 2012 ICC Rules of Arbitration from the Secretariat of the ICC International Court of Arbitration</u> 91 (2012).

- The fixing of the date for the evidentiary hearing and for the parties' evidentiary and legal submissions;

- The procedure and schedule to be followed during the evidentiary hearing;

- The opportunity to file post-hearing briefs; and

- Evidence filed late by Yukos Capital.

JA-1951-1955, ¶¶ 35-57; JA-2447-2452. In a similar case brought by Yukos Capital in France to enforce an ICC arbitral award against a different former Yukos Oil subsidiary, the Paris Court of Appeal recently held that failure to provide notice of such key events deprives the respondent of the right of defense, requiring the court to decline Yukos Capital enforcement of its award. JA-3370-3375.

The District Court further erred in its holding that, although the notice actually sent to Samaraneftegaz may have been deficient, it was nonetheless "reasonable" for the ICC and the tribunal to direct correspondence to Yukos EP. SPA-35-36. The ICC, the arbitrators, and Yukos Capital all knew where Samaraneftegaz could be found – at its headquarters in Samara, as Yukos Capital advised when it filed its claim and as provided by the ICC rules. JA-1695. Due process and actual notice were not satisfied by the ICC and the tribunal ignoring Samaraneftegaz's own address and instead sending all correspondence to an address lifted from a single letter sent by Yukos EP. That letter neither asserted that Yukos EP was Samaraneftegaz's representative in the arbitration nor purported to change the address for service. SPA-28; JA-2174; accord Sea Hope

49

Nav. Inc. v. Novel Commodities SA, No. 13 Civ. 3225(LAK)(GWG), 2013 WL
5695955, at *5-6 (S.D.N.Y. Oct. 21, 2013) (vacating default judgment confirming
arbitral award where notice was provided "to an email address taken off a
website").

   The tribunal knew its unreasonable approach was inadequate.
According to the Chairman, he attempted to contact Mr. Grekhov of Yukos EP in
July 2006 and learned he no longer worked for Yukos EP.  JA-2231-2232.  By
then, Yukos EP's agreement with Samaraneftegaz had terminated.  But rather than
ask Samaraneftegaz who was authorized to speak for it, the Chairman unilaterally
decided to address subsequent notices to a person at Yukos EP he deemed a
replacement for Mr. Grekhov, writing "I suggest that you have replaced Mr. V.V.
Grekhov."  JA-2231.  Although no one asked or instructed him to do so, he
continued sending critical notices regarding the proceedings to that individual at
Yukos EP and not to Samaraneftegaz.

   Yukos Capital was fully complicit.  At least by the summer of 2006
Yukos Capital must have known that Yukos EP, its corporate affiliate, was not
authorized to act for Samaraneftegaz.  JA-3427-3428; JA-3461-3462; JA-3467-
3469.  As the Claimant, it was Yukos Capital's obligation to ensure the ICC and
tribunal used a correct address for Samaraneftegaz.  Yves Derains & Eric A.
Schwartz, A Guide to the ICC Rules of Arbitration 36-37 (2005) ("whether the

addresses communicated by the Claimant are correct . . . is the Claimant's responsibility"); W. Laurence Craig, William W. Park & J. Paulsson, International Chamber of Commerce Arbitration 152 (3d ed. 2000) (the burden is on the claimant to ensure that a party who does not appear receives notice of "every step" of the proceedings at a proper address). Not only did Yukos Capital fail to correct the ICC and the tribunal, it sent its own submissions to Yukos EP, not Samaraneftegaz.

Nor did the solitary letter from the Chairman sent to Samaraneftegaz directly, annexing a draft version of the Terms of Reference, satisfy due process. SPA-34. That document, sent some seven months after the commencement of the arbitration, did not apprise Samaraneftegaz of the critical stages of the proceedings, such as the schedule for evidentiary and legal submissions or the hearing dates and location, or how it could participate in them. JA-2290-2311. The document was, moreover, written in English – a language Samaraneftegaz does not understand or use as a matter of course, JA-2474, Tr. 30:13-15 – and thus could not have been expected to have "alerted [Samaraneftegaz] to the fact that the arbitration was proceeding in its absence." SPA-34; see Qingdao Free Trade Zone Genius Int'l Trading Co. v. P&S Int'l, Inc., No. 08-1292-HU, 2009 WL 2997184, at *3-5 (D. Or. Sept. 16, 2009) (considering Julen v. Larson, 25 Cal. App. 3d 325, 328 (Cal. Ct. App. 1972) (finding notice inadequate when "[d]efendant did not understand

51

the language in which the legal documents were written, and the accompanying correspondence did not identify the documents as materials of legal significance")). The District Court's conclusion that "the onus rested on Samaraneftegaz to secure a translation," SPA-36, assumes the crux of the issue – having no prior notice of the appointment of the Chairman, for example, Samaraneftegaz had no reason to know who he was, much less the import of his isolated letter.

The District Court's conclusion does not even square with the due process required for a defaulting defendant in federal court, who after appearing is entitled to specific notice of the hearing at which the terms of a default judgment will be decided, regardless of what other notices it may have received in the case. Fed. R. Civ. P. 55(b)(2). At a minimum, Samaraneftegaz should analogously have been notified of the final hearing in the arbitration. It is undisputed that it was not. Samaraneftegaz was deprived of notice sufficient to allow it to participate in the arbitration "in a meaningful manner," Mathews, 424 U.S. at 333, and the District Court's contrary conclusion was in error.

## C.     Enforcement Of The Award Would Violate U.S. Public Policy

The District Court likewise erred in enforcing the Award because doing so was contrary to U.S. public policy against abetting tax fraud.

The District Court misconceived Samaraneftegaz's Article V(2)(b) defense from the start, framing it as a challenge to the validity of the underlying contracts and concluding, "review of an arbitral award . . . does not extend to the validity of the Loan agreements."  SPA-37.  But Samaraneftegaz's argument under Article V(2)(b) is that enforcement of the Award (irrespective of the validity of the underlying contracts) would impermissibly give effect to a tax fraud scheme.  To be sure, the Loan Agreements were part of such a scheme, but Samaraneftegaz's challenge did not call upon the District Court to adjudicate their validity.

Other courts have held awards unenforceable on the basis of Article V(2)(b) for reasons that, like those here, touch on an underlying contract without encroaching on the precept that validity of the underlying contract is a question for the arbitrator.  See, e.g., Sea Dragon, Inc. v. Gebr. Van Weelde Scheepvaartkantoor B.V., 574 F. Supp. 367, 372 (S.D.N.Y. 1983) (finding "that the case at bar violates public policy and warrants deviation from the general rule of confirmation of arbitration awards" because the award conflicted with a valid foreign order); Changzhou AMEC E. Tools & Equip. Co. v. E. Tools & Equip., Inc., No. EDCV 11-00354 VAP, 2012 WL 3106620, at *19 (C.D. Cal. July 30, 2012) (denying "confirmation of the arbitral award under Article V(2)(b)" based on an agreement exacted under duress); Laminoirs-Trefileries-Cableriesd e Lens, S. A. v. Southwire Co., 484 F. Supp. 1063, 1068-69 (N.D. Ga. 1980) (under Article

V(2)(b) of the New York Convention, declining to enforce portion of an award applying the French legal interest rate in a contract dispute, holding that the rate violated U.S. public policy notwithstanding the arbitrators' decision concerning enforceability of governing law clause). The District Court's invocation of Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440 (2006), and its progeny was therefore misplaced. SPA-37-38.

The facts establish that enforcing the Award would implement tax fraud. As the courts held in the Neft-Aktiv proceedings, consistent with the prior tax judgments against Yukos Oil, Yukos Oil forced its production subsidiaries, including Samaraneftegaz, to sell their oil to sham entities controlled by Yukos Oil at far below market prices. JA-1715-1718; JA-1720-1722; JA-3184-3187. This allowed Yukos Oil to capture the profit on sales in the sham entities, which were organized in low-tax regions in the Russian Federation, and thereby unlawfully evade taxes. JA-1715-1718; JA-3184-3187. The fruits of the tax fraud were then transferred offshore to Yukos Capital and others. In the meantime, Samaraneftegaz and the other operating subsidiaries were deprived of funds which they would have received had the original sales been at market prices. JA-1717-1718. Yukos Oil caused those funds to be returned to the subsidiaries to which they rightly belonged in various disguised forms, including purported gifts and loans. The scheme was cogently described and its illegality affirmed by the

54

European Court of Human Rights in a proceeding against the Russian government pursued by the Stichting, which owns, controls, and is managed by the same people who manage Yukos Capital. JA-1890-1891, ¶¶ 591-593; JA-1911-1912, ¶ 664. In other words, Yukos Capital's "loans" to Samaraneftegaz were no credit extension at all: Yukos Capital merely cycled Samaraneftegaz's own funds back to it, solely to evade taxes and insulate Yukos Oil from liability. The Russian court in Yukos Capital's arbitration enforcement action made similar findings. JA-1698-1700.

Enforcing the Award gives effect to this scheme by finalizing Yukos Capital's complicity in laundering the proceeds of Yukos Oil's tax-evasion scheme and permanently depriving Samaraneftegaz of funds that were wrongfully taken from it as the first step in the scheme. Indeed, enforcing the Award would give that scheme this Court's imprimatur of legitimacy, contradicting U.S. public policy.

The District Court's conclusion that U.S. public policy against illegal tax evasion stops once the illegality concerns foreign governments is untenable. JA-38-40. As the District Court would have it, the United States permits its courts to enable fraudsters and tax evaders to launder funds, so long as their misdeeds originate outside the country. That is inconsistent with established precedent recognizing this country's desire to quash even foreign tax evasion. See

Pasquantino v. United States, 544 U.S. 349, 357 (2005) (acts in furtherance of "a 'scheme or artifice to defraud' Canada of its valuable entitlement to tax revenue" violated the federal wire fraud statute); United States v. Trapilo, 130 F.3d 547, 551-553 (2d Cir. 1997) (denouncing a similar scheme to defraud the Canadian government of tax revenues); United States v. $15,270885.69 Formerly on Deposit in Account No. 8900261137, No. 99 Civ. 10255 (RCC), 2000 WL 1234593, at *3-4 (S.D.N.Y. Aug. 31, 2000) (holding that "[a] scheme [] designed to avoid Russian taxes and capital controls" would qualify as "specified unlawful activity" prohibited under a U.S. money laundering statute).

United States courts do not enforce contracts "entered into with a view of violating the laws of another country . . . even though [they do] not otherwise contravene law of the … forum." Rutkin v. Reinfeld, 229 F.2d 248, 255 (2d Cir. 1956); see also United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 42 (1987) ("[N]o court will lend its aid to one who founds a cause of action upon an immoral or illegal act[.]"); Nat'l Petrochem. Co. of Iran v. M/T Stolt Sheaf, 930 F.2d 240, 243 (2d Cir. 1991) (holding that "a perfectly legitimate contract may be rendered unenforceable by its 'direct connection' with an illegal transaction") (internal citations omitted).

Both the Supreme Court and this Court have likewise acknowledged the U.S.'s interest in aiding foreign nations in their tax investigations. See, e.g.,

United States v. Stuart, 489 U.S. 353, 368-70 (1989) (holding that the IRS may issue summons to aid Canadian tax investigations); United States v. A.L. Burbank & Co., 525 F.2d 9, 11, 16-17 (2d Cir. 1975) (holding that the IRS could issue summons to assist Canadian tax investigation even with "no United States interest in the investigation and no claim that United States income taxes are potentially due and owing").

Moreover, giving effect to the Yukos tax scheme by enforcing the Award would be contrary to the policies underlying the U.S.-Russia anti-tax-evasion treaty, which specifically notes in its title that "prevention of fiscal evasion" was an impetus for its entry. See The Convention Between the United States of America and The Russian Federation For the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital, U.S.-Rus., June 17, 1992, S. Treaty Doc. No. 102-39.

For a United States court to legitimize a tax fraud and money laundering scheme by enforcing an arbitral award that arose as part of that scheme would offend the "most basic notions of morality and justice." See Parsons & Whittemore, 508 F.2d at 974. This Court should therefore decline enforcement of the Award.

# POINT FOUR

## THE DISTRICT COURT ERRED IN CONVERTING THE JUDGMENT FROM RUBLES TO DOLLARS

The District Court compounded its errors when it entered a "Supplemental Final Judgment" converting the 3,080,711,971 rubles due under the Award to a dollar equivalent of more than 3,937,863,324 rubles, or over 25% more than was awarded.[17]

This Court reviews the District Court's amendment of the judgment for abuse of discretion. Devlin v. Transp. Commc'ns Int'l Union, 175 F.3d 121, 131-32 (2d Cir. 1999) (Rule 59(e) motion); Paddington Partners v. Bouchard, 34 F.3d 1132, 1140 (2d Cir. 1994) (Rule 60(a) motion). "[A] district court abuses its discretion when its decision is premised on errors of law," India.Com, Inc. v. Dalal, 412 F.3d 315, 320 (2d Cir. 2005), relies on "clearly erroneous factual findings," or is otherwise not "within the range of permissible decisions," Manley v. AmBase Corp., 337 F.3d 237, 245 (2d Cir. 2003).

The District Court's determination was error for three reasons. First, the District Court lacked authority to grant Yukos Capital's motion under Federal Rule 59(e) in the absence of a need "to correct a clear error of law or prevent manifest injustice." Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir.

---

[17] Compare the exchange rate prevailing on the date of the Award, 1:25.7088, JA-3486, with that prevailing on the date of judgment, 1:32.8618, JA-3507.

2004) (quoting Collision v. Int'l Chem. Workers Union, Local 217, 34 F.3d 233, 236 (4th Cir. 1994)). Yukos Capital made no such showing, and the District Court made no such finding. Instead, Yukos Capital used its Rule 59(e) motion to the exact effect against which the Supreme Court has warned, namely "to raise arguments or present evidence that could have been raised prior to the entry of judgment." Exxon Shipping Co. v. Baker, 554 U.S. 471, 485 n.5 (2008). Yukos Capital's proposed order submitted with its original Petition did not provide for currency conversion, asking instead only for confirmation of the Award "in all respects, and that judgment be entered in conformity therewith," JA-39-40, and Yukos Capital never requested conversion during the entirety of the proceedings. Its belated request for a dollar-denominated judgment was improper under Rule 59(e).

Second, the District Court improperly exceeded the scope of the Award by changing the amount to be paid through its conversion from rubles to dollars. See Robert Lewis Rosen Assocs., Ltd. v. Webb, 473 F.3d 498, 506 (2d Cir. 2007) ("[T]he general rule is that a district court may not go beyond the scope of the arbitrator's award and calculate damages in the first instance."). Conversion to dollars was contrary to the modern rule that "[t]he court should enter the judgment in the currency the parties themselves selected for their dealings, the currency in which the loss is felt." Sea-Roy Corp. v. Parts R Parts, Inc., 173 F.3d

59

851, 1999 WL 111281, at *4 (4th Cir. 1999); see also In re Oil Spill by Amoco Cadiz, 954 F.2d 1279, 1328 (7th Cir. 1992). This court has challenged the proposition that currency conversion is ever legally required. See Competex, S.A. v. Labow, 783 F.2d 333, 336-337 (2d Cir. 1986). The District Court should have adhered to the terms of the Award and Yukos Capital's original petition and left its judgment in rubles.

Third, the District Court erred by applying the exchange rate on the date of the Award rather than on the date of the judgment. This improperly penalized Samaraneftegaz by inflating the present dollar value of the Award by over 25%. Such inflation is contrary to this Court's long-standing instruction that, if a judgment is converted to dollars, "[w]here a debt is due in a foreign country payable in the currency of that country … the plaintiff should recover what that currency is worth in this country on the day of judgment." Tillman v. Russo Asiatic Bank, 51 F.2d 1023, 1025 (2d Cir. 1931) (emphasis added); see also Vishipco Line v. Chase Manhattan Bank, N.A., 660 F.2d 854, 865 (2d Cir. 1981) ("federal courts sitting in non-diversity cases have rather consistently adopted the judgment-day rule"); Conte v. Flota Mercante Del Estado, 277 F.2d 664, 670 (2d Cir. 1960) (for performance in Argentina under Argentine law, "the conversion from the foreign currency into dollars is to be made at the rate of exchange prevailing at judgment" (emphasis added)); Shaw Savill, Albion & Co. v. The

60

Fredericksburg, 189 F.2d 952, 955 (2d Cir. 1951) ("[W]here the obligation is performable in a foreign country in the money of that country, the judgment day rule has been held applicable, on the ground that an obligation in terms of the currency of that country takes the risk of currency fluctuation.").[18]

   The Loan Agreements were made in Russia in rubles, were repayable in Moscow in rubles, and were between two subsidiaries of a Russian oil company. The Agreements thus arose and were performable "in a foreign country" and conversion (were it required) should have been at the exchange rate as of the date of judgment. Shaw, 189 F.2d at 955.

---

[18] The District Court also erred in ordering interest between the date of judgment and the date of the "Supplemental Final Judgment" at the pre-judgment rate rather than the statutory post-judgment rate. See Indu Craft, Inc. v. Bank of Baroda, 87 F.3d 614, 620 (2d Cir. 1996) (holding that "post-judgment interest is to commence from a judgment that is ascertained in a meaningful way and is supported by the evidence" (internal quotes omitted) and awarding post-judgment interest from the date of the original judgment).

# CONCLUSION

For the reasons stated above, the judgment should be reversed, and the

Petition should be dismissed.

Dated:       January 24, 2014
             Washington, D.C.

                              Respectfully submitted,

                              /s/ *Matthew D. Slater*
                              Matthew D. Slater
                              CLEARY GOTTLIEB STEEN & HAMILTON LLP
                              2000 Pennsylvania Avenue, NW
                              Washington, DC  20006
                              Telephone: (202) 974-1500
                              Facsimile: (202) 974-1999
                              mslater@cgsh.com

                              *Attorneys for Respondent-Appellant OAO*
                              *Samaraneftegaz*

# CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)(7)(C)

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,787 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Microsoft Word Version 14 in 14-point Times New Roman font.

Dated:      January 24, 2014
           Washington, D.C.

               Respectfully submitted,

               */s/ Matthew D. Slater*
               Matthew D. Slater
               CLEARY GOTTLIEB STEEN & HAMILTON LLP
               2000 Pennsylvania Avenue, NW
               Washington, DC  20006
               Telephone: (202) 974-1500
               Facsimile: (202) 974-1999
               mslater@cgsh.com

               *Attorneys for Respondent-Appellant OAO Samaraneftegaz*