# 13-3357-cv

# United States Court of Appeals

*for the*

## Second Circuit

---

YUKOS CAPITAL S.A.R.L.,

*Petitioner-Appellee,*

v.

OAO SAMARANEFTEGAZ,

*Respondent-Appellant.*

---

**On Appeal from the United States District Court
for the Southern District of New York**

---

**BRIEF OF PETITIONER-APPELLEE YUKOS CAPITAL S.A.R.L.**

---

Robert L. Weigel
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for Yukos Capital S.a.r.l. ("Yukos Capital") (a private, nongovernmental party) certifies that Yukos Capital is wholly owned by Yukos International UK BV, 100% of the shares of which are held by Stichting Administratiekantoor Yukos International. No publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................1

ISSUES PRESENTED....................................................................................5

COUNTER-STATEMENT OF THE CASE AND THE FACTS ...........................7

SUMMARY OF ARGUMENT .......................................................................22

ARGUMENT ..............................................................................................24

I.  THE DISTRICT COURT PROPERLY RETAINED JURISDICTION
    OF A PROCEEDING TO CONFIRM A NEW YORK-SEATED
    ARBITRAL AWARD ...........................................................................24

    A.  THE DISTRICT COURT PROPERLY HELD THAT THE
        ARBITRATION AGREEMENT IS VALID ......................................29

        1.  The Power of Attorney Is Valid under Russian Law...............29

        2.  The Addenda Are Valid Under Russian Law ..........................32

            a.  There was no "abuse of right" ........................................32

            b.  Godfrey did not breach any duty to
                Samaraneftegaz.................................................................33

            c.  The Addenda were properly executed ............................34

    B.  The Addenda Are Also Valid Under New York Law........................35

II. CONFIRMATION OF THE AWARD WAS PROPER ..............................36

    A.  The District Court Properly Held that Samaraneftegaz Had
        Sufficient Notice....................................................................36

    B.  The District Court Properly Exercised its Discretion Not to
        Defer to the Russian Court ................................................41

    C.  The District Court Correctly Rejected Samaraneftegaz's "Public
        Policy" Defense .................................................................43

# TABLE OF CONTENTS
## (continued)

Page

1. The District Court properly rejected Samaraneftegaz's attempt to circumvent the arbitration agreement ...................... 44

2. Samaraneftegaz offered no evidence in support of its tax evasion allegations ................................. 47

3. Samaraneftegaz failed to identify any public policy contrary to enforcement of the award ....................... 49

    a. U.S. public policy is clear and expressly supports Yukos Capital here ......................... 51

III. THE DISTRICT COURT PROPERLY AMENDED THE JUDGMENT TO STATE THE AWARD IN DOLLARS ........................... 53

  A. The District Court Had Authority to Issue the Supplemental Final Judgment ....................... 53

  B. The District Court's Conversion of Rubles to Dollars was Correct ................................... 55

  C. Conversion into Dollars as of the Date of the Award was Correct ................................... 56

CONCLUSION ................................. 59

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Am. Constr. Mach. & Equip. Corp. Ltd v. Mechanised Const. of Pakistan Ltd*,
659 F. Supp. 426 (S.D.N.Y. 1987),
*aff'd*, 828 F.2d 117 (2d Cir. 1987) ............................................................... 49, 52

*Banco de Seguros del Estado v. Mut. Marine Office, Inc.*,
344 F.3d 255 (2d Cir. 2003) ...................................................... 43, 45, 48

*Blanco v. Banco Indus. de Venezuela, S.A.*,
997 F.2d 974 (2d Cir. 1993) ......................................................................25

*Brody v. Vill. of Port Chester*,
434 F.3d 121 (2d Cir. 2005) ......................................................................37

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006) ............................................................................ 44, 45

*Changzhou AMEC E. Tools & Equip. Co. v. E. Tools & Equip., Inc.*,
No. EDCV 11-00354 VAP,
2012 WL 3106620 (C.D. Cal. July 30, 2012) ......................................46

*Competex, S.A. v. Labow*,
783 F.2d 333 (2d Cir. 1986) ................................................................ 55, 58

*Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria*,
932 F. Supp. 2d 153 (D.D.C. 2013) ......................................... 54, 56, 57

*Conte v. Flota Mercante Del Estado*,
277 F.2d 664 (2d Cir. 1960) ......................................................................57

*Deutsche Bank Filiale Nurnberg v. Humphrey*,
272 U.S. 517 (1926) ....................................................................................57

*DiRienzo v. Philip Servs. Corp.*,
294 F.3d 21 (2d Cir. 2002) .................................................................. 24, 25

*Elite Entm't, Inc. v. Khela Bros. Entm't Inc.*,
396 F. Supp. 2d 680 (E.D. Va. 2005)...................................................55

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*,
403 F.3d 85 (2d Cir. 2005) ........................................................ 23, 36, 47

*Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., Inc.*,
804 F.2d 787 (2d Cir. 1986) ................................................................. 53

*Europcar Italia, S.p.A. v. Maiellano Tours*,
156 F.3d 310 (2d Cir. 1998) ........................................................ 43, 44, 46

*European Cmty. v. RJR Nabisco*,
424 F.3d 175 (2d Cir. 2005) ................................................................. 50

*Ferrara S.p.A. v. United Grain Growers, Ltd*,
441 F.Supp. 778 (S.D.N.Y. 1977),
*aff'd mem.*, 580 F.2d 1044 (2d Cir. 1978) ............................................ 41

*Figueiredo Ferraz E Engenharia de Projeto Ltd. v. Republic of Peru*,
665 F.3d 384 (2d Cir. 2011) ................................................................. 25

*Geotech Lizenz AG v. Evergreen Sys., Inc.*,
697 F.Supp. 1248 (E.D.N.Y. 1988) ...................................................... 41

*Gulf Oil Corp. v. Gilbert*,
330 U.S. 501 (1947) ............................................................................. 24

*Hicks v. Guinness*,
269 U.S. 71 (1925) ............................................................................... 56

*In re Good Hope Chem. Corp.*,
747 F.2d 806 (1st Cir. 1984) ............................................................... 57

*In re Monegasque*,
311 F.3d 488 (2d Cir. 2002) ................................................................. 28

*In re: Oil Spill by the Amoco Cadiz*,
954 F.2d 1279 (7th Cir. 1992) ............................................................. 55

*Indasu Int'l, C.A. v. Citibank, N.A.*,
861 F.2d 375 (2d Cir. 1988) ................................................................. 26

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Laminoirs-Trefileries-Cableries de Lens, S. A. v. Southwire Co.*,
484 F. Supp. 1063 (N.D. Ga. 1980) .................................................... 46

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
No. 03 Civ. 2175,
2013 WL 105776 (S.D.N.Y. Jan. 9, 2013) ......................................... 58

*Manu Int'l, S.A. v. Avon Prods., Inc.*,
641 F.2d 62 (2d Cir. 1981) ................................................................ 29

*Ministry of Def. & Support v. Cubic Def. Sys., Inc.*,
665 F.3d 1091 (9th Cir. 2011) ..................................................... 48, 49

*Mitsui & Co., Ltd. v. Oceantrawl Corp.*,
906 F. Supp. 202 (S.D.N.Y. 1995) .................................................... 55

*Motorola Credit Corp. v. Uzan*,
388 F.3d 39 (2d Cir. 2004) ................................................................ 35

*Mullane v. Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) .......................................................................... 39

*Munafo v. Metro. Transp. Auth.*,
381 F.3d 99 (2d Cir. 2004) ................................................................ 54

*Nat'l Petrochem. Co. of Iran v. M/T Stolt Sheaf*,
930 F.2d 240 (2d Cir. 1991) .............................................................. 51

*Norton v. Sam's Club*,
145 F.3d 114 (2d Cir.1998) ............................................................... 53

*Ortiz-Gonzalez v. Fonovisa*,
277 F.3d 59 (lst Cir. 2002) ............................................................... 37

*Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier*,
508 F.2d 969 (2d Cir. 1974) ........................................................ 36, 39

*Pasquantino v. United States*,
544 U.S. 349 (2005) .......................................................................... 50

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Peregrine Myanmar Ltd. v. Segal,*
  89 F.3d 41 (2d Cir. 1996) ...................................................................24

*R. Maganlal & Co. v. M.G. Chem. Co., Inc.,*
  942 F.2d 164 (2d Cir. 1991) ...............................................................25

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.,*
  68 F.3d 1478 (2d Cir. 1995) ...............................................................41

*Rent-a-Center, W., Inc. v. Jackson,*
  130 S. Ct. 2772 (2010) ......................................................................44

*Republic of Ecuador v. Chevron Corp.,*
  638 F.3d 384 (2d Cir. 2011) ...............................................................47

*Robert Lewis Rosen Assoc., Ltd., v. Webb,*
  473 F.3d 498 (2d Cir. 2007) ......................................................... 53, 54

*Rutkin v. Reinfeld,*
  229 F.2d 248 (2d Cir. 1956) ...............................................................51

*Schwartz v. Liberty Mut. Ins. Co.,*
  539 F.3d 135 (2d Cir. 2008) ......................................................... 53, 54

*Sea Dragon, Inc. v. Gebr. Van Weelde Scheepvaartkantoor B.V.,*
  574 F. Supp. 367 (S.D.N.Y. 1983) .....................................................46

*Sea-Roy Corp. v. Parts R Parts, Inc.,*
  173 F.3d 851 (4th Cir. 1999) ..............................................................55

*Shaw, Savill Albion & Co. v. The Fredericksburg,*
  189 F.2d 952 (2d Cir. 1951) ...............................................................58

*Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.,*
  263 F.3d 26 (2d Cir. 2001) .................................................................35

*Telenor Mobile Commc'ns AS v. Storm LLC,*
  524 F. Supp. 2d 332 (S.D.N.Y. 2007) .................................................46

*Telenor Mobile Communc'ns AS v. Storm LLC,*
  584 F.3d 396 (2d Cir. 2009) ........................................ 35, 36, 49, 52

vi

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Tillman v. Russo Asiatic Bank*,
    51 F.2d 1023 (2d Cir. 1931) .................................................................57

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*,
    484 U.S. 29 (1987) ........................................................ 43, 44, 49, 50

*United States v. $15,270885.69 Formerly on Deposit in Account No. 8900261137*,
    No. 99 Civ. 10255 (RCC),
    2000 WL 1234593 (S.D.N.Y. Aug. 31, 2000) ............................. 50, 51

*United States v. Trapilo*,
    130 F.3d 547 (2d Cir. 1997) ........................................................ 50, 51

*Vishipco Line v. Chase Manhattan Bank, N.A.*,
    660 F.2d 854 (2d Cir. 1981) .................................................................57

*W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber*,
    461 U.S. 757 (1983) .................................................................49

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" US, Inc.*,
    126 F.3d 15 (2d Cir. 1997) .................................................................28

## Statutes

N.Y. Bus. Corp. Law § 107 (McKinney 2012).........................................35

Sergei Magnitsky Rule of Law Accountability Act of 2012,
    Pub. L. No. 112-208, 126 Stat. 1504 (Sec. 402(a)(13)) ................................. 5, 48

## Other Authorities

Federal Judicial Center Int'l Litig. Guide,
    "International Commercial Arbitration: A Guide for U.S. Judges" (2012).........59

Gary B. Born,
    *International Commercial Arbitration* (2009) ......................................41

*ICCA's Guide to the Interpretation of the 1958 New York Convention: Handbook for Judges* (2011) ......................................... 40, 41

Restatement (Third) of Foreign Relations Law § 823(1) (1987).............................57

# TABLE OF AUTHORITIES
### (continued)

Page(s)

W. Laurence Craig, William W. Park & J. Paulsson,
*International Chamber of Commerce Arbitration* (3d ed. 2000) ........................ 38

Yves Derains & Eric A. Schwartz,
*A Guide to the ICC Rules of Arbitration* (2005) .................................................. 38

## **Rules**

Fed. R. Civ. P. 59 ............................................................................... 53, 54

Fed. R. Civ. P. 60 .................................................................................. 53

## PRELIMINARY STATEMENT

This case arises from an arbitral award made in New York under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "Convention"). A three-member tribunal of distinguished arbitrators heard evidence and issued an award requiring Respondent-Appellant OJSC Samaraneftegaz ("Samaraneftegaz") to repay the commercial loans made by Petitioner-Appellant Yukos Capital S.a.r.l. ("Yukos Capital"). There is no dispute that Yukos Capital made the loans or that Samaraneftegaz never repaid them. Indeed, Samaraneftegaz's own financial statements listed the loans as due and unpaid. Nor is there any dispute that Samaraneftegaz's manager signed a power of attorney that authorized amendments to the loans to provide for disputes to be arbitrated in New York pursuant to the rules of the International Court of Arbitration of the International Chamber of Commerce ("ICC").

In Appellant's Opening Brief ("AOB"), Samaraneftegaz asserts four defenses to confirmation of the award, none of which has any merit.

*First*, Samaraneftegaz claims that the District Court should have dismissed the case on *forum non conveniens* grounds, even though Yukos Capital sought confirmation in the primary jurisdiction, New York. Quite simply, there is no precedent to dismiss a petition to confirm a Convention award in the primary jurisdiction on *forum non conveniens* grounds. Moreover, nearly all the relevant

1

witnesses and documents proved to be located in the U.S. Accordingly, the District Court's retention of jurisdiction was proper.

*Second*, Samaraneftegaz contends that the arbitration agreement is invalid, even though it never disputed that Viktor Grekhov, president of its corporate manager, Yukos EP, signed a power of attorney authorizing David Godfrey to amend agreements on behalf of Samaraneftegaz. In support of its motion to dismiss, Samaraneftegaz submitted an affidavit from Grekhov, in which Grekhov claimed he was not aware of the arbitration agreement when he issued the power of attorney. JA-193-94.[1] Discovery proved that Grekhov signed the power of attorney for the express purpose of allowing Godfrey to amend the loans to provide for arbitration in a neutral forum. The undisputed testimony was that Grekhov was personally concerned that signing the Addenda would expose him to retaliation by the Russian state, which had undertaken a campaign of harassment against employees of the Yukos companies.

Samaraneftegaz next claimed that the arbitration agreement was invalid because Grekhov signed the power of attorney on a day different than the date on the document, and that Yukos Capital had somehow concealed the true date of signing. Nothing in the record suggests Yukos Capital had any involvement in

---

[1] Citations to "JA-__" are to the Joint Appendix; citations to "SPA-__" are to the Special Appendix; citations to "SJA-__" are to the Sealed Joint Appendix; and citations to "Dkt." are to the District Court docket.

signing or dating the power of attorney. Indeed, Samaraneftegaz did not make Grekhov available for deposition, so Yukos Capital never had the opportunity to ascertain the reason why Grekhov did not date the power of attorney on the same day he signed it. In any event, as Yukos Capital demonstrated through two Russian law reports, the date on which the power of attorney was signed does not determine its validity under Russian law. The arbitration agreement is valid under both Russian and New York Law because it was signed pursuant to the power of attorney and stamped with the corporate seal of Samaraneftegaz. Accordingly, the District Court properly upheld its validity.

*Third*, Samaraneftegaz claimed that it lacked adequate notice of the arbitration despite its admissions that (1) it received at least five separate communications from the ICC and the arbitrators; and (2) its representative communicated with the ICC on multiple occasions. Grekhov wrote to the ICC in response to the request for arbitration, informing the ICC that he was Samaraneftegaz's manager and objecting to the jurisdiction of the ICC. The record shows that as a result of Yukos EP's communications with the ICC, the ICC properly designated Yukos EP as Samaraneftegaz's representative and sent it notice of *every stage of the arbitration*.

Samaraneftegaz further admits that it received a draft of the Terms of Reference that identified the arbitrators, summarized the claims to be decided,

provided a procedural timetable, and listed Yukos EP as Samaraneftegaz's party representative. Accordingly, the District Court properly found that the notice provided to Samaraneftegaz comports with due process under U.S. law.

*Fourth*, Samaraneftegaz's decision not to contest the validity of the loans before the arbitrators forecloses its defense that the loans are allegedly part of some Russian tax evasion scheme. The U.S. Supreme Court has ruled that while the court may review the validity of an arbitration agreement, the validity of the underlying contract is for the arbitrators alone to determine. Moreover, Samaraneftegaz has never offered any evidence—indeed any explanation—of how Yukos Capital loaning funds to Samaraneftegaz affected anyone's taxes.

Instead, Samaraneftegaz asks the Court to defer to the decision of a Russian court—in a collusive lawsuit brought by Samaraneftegaz's sole shareholder[2] *against* Samaraneftegaz long after the commencement of the arbitration, and which Samaraneftegaz supported—invalidating the loans on the grounds that they formed part of a Russian tax evasion scheme. This decision was based not on evidence, or witness testimony, but on the findings contained in the second criminal conviction in Russia of Mikhail Khodorkovsky, the former head of Yukos Oil. That conviction—of which Khodorkovsky has been pardoned—was expressly

---

[2] While the arbitration was proceeding, Samaraneftegaz was acquired at auction by Neft-Aktiv, a subsidiary of the Russian state-owned oil company OJSC Rosneft.

4

condemned by the U.S. Congress for its "*lack of credible charges, intimidation of witnesses, violations of due process and procedural norms.*" Sergei Magnitsky Rule of Law Accountability Act of 2012, Pub. L. No. 112-208, 126 Stat. 1504 (Sec. 402(a)(13)) ("Magnitsky Act").

The District Court properly refused to defer to the findings of a lawsuit it concluded was "a transparent attempt to circumvent" the arbitration (SPA-38), rejected Samaraneftegaz's attempt to relitigate the validity of the underlying contracts, and found that Samaraneftegaz had failed to identify any well-defined public policy against confirming the award.

Accordingly, Yukos Capital respectfully requests that this Court affirm the District Court's orders in their entirety.

## **ISSUES PRESENTED**

1.      Whether the District Court properly exercised its discretion to retain jurisdiction to confirm a Convention award made in New York under New York law.

2.      Whether the District Court properly held that the arbitration agreement was valid, where (1) the agreement was signed pursuant to a power of attorney signed by Samaraneftegaz's corporate manager and stamped with Samaraneftegaz's corporate seal; and (2) the agreement was stamped with the corporate seal of Samaraneftegaz and recorded in its corporate registry.

3.    Whether the District Court properly held that the arbitration comported with U.S. standards of due process, where (1) Samaraneftegaz admits it received notice of the arbitration's commencement and additional correspondence summarizing all key events; and (2) notice of each stage of the arbitration was sent to Samaraneftegaz's corporate manager after it appeared on Samaraneftegaz's behalf.

4.    Whether the District Court properly exercised its discretion in declining to apply collateral estoppel to a Russian court decision finding Samaraneftegaz received insufficient notice of the arbitration, where the District Court properly found that (1) there was no factual dispute as to the notices Samaraneftegaz admitted receiving; and (2) there was insufficient identity of issues to support collateral estoppel.

5.    Whether the District Court properly held that Samaraneftegaz was not entitled to relitigate the validity of the underlying loans as determined by the arbitrators.

6.    Whether the District Court properly held that Samaraneftegaz failed to identify a well-defined and dominant public policy of enforcing foreign tax laws.

7.    Whether the District Court properly exercised its discretion in entering the final supplemental judgment to specify the amount owed under the award.

6

8.     Whether the District Court properly exercised its discretion in converting rubles to dollars as of the date of the arbitration award, where long-standing precedent favors conversion of foreign currency to dollars and applies the "breach day" rule to claims arising under domestic law.

## COUNTER-STATEMENT OF THE CASE AND THE FACTS

The ICC issued an award in favor of Yukos Capital on August 15, 2007 (the "Award").  Samaraneftegaz never moved to vacate the Award.

Yukos Capital filed its petition to enforce the Award in the District Court on July 2, 2010, pursuant to the Convention and the Federal Arbitration Act.

**The Parties**

Yukos Capital is a Luxembourg company established in January, 2003 to act as a funding vehicle for companies within the Yukos group.  JA-378; JA-628. From January 31, 2003 to February 6, 2007, TMF Corporate Services S.A. ("TMF") was Yukos Capital's managing director and authorized to sign agreements on behalf of the company.  JA-1344-45; JA-1353.

Yukos Oil was Samaraneftegaz's sole shareholder from around 2001 until May 2007.  JA-492.  Yukos EP was Samaraneftegaz's management company  and was authorized to enter into agreements on behalf of Samaraneftegaz.  JA-522; JA-582.  Viktor Grekhov was president of Yukos EP from mid-2005 until May 2006.

JA-502. It is undisputed that Grekhov had authority to sign, or authorize the signing, of agreements on behalf of Samaraneftegaz. *Id.*

As of March 2006, E.K. Rebgun was appointed provisional manager of Yukos Oil and received communications directed to the Yukos Oil subsidiaries at a fax number and mailing address shared by Yukos EP and Yukos Refining and Marketing ("Yukos RM"), to which all correspondence from the ICC and Tribunal was sent during the arbitration. JA-2669-2727.

Samaraneftegaz is currently a fully-owned, indirect subsidiary of OJSC Oil Company Rosneft ("Rosneft").

**The Loans**

In July 2004, Yukos Capital entered into two loan agreements with Samaraneftegaz (the "Loans"). JA-653-58; JA-661-66. These Loans were made by Yukos Capital because Samaraneftegaz needed funds to continue its operations as a result of the Russian government freezing certain Yukos assets. JA-1968-69.

Samaraneftegaz borrowed RUR 2,415,890,000 under the Loans (approximately $120 million). JA-1266; JA-1269; JA-1272; JA-1275. Samaraneftegaz failed to make interest payments or repay the Loans. JA-379. Samaraneftegaz never disputed these facts. Indeed, shortly before the arbitration commenced, the president of Samaraneftegaz acknowledged its debt to Yukos Capital in writing. JA-1381.

**The Decision to Amend the Loans**

By the spring of 2005, the senior managers of Yukos Oil, including Chief

Executive Officer Steven Theede, Chief Financial Officer Bruce Misamore, and

Vice President for Legal Affairs David Godfrey, had been forced to leave Russia

as a result of the politically-motivated state campaign against Yukos Oil.  JA-374;

JA-380.  The senior managers continued to conduct the affairs of Yukos Oil from

abroad, and met in Europe regularly as a committee with other high level

executives within the Yukos group, including Grekhov, Yuri Beylin (Deputy Chief

Executive Officer of Yukos Oil), and Anatoly Nazarov (President of Yukos RM)

(collectively, the "Management Committee").  SJA-79; SJA-86-87; SJA-109; SJA-

150; SJA-153.

As a result of the turmoil in Russia, the senior managers of Yukos Oil

determined that the Russian Federation was not an appropriate judicial forum for

the hearing of any disputes relating to Yukos companies.  *E.g.*, JA-380; SJA-155;

SJA-169; SJA-183; SJA-48; SJA-80; SJA-92; SJA-110; SJA-210.  Indeed,

management believed they "had a fiduciary responsibility to make sure that any

potential disagreements [between the companies within the group] could be

decided in a fair and balanced way."  SJA-81.

The possibility of amending the Loans to provide for dispute resolution

outside Russia was discussed at a Management Committee meeting on June 6,

9

2005.  JA-701-03.  The final minutes of this meeting note that "Samaraneftegaz would be willing to amend the agreement."  JA-703.

Around October 12, 2005, Theede instructed Grekhov in writing to sign the Addenda on behalf of Samaraneftegaz.  *E.g.*, SJA-186; SJA-199; SJA-83; SJA-93.

The amendment of the Loans was again discussed at a Management Committee meeting on October 26, 2005, at which Grekhov was present.  JA-705-08.  The minutes reflect that Rudolf Mkhitaryan, Yukos RM's General Counsel, confirmed that there was no legal reason why the Loans could not be amended to change the law and arbitral forum.  *Id.*  The minutes further reflect that Grekhov stated that "he would be happy to sign" if there were no criminal risks.  *Id.*  The minutes note "[Viktor Grekhov] to decide what he wants to do … within a week."  *Id.*

The amendments to the Loans ("Addenda") were prepared by Russian counsel at Yukos RM.  JA-821-22; JA-826-32.  Yukos RM functioned as the legal department of Yukos Oil and provided legal advice to Yukos Oil's Russian subsidiaries, including Yukos EP and Samaraneftegaz.  SJA-45.

**Execution and Ratification of the Power of Attorney and the Addenda**

The undisputed testimony of the witnesses was that Grekhov—who still lived in Russia and was close to retirement—feared that signing the Addenda would subject him to pressure from the Russian authorities because numerous

10

Yukos employees had come under investigation or been forced to leave Russia. *E.g.*, SJA-162; SJA-171; SJA-53-54; SJA-56; SJA-82-83; SJA-206-07. Mkhitaryan testified that he discussed the subject of the Addenda with Grekhov on several occasions, and Grekhov took a long time deciding whether he should sign the Addenda or give a power of attorney for someone else to sign. SJA-59.

In the summer of 2005, Grekhov asked Mkhitaryan to prepare a power of attorney in favor of Godfrey for the purpose of executing the Addenda. SJA-59. The Yukos RM legal department prepared the power of attorney and sent it to Grekhov. SJA-58; SJA-70. The record reflects that sometime after the Management Committee meeting of October 26, 2005, Grekhov called Mkhitaryan into his office at Yukos EP, printed and signed the power of attorney, and instructed Mkhitaryan to take the signed power of attorney to be stamped with Samaraneftegaz's seal. SJA-57. The operations manager of Yukos EP maintained the corporate seal of Samaraneftegaz, the only such seal kept outside Samaraneftegaz. SJA-60; JA-1377. The operations manager verified the signature of Grekhov and placed the seal of Samaraneftegaz on the power of attorney. SJA-60. Yukos EP then assigned a registry number to the Power of Attorney and recorded it on the company's registry of powers of attorney. SJA-61; JA-1378. The registry of powers of attorney produced by Samaraneftegaz states that the "date of issue" of the Power of Attorney is July 26, 2005. JA-1419.

11

The undisputed record testimony is that Godfrey signed the Addenda on behalf of Samaraneftegaz after Grekhov signed the Power of Attorney. JA-505; SJA-160-61; SJA-180; SJA-57; SJA-70. TMF, managing director of Yukos Capital, signed the Addenda on behalf of Yukos Capital. JA-507. The fully executed Addenda were then stamped with the Samaraneftegaz corporate seal by the Yukos EP operations manager. SJA-60.

Samaraneftegaz received the signed and sealed Addenda on December 2, 2005 from Yukos EP. JA-1376-77. The head of administration for Samaraneftegaz then caused the Addenda to be recorded in Samaraneftegaz's registry of contracts. JA-1375.

After the Addenda were duly executed, sealed and recorded in the company registry by Samaraneftegaz, Grekhov wrote to Godfrey to revoke the Power of Attorney, but did not contend that it was invalid or improperly executed. JA-867.

**The ICC Arbitration**

Yukos Capital filed a request for arbitration with the ICC on January 12, 2006 ("Request"). JA-2111. After receiving Yukos Capital's Request, the ICC notified Samaraneftegaz of the arbitration at its corporate address by letter dated January 20, 2006, provided it with a copy of the Request, and requested a response within 30 days. JA-2129. Samaraneftegaz received the letter on January 23, 2006. JA-2133.

12

By letter dated February 7, 2006, the ICC reminded Samaraneftegaz that its Answer was due on February 22, 2006. JA-2135. Samaraneftegaz received that letter at its corporate address in Samara on February 10, 2006. JA-2139. By letter dated February 15, 2006, the ICC requested Samaraneftegaz's comments on Yukos Capital's proposal that the arbitral tribunal consist of a sole arbitrator. JA-2142. Samaraneftegaz received this correspondence on February 17, 2006. JA-2144. By letter dated February 28, 2006, the ICC advised Samaraneftegaz that due to its failure to submit an Answer, the ICC Court would determine whether the ICC had jurisdiction pursuant to Article 6(2) of the 1998 ICC Rules. JA-2146. In the same correspondence, the ICC also noted that Yukos Capital had nominated Mr. John Kerr as a co-arbitrator. *Id.* Samaraneftegaz received this letter on March 2, 2006. JA-2150-52. Subsequently, by letter dated March 13, 2006, the ICC forwarded Samaraneftegaz a copy of Mr. Kerr's declaration of acceptance to serve as co-arbitrator, statement of independence, and curriculum vitae. JA-2155-70. Samaraneftegaz received these materials on March 15, 2006. JA-2171. Samaraneftegaz does not dispute receiving these notices. SPA-27.

In response to the ICC's correspondence, Yukos EP—"management company … of OAO Samaraneftegaz"—sent the ICC a letter dated April 6, 2006, disputing the validity of the arbitration agreement and refusing to pay Samaraneftegaz's share of the costs of the arbitration. JA-2174; JA-46. The April

6 letter was signed by Grekhov as President of Yukos EP and bore Yukos EP's letterhead, which listed Yukos EP's mailing address, phone number, and fax number. JA-2174. On April 13, 2006, by fax to Yukos EP, the ICC acknowledged receipt of Grekhov's letter. JA-2176; JA-2178. Then, on April 28, 2006, the ICC faxed Yukos EP Yukos Capital's comments on the jurisdictional challenge, advising Samaraneftegaz that the arbitration file would be transferred to the arbitrators ("Tribunal") if the matter proceeded beyond the jurisdictional stage. JA-2180; JA-2185.

On May 5, 2006, the ICC Court determined that the arbitration would proceed. JA-47. On May 9, 2006, the ICC faxed Yukos EP a letter notifying Samaraneftegaz of the ICC Court's jurisdictional decision and informing Samaraneftegaz that the ICC Court had confirmed Mr. Kerr as co-arbitrator and appointed Dr. Ivan Zykin as co-arbitrator "upon the proposal of the Russian National Committee on behalf of [Samaraneftegaz]." JA-2187. The ICC requested that Samaraneftegaz pay its share of the projected costs of the arbitration in the amount of $310,000. JA-2188.

By letter dated May 12, 2006, Y. Starodubtsev, the Acting President of Yukos EP, wrote to the ICC to confirm that Yukos EP had received the May 9 fax from the ICC and to reaffirm Samaraneftegaz's position that the ICC lacked jurisdiction over Samaraneftegaz. JA-2192.

14

Following Starodubtsev's May 12 letter, by fax dated July 4, 2006, the ICC informed Yukos EP that, pursuant to Article 9(3) of the ICC Rules, it had appointed a Chairman and the ICC's files would be forwarded to the Tribunal. JA-2194. On the same date, the ICC sent a letter to the arbitrators, copying Yukos EP via fax and mail, which listed Yukos EP as Samaraneftegaz's party representative and Fulbright & Jaworski LLP as Yukos Capital's party representative. JA-2206.

Thereafter, the Tribunal sent all notices to Yukos EP. The Chairman also sent a letter dated October 24, 2006, including a copy of the revised Terms of Reference for signature, directly to Samaraneftegaz's corporate address in Samara. JA-2290. The draft Terms of Reference summarized the parties' positions and the procedural history, noted the identity, appointment and confirmation of the three arbitrators, and set forth the issues to be determined in the arbitration. JA-2294-2311. The letter also noted that Samaraneftegaz was represented in the arbitration by its corporate manager, Yukos EP. JA-2292. Samaraneftegaz admits receiving this document. AOB 15.

Despite receiving this communication informing it that the Tribunal considered Yukos EP Samaraneftegaz's representative, Samaraneftegaz did not inform the Tribunal of any change in its corporate management. SPA-36.

**The Tribunal Held that Samaraneftegaz Was Required To Repay the Loans**

The Tribunal heard evidence and concluded that the Addenda were valid and therefore that the ICC had jurisdiction. JA-48-50; JA-60. The Tribunal further concluded that there was no dispute as to the validity or enforceability of the Loans and that Samaraneftegaz had never repaid its debt to Yukos Capital. JA-60. The Tribunal determined that Samaraneftegaz was obligated to repay the Loans, finding:

- In July 2004, Yukos Capital transferred the amount of RUR 2,415,890,000 to Samaraneftegaz. *Id.*

- Samaraneftegaz never made any interest payments, and was thus in breach of its obligations under both Loans. JA-61.

Accordingly, the Tribunal awarded Yukos Capital RUR 2,415,890,000 in principal and RUR 664,821,971 in interest, $435,000 in arbitration costs and $284,474.54 in legal fees. JA-68.

Yukos Capital filed its petition to confirm the Award in the District Court on July 2, 2010. JA-22.

**The Neft-Aktiv Action**

In July 2007, while the arbitration was still pending, Samaraneftegaz's sole shareholder Neft-Aktiv sued Samaraneftegaz and Yukos Capital in Russia, seeking invalidation of the Loans on the grounds that they were "sham transaction[s] designed to conceal the true relationship between the parties involving the unlawful diversion of funds from Samaraneftegaz OJSC to Yukos Capital S.a.r.l.

16

and the subsequent return of those funds to Samaraneftegaz OJSC as a loan." JA-2343; JA-2364-65 (the "Neft-Aktiv Action"). Samaraneftegaz filed a statement in which it advised the Russian court that it "believes that Neft-Aktiv LLC legitimately argues … that the Loan Agreements are invalid." JA-2380. On July 28, 2009, the Russian court stayed the proceeding pending the second criminal trial of Mikhail Khodorkovsky and Platon Lebedev. JA-2359; JA-2361.

On February 8, 2012—six years after Yukos Capital commenced arbitration and more than one year after Yukos Capital filed the petition to confirm the Award in the District Court, the Russian court invalidated the Loans, relying primarily on the verdict in the widely condemned second conviction of Khodorkovsky. JA-1713.

**The Samara Enforcement Action**

After filing its petition to confirm the Award in the Southern District, Yukos Capital filed a petition to enforce the Award in the Samara Arbitrazh court on August 9, 2010.

On February 22, 2011, the Russian court issued its decision refusing to enforce the ICC Award. JA-1435-41. The Russian court did not hold that either the Addenda or the Power of Attorney were invalid under Russian law. *Id.* Rather, the Russian court held, despite repeated notices to Samaraneftegaz and correspondence on its behalf with the Tribunal, that Samaraneftegaz did not

receive adequate notice under Russian law, and that the enforcement of the Award would violate Russian public policy. *Id.*

**The District Court's January 7, 2011 Order**

In support of its motion to dismiss Yukos Capital's petition or to stay the action in favor of the later-filed Russian proceeding to enforce the Award, Samaraneftegaz filed an affidavit of Grekhov, who claimed:

> The power of attorney was not created for the purpose of having Mr. D. Godfrey sign the Addendum Agreements. I had no discussions and no awareness of the proposed Addendum Agreements until I saw signed versions bearing Mr. D. Godfrey's signature … I never agreed that either Mr. D. Godfrey or any other person should sign these particular Addendum Agreements.

JA-1400.

Samaraneftegaz also claimed that nearly all of the relevant witnesses and documents were located in Russia, although it did not specifically identify any other Russian witnesses besides Grekhov. Dkt. 12 at 15-16; JA-187.

The District Court held that the "confirmation proceeding is properly before this court" pursuant to the Convention and therefore "the court should not necessarily dismiss the case on *forum non conveniens* grounds even if it finds that the threshold jurisdictional issue is better resolved in Russia." JA-416-17. The District Court observed that "Samaraneftegaz claims that the power of attorney 'had nothing to do' with the addenda, and that Grekhov would have never agreed to the modifications." JA-414. On that basis, later proved false during discovery,

18

the District Court stayed the action to allow the Russian court to rule on the validity of the Addenda in the Samara enforcement proceeding. JA-417. The District Court expressly held that "[t]his does not mean the Russian court's findings are binding on this court." JA-418.

On May 13, 2011, the District Court unstayed the proceeding following the ruling of the Russian court in the enforcement action, which did not find the Addenda invalid. The District Court directed discovery into the validity of the Addenda. SPA-2-4.

**The District Court's July 24, 2012 Order**

After extensive discovery—including seven depositions of Yukos Capital's witnesses held in the U.S. and two depositions of Samaraneftegaz's witnesses—the District Court granted Yukos Capital's motion for summary judgment on personal jurisdiction. SPA-5. The District Court held that the Addenda are valid under Russian law and that Samaraneftegaz therefore consented to the jurisdiction of the ICC and the District Court for purposes of enforcement of the Award. SPA-21.

The District Court addressed each of Samaraneftegaz's Russian law arguments in turn.[3] The District Court:

---

[3] Yukos Capital argued that New York, not Russian law, governed the validity of the Addenda. The District Court applied Russian law. Yukos Capital's position is that the Addenda are valid under either Russian law or New York law, the law selected in the Addenda.

- Held that Godfrey had the authority to sign the Addenda. SPA-11-13.

- Rejected Samaraneftegaz's argument that the Power of Attorney was void under Russian law because it bore a date different than the date on which it was signed by Grekhov. *Id.*

- Found that there was no abuse of Samaraneftegaz's rights because there was no evidence that Godfrey, by changing the applicable law and dispute resolution forum to an unbiased forum "exercised the power of attorney 'solely with the intention of inflicting harm upon another person'" as required under Russian law to prove such a claim. SPA-14-15.

- Found that signing the Addenda was in fact in Samaraneftegaz's interest in complying with the directive of its parent company to sign. SPA-17.

- Held that Godfrey did not breach any fiduciary duty to Samaraneftegaz because he did not represent both parties to the transaction and did not act against Samaraneftegaz's interests. SPA-17-18.

Finally, the District Court analyzed and rejected Samaraneftegaz's "hypertechnical" argument that the Addenda were void because they were not signed and sealed by the proper individuals or entities. SPA-21.

**The District Court's August 6, 2013 Order**

The District Court correctly found that Samaraneftegaz could not meet its "heavy" burden to demonstrate that one of the statutory defenses to confirmation under the Convention applied in this case. SPA-31.

The District Court rejected Samaraneftegaz's argument that it did not receive adequate notice of the arbitration, finding it "significant that Samaraneftegaz decided not to participate in the arbitration with full knowledge of its existence after having received five separate notices of its initiation." SPA-33.

20

In addition, Samaraneftegaz directly received correspondence informing it "that it was being represented by Yukos EP, reported Grekhov and Starodubtsev's jurisdictional challenges on behalf of Samaraneftegaz, summarized the parties' positions, outlined the issues to be determined, catalogued the procedural history…including notice that the ICC court confirmed" the appointment of the three arbitrators.  SPA-34.

Further, the District Court held there was no due process violation "when the notices were reasonably calculated to inform Samaraneftegaz of the proceeding and provided Samaraneftegaz an opportunity to be heard."  SPA-35.

The District Court held that Samaraneftegaz's public policy defense impermissibly sought to relitigate the validity of the underlying contracts.  SPA 37.  Because Samaraneftegaz failed to contest the validity of the Loans before the Tribunal, "it cannot now rely on its own omissions to support a public policy defense."  SPA-38.  Further, Neft-Aktiv's suit to invalidate the Loans while the arbitration was pending was a "transparent attempt to circumvent a forum that it considered unfavorable."  *Id.*

Finally, the District Court held that Samaraneftegaz failed to meet its "heavy burden" to identify a well-defined public policy that confirmation of the Award would violate.  SPA-38.

**The Final and Supplemental Final Judgments**

On August 9, 2013, the clerk entered Final Judgment. SPA-42. The Final Judgment simply stated that Yukos Capital's motion for summary judgment was granted. Yukos Capital timely moved to amend the judgment, and on October 2, 2013 the Supplemental Final Judgment was entered. SPA-43. The Supplemental Final Judgment set forth the specific relief and sums owed as stated in the Award (which were set forth in both dollars and rubles), and converted the total amount of the Award to U.S. Dollars using the exchange rate as of the date the Award was issued. SPA-43-44.

## SUMMARY OF ARGUMENT

I. The Award was made in New York, pursuant to New York law. Key witnesses and documents were located in the United States. There is no support in law or logic for Samaraneftegaz's position that *forum non conveniens* can be invoked in a confirmation proceeding under the Convention in the country that has primary jurisdiction over the award. The District Court therefore correctly retained jurisdiction over this case.

II. Samaraneftegaz cannot overcome the undisputed evidence that the director of its management company executed a power of attorney and that, pursuant to that power of attorney, Samaraneftegaz signed the Addenda, ratifying both documents with its corporate seal. None of Samaraneftegaz's hindsight

arguments undermine the import of these facts, which under either Russian or New York law, compel the conclusion reached by the District Court: Samaraneftegaz is bound by its agreement to arbitrate any disputes regarding the Loans.

III.     The District Court correctly found that Samaraneftegaz could not meet its "heavy" and "substantial burden" of proving "that one of the seven defenses under the New York Convention" applied in this case. *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005).

A.     Samaraneftegaz's lack of notice argument fails in light of the uncontroverted evidence that it received actual notice of the arbitration and chose not to participate.  SPA-33-34; JA-2129-2340; JA-2669-2727.  Every single notice sent by the Tribunal satisfies U.S. due process.

B.     Samaraneftegaz's public policy defense is, as the District Court found, a thinly veiled attempt to circumvent the dispute resolution mechanism it contractually agreed to in the Addenda.  Samaraneftegaz's failure to either contest the validity of the Loans in the arbitration or to identify a relevant public policy against confirmation dooms this defense.

IV.     In its Supplemental Final Judgment, the District Court corrected the Judgment to specify the amount owed to Yukos Capital under the Award.  SPA-45. Yukos Capital's petition to confirm the Award stated the debt owed in both rubles and dollars, stating that "the Tribunal awarded Yukos Capital a total of RUR

23

3,080,711,971 (approximately $120 million) against Defendant Samaraneftegaz,"
and made clear that the $120 million was based on the exchange rate as of the date
of the Award. JA-25. The District Court correctly converted the Award from
Russian rubles to U.S. dollars as of the date of the Award so that Samaraneftegaz
would not benefit from a depreciation of the ruble during the six years that
Samaraneftegaz failed to satisfy the Award. The District Court's conversion to
dollars was necessary to prevent manifest injustice.

## ARGUMENT

## I.   THE DISTRICT COURT PROPERLY RETAINED JURISDICTION OF A PROCEEDING TO CONFIRM A NEW YORK-SEATED ARBITRAL AWARD

"Appellate review of a forum non conveniens decision is extremely limited.
We have said that the decision 'lies wholly within the broad discretion of the
district court' and should be reversed only if 'that discretion has been clearly
abused.'" *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 46 (2d Cir. 1996)
(citation omitted).

On a motion to dismiss under *forum non conveniens*, "unless the balance
strongly favors defendant, plaintiffs' choice of forum 'should rarely be disturbed.'"
*DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 30-31 (2d Cir. 2002) (quoting *Gulf
Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). Accordingly, a plaintiff should
not be "deprived of [its] choice of forum except upon defendants' clear showing

24

that a trial in the United States would be so oppressive and vexatious to them as to be out of all proportion to plaintiffs' convenience." *Id.* at 30. Samaraneftegaz failed to show that litigating in New York—where it consented to arbitrate—would be "oppressive and vexatious."[4]

As a threshold matter, Samaraneftegaz fails to cite a single case in which an appellate court reversed a district court order denying a motion for *forum non conveniens* after the case had proceeded to discovery and summary judgment before the district court. *Figueiredo Ferraz E Engenharia de Projeto Ltd. v. Republic of Peru*, 665 F.3d 384, 386 (2d Cir. 2011), on which Samaraneftegaz relies, involved an interlocutory appeal of an order denying dismissal of a proceeding to enforce an arbitral award made in Peru against the Republic of Peru.[5] Samaraneftegaz did not seek interlocutory appeal. Samaraneftegaz used

---

[4] The District Court gave Samaraneftegaz the extra benefit of declining to give any deference to Yukos Capital's selection of New York as a forum, a ruling with which Yukos Capital respectfully disagrees. *See R. Maganlal & Co. v. M.G. Chem. Co., Inc.*, 942 F.2d 164, 168 (2d Cir. 1991) ("Where, as here, the plaintiff is foreign, the plaintiff's choice of forum is entitled to less weight. However, this reduced weight is not an invitation to accord a foreign plaintiff's selection of an American forum *no* deference since dismissal for forum non conveniens is the exception rather than the rule.") (internal citations and quotations omitted) (emphasis in original).

[5] *Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 982 (2d Cir. 1993) (cited in AOB 26 n.6) affirmed *dismissal* of an action where the "sole connection to the local forum" was that payments under the loan agreements were to be made in New York.

Grekhov's false submission to insist on taking discovery, and noticed seven depositions of Yukos Capital's witnesses (none of whom reside in Russia), which were conducted in New York, Washington D.C. and Houston. JA-517; JA-599; JA-623; JA-711; JA-775; JA-848.

The fact that the case has already been decided on the merits after discovery further weighs in favor of affirmance here. *Indasu Int'l, C.A. v. Citibank, N.A.*, 861 F.2d 375, 380 (2d Cir. 1988) ("After a full trial, a party challenging a determination of *forum non conveniens* must display substantial prejudice."). Samaraneftegaz cannot show any prejudice here. Indeed, discovery disproved all of Samaraneftegaz's assertions as to why Russia was the preferable forum and confirmed the correctness of the District Court's decision to retain jurisdiction.

*First*, only two of the nine witnesses deposed were located in Russia. JA-517; JA-591; JA-599; JA-623; JA-711; JA-775; JA-848; JA-889. The key witnesses—who could not safely travel to Russia—included the American former CEO of Yukos Oil, the American former CFO of Yukos Oil, and the American former in house counsel at Yukos Oil. Dkt. 17 at 14; JA-372; JA-375; JA-382-83. Samaraneftegaz's Russian witnesses were deposed in Helsinki, Finland as a result of the District Court's July 5, 2011 order finding "uncertainty concerning whether depositions in a case such as this are, in fact, permitted or unlawful in Russia." JA-489.

26

Samaraneftegaz has not identified any additional witnesses besides Grekhov. Grekhov never denied signing the Power of Attorney, but submitted a false affidavit claiming he was not aware of the Addenda. JA-194. Although Samaraneftegaz claimed that Grekhov was not under its control, Samaraneftegaz procured his false affidavit and instructed Yukos Capital's counsel not to contact him. JA-1459. Discovery revealed that Grekhov attended a meeting of the Management Committee at which the Addenda were discussed and agreed that he would sign the Addenda as long as there were no criminal risks. JA-705-07. Further, the CEO of Samaraneftegaz's parent instructed Grekhov in writing to sign the Addenda. SJA-186. If anyone were prejudiced by the inability to depose Grekhov, it would be Yukos Capital, who lacked the opportunity to cross-examine him about his false affidavit.

*Second*, although Samaraneftegaz also claimed that most of the relevant documents would be located in Russia and written in the Russian language (Dkt. 12 at 15-16), this too proved false. The majority of the documents on which Samaraneftegaz relied in its summary judgment motion were produced by Yukos Capital—including key Management Committee meeting minutes discussing the Addenda—and written in English. *See, e.g.*, JA-669; JA-701; JA-705; JA-755; JA-757; JA-764; JA-770; JA-773; JA-821; JA-824; JA-826; JA-834; JA-843; JA-846; JA-863; JA-869-87.

27

*Third*, it would be inappropriate to dismiss a New York proceeding to confirm a New York-seated Convention award, made under New York law, on *forum non conveniens* grounds. Samaraneftegaz fails to cite a single case in which a court has dismissed a proceeding to confirm a Convention award in the primary jurisdiction. To do so would be completely contrary to the Convention. *See Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" US, Inc.*, 126 F.3d 15, 22 (2d Cir. 1997) ("[U]nder the Convention, the power and authority of the local courts of the rendering state remain of paramount importance."). Importantly, in *In re Monegasque*, 311 F.3d 488, 500 (2d Cir. 2002) (AOB 22-24), the petitioner sought confirmation of a Russian arbitral award in an enforcement action that had "no connection with the United States other than the fact that the United States is a Convention signatory." Furthermore, in *Monegasque* the petitioner sought to enforce the award against Ukraine, a sovereign state and non-signatory to the arbitral agreement, based on a veil-piercing theory, necessitating extensive discovery in the Ukraine. *Id.* at 494-95. Here, the Award was made in New York pursuant to an agreement governed by New York law.

Finally, the District Court concluded only that the threshold question of the *validity of the Addenda*—not whether the Award should be confirmed in the U.S.—should be litigated in Russia, and stayed the proceeding to allow the Russian enforcement action to proceed first. SPA-1. The Russian court did not rule on the

validity of the Addenda or the Power of Attorney under Russian law. JA-1435-41. Accordingly, the District Court properly determined that it would rule on the threshold issue.[6]

As the Award was made under New York law in New York and key witnesses and documents were located in the United States, the balance of public and private factors did not weigh in favor of dismissal. Accordingly, the District Court's decision to retain jurisdiction was proper.

### A. THE DISTRICT COURT PROPERLY HELD THAT THE ARBITRATION AGREEMENT IS VALID

#### 1. The Power of Attorney Is Valid under Russian Law

As Yukos Capital demonstrated below through two expert Russian law reports, the purpose behind the statutory requirement that a power of attorney bear the date of execution is that the term of its validity is measured from that date. JA-1062-63; JA-1120. The District Court found "ample support for this argument." SPA-12 n.7. Under Russian law, a power of attorney is valid for a maximum of three years, and a power of attorney that does not state its duration is valid for one

---

[6] This Court has held that "the need to apply foreign law is not in itself a reason to apply the doctrine of forum non conveniens, and we must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform." *Manu Int'l, S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 67-68 (2d Cir. 1981) (quotations and citations omitted). Samaraneftegaz's assertion a Russian court would have correctly applied Russian law lacks any force because the Russian court did not even address the validity of the Power of Attorney and the Addenda.

year.  JA-1062; JA-1120.  A power of attorney that bears no date is void without a date from which to measure the period of validity.  *Id*.  The date of execution does not necessarily mean the date of signing, but rather the date of effectiveness as determined by the principal, who is free to determine the effective date of the power of attorney.  JA-1118; JA-1122.[7]

The District Court found determinative a Russian case in which a power of attorney was dated three days before the notary provided the required certification:

> The Russian court ruling on the issue 'considered [the power of attorney] valid only from the date of its certification by the notary, not the earlier date placed on the power of attorney by the principal.'  By modifying the date of execution to reflect the later date—from which the term of effectiveness ran … the Court held that an inaccurate execution date does not void a power of attorney.

SPA-13 (alteration in original).  This case is contrary to Samaraneftegaz's assertion that "a power of attorney is *void ab initio* if it does not bear the date when it was signed."  AOB 28.

Samaraneftegaz's argument that the Russian case cannot override "the plain language of the Civil Code" fails because (1) as explained by Yukos Capital's

---

[7]  Even if Samaraneftegaz's interpretation of the "execution" requirement of a power of attorney were correct, Samaraneftegaz failed to challenge the Power of Attorney within the limitations period.  Under Article 181(1) of the Russian Civil Code, a party must bring an action for applying the consequences of a void transaction within three years of the transaction.  JA-1123-24; JA-1061.  Because Samaraneftegaz has never challenged the power of attorney in a Russian court, it cannot now rely on the defense that the Power of Attorney is void.

experts and supported by the cited case, "execution" need not mean the date of signing; (2) the statutory regime supports the ability of the principal to determine the effective date of the power of attorney, even retroactively;[8] and (3) Russian law does not permit the use of extrinsic evidence to override the explicit text of a contract. JA-1122. The Power of Attorney bears the date placed on it by Samaraneftegaz's manager and that date is recorded in its registry of contracts. That is the "only legal expression of the date of execution … that is relevant under the Russian law." JA-1123.

Samaraneftegaz's interpretation of Russian law would allow a party to escape liability by the simple expedient of signing the power of attorney on a date later than the stated date on the document. If the contract turns out to be favorable the party never has to reveal when the power of attorney was signed. On the other hand, if the party wishes to get out of the contract, under Samaraneftegaz's view of the law, all the party has to do is reveal the date the power of attorney was signed and the contract is void. This is wholly inconsistent with Russian law and commercial norms. JA-1125.

---

[8] Russian law allows for a retroactive power of attorney under Article 425, paragraph 2 of the Civil Code. JA-1118-19; JA-1063. Furthermore, Article 183, paragraph 2 of the Civil Code allows a subsequent ratification of a transaction by the person represented pursuant to a power of attorney. *Id*.

### 2. The Addenda Are Valid Under Russian Law

The uncontroverted record evidence establishes that Grekhov was present at meetings of the Management Committee at which changing the dispute resolution clause to English or U.S. law was openly discussed, and that Grekhov agreed to sign the Addenda absent "criminal risks" to himself. SPA-15. Further, "[k]nowing that Yukos Oil wanted to change the arbitration provision, Grekhov signed the power of attorney which explicitly authorized Godfrey" to amend agreements on behalf of the company. *Id.* The District Court's findings, supported by the undisputed record evidence, refute Samaraneftegaz's claim that the Addenda were executed against the interests of Samaraneftegaz.

#### a. There was no "abuse of right"

Under Russian law, the abuse of right doctrine applies only where an act was performed with the sole intention of harming another. JA-1064. There is no evidence whatsoever that Godfrey sought to harm Samaraneftegaz merely by selecting a neutral forum to arbitrate disputes between sister companies. Furthermore, a Russian corporation has the authority to direct a subsidiary's actions. JA-1128. The Russian cases Samaraneftegaz relies on are wholly inapposite. AOB 35-36. One involved a conspiracy between managers of two companies to defraud one of the companies. JA-1128-29. Another involved a board of directors' planned resignation with the sole aim of destabilizing the

32

company and harming its shareholders. *Id.*; JA-1064-65. Here, the management of Samaraneftegaz's parent, Yukos Oil, made a reasoned decision, vetted by Russian counsel, to provide for arbitration in a neutral forum. The District Court rightly found, distinguishing the Russian case relied on by Samaraneftegaz, that "Samaraneftegaz is not an individual shareholder which cannot afford to travel outside of Russia, but rather is an oil company" and that "Samaraneftegaz has not cited any Russian statute from which the Court can conclude that a New York forum would be inappropriate for arbitration between these two companies." SPA-16.[9]

### b. Godfrey did not breach any duty to Samaraneftegaz

Samaraneftegaz's claim that Godfrey had a "conflict of interest" when he signed the Addenda fails under Russian law, which requires that an individual directly represent both parties to a transaction and typically involves financial self-dealing. JA-1131-33; JA-1067-69. Godfrey did not represent both parties to the transaction. As the District Court found, Samaraneftegaz "has not shown that Godfrey had the authority … to sign the Addenda on behalf of Yukos Capital

---

[9] Despite its claims that it lacked the ability to defend an arbitration in New York, Samaraneftegaz retained superb counsel to oppose this action to confirm the Award, and mounted a vigorous and imaginative defense. Samaraneftegaz would have needed outside counsel to defend such a significant claim even in Russia. SJA-46-47; JA-1327 (admitting that Samaraneftegaz used outside counsel in Samara enforcement proceeding).

without a power of attorney in place—just as he needed a power of attorney to sign

on behalf of Samaraneftegaz." SPA-18.  Indeed, "Godfrey's indirect relationship

to Yukos Capital is much more attenuated than the relationships" in a case in

which the highest Russian court rejected the conflict of interest argument

Samaraneftegaz advances here. *Id*; JA-1134.  Further, contrary to

Samaraneftegaz's claims, the District Court properly found that Godfrey acted "at

least in one important sense, in Samaraneftegaz's interest" because

"Samaraneftegaz had an interest in complying with Yukos Oil's directive to

execute the Addenda." SPA-17.  There is no evidence to suggest that Godfrey

benefited financially from the amendment of the Loans.

### c.     The Addenda were properly executed

Under Russian law, the presence of a corporate seal on a contract overrides

any alleged defects in the contract's execution.  JA-1125.  The record shows that

both the Power of Attorney and the Addenda bear the seal of Samaraneftegaz.  JA-

858; JA-150; JA-160.  Samaraneftegaz has never put forward evidence that the

application of the seal of Samaraneftegaz was unauthorized.

Samaraneftegaz's argument that the Addenda should have been sealed by

Yukos Capital instead of TMF or Yukos EP instead of Samaraneftegaz fails.  TMF

was authorized to sign for Yukos Capital, and the representative of TMF affixed

his signature and applied the seal of the company he represented, TMF.  JA-1136-

37.  The District Court properly held that this signature and stamp was authorized by the Russian version of Section 6.2 of the Loans.  SPA-20.  Godfrey signed the Addenda as the representative of Samaraneftegaz pursuant to the Power of Attorney, and the seal of Samaraneftegaz was applied to the Addenda by Yukos EP after it received the Addenda signed by Godfrey.  *Id.*  The District Court correctly found that Godfrey's signature (as Samaraneftegaz's representative) and Samaraneftegaz's seal was authorized.

## B.    The Addenda Are Also Valid Under New York Law[10]

"The presence of the corporate seal on a written instrument purporting to be executed by authority of a domestic or foreign corporation shall be prima facie evidence that the instrument was so executed."  N.Y. Bus. Corp. Law § 107 (McKinney 2012).

In addition, Godfrey had apparent authority to bind Samaraneftegaz to the Addenda because he signed the Addenda pursuant to a Power of Attorney that bore

---

[10]  This Court has repeatedly held that the validity of an arbitration agreement may be decided under the law specified in the challenged contract.  *See Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 32 n.3 (2d Cir. 2001) (applying law contained in challenged agreement to arbitrate allegedly signed by agent acting outside the scope of his authority and against the interest of the company); *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 50 (2d Cir. 2004) ("[A] choice-of-law clause in a contract will apply to disputes about the existence or validity of that contract."); *Telenor Mobile Communc'ns AS v. Storm LLC*, 584 F.3d 396, 411 n.11 (2d Cir. 2009) (applying New York law to determine validity of arbitration agreement).

the seal of Samaraneftegaz and the signature of Yukos EP's President, Grekhov. The undisputed evidence that the Power of Attorney was prepared by Russian counsel, signed by Grekhov in the presence of counsel, sealed with the corporate stamp of Samaraneftegaz, and recorded on the registry of powers of attorney (*see infra* at 12), proves that "everyone at the relevant time, including [defendant], thought that [the agent] had the authority to execute the agreement." *See Telenor*, 584 F.3d at 412 (2d Cir. 2009).

Accordingly, the validity of the Addenda should be upheld under both Russian and New York law.

## II.    CONFIRMATION OF THE AWARD WAS PROPER

"The party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses under the New York Convention applies.  The burden is a heavy one, as the showing required to avoid summary confirmance is high." *Encyclopaedia Universalis*, 403 F.3d at 90 (citation and quotation omitted).

### A.    The District Court Properly Held that Samaraneftegaz Had Sufficient Notice

The relevant standard is whether notice of the arbitration complied with U.S. standards of due process.  *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier*, 508 F.2d 969, 975 (2d Cir. 1974).  Under well-settled law, the "inquiry into the adequacy of notice focuses on the reasonableness of the chosen means, not whether the affected persons actually received notice."

36

*Brody v. Vill. of Port Chester*, 434 F.3d 121, 127 (2d Cir. 2005). Moreover, under U.S. law, by failing to respond to the notice of arbitration, Samaraneftegaz was not entitled to notice of every subsequent event in the proceeding, although it is undisputed that such notice was given. *See Ortiz-Gonzalez v. Fonovisa*, 277 F.3d 59, 63 (1st Cir. 2002) ("[B]y failing to respond or appear, [defendant] lost its right to notice of the trial date.").

Samaraneftegaz admits it received Yukos Capital's Request for Arbitration. JA-46; JA-1949-50; JA-2129-33. Samaraneftegaz further admits that its manager Yukos EP wrote to the ICC to express Samaraneftegaz's jurisdictional objection and to refuse to pay its share of the costs. JA-2174. As a result, the ICC and Tribunal sent notice of each stage of the arbitration to Yukos EP. JA-2176-2240, JA-2669-2727. Yukos EP responded on Samaraneftegaz's behalf to the notices it received. JA-2192.

Samaraneftegaz's challenge to the reasonableness of the notice provided by the ICC Secretariat and the Tribunal strain credibility. First, Samaraneftegaz asserts that "the Chairman [of the tribunal] unilaterally decided to address subsequent notices to a person at Yukos EP he deemed a replacement for Mr. Grekhov." AOB 50. But the ICC received a letter *from Mr. Starodubtsev*, "Acting President of ZAO Yukos EP – Management Company of OAO Tomskneft VNK and OAO Samaraneftegaz." JA-2192. That Starodubtsev was the appropriate

37

recipient of further correspondence was confirmed on July 17, 2006 when

"[d]uring a follow-up telephone call with Respondent, the Chairman was informed

that Respondent's designated representative, Grekhov…had been replaced by

Starodubtsev."  JA-47.

Samaraneftegaz claims that as of July 2006, Yukos EP's management

agreement with Samaraneftegaz was terminated.  AOB 50.  Samaraneftegaz's

alleged new corporate manager, Yukos RM, shared the same address and fax

number with Yukos EP during the relevant period.  *Compare* JA-2174; JA-2192

*with* JA-2639; JA-2646-47; JA-2655.  The record is clear that Yukos Capital

provided the ICC with the address for Samaraneftegaz's corporate headquarters.

JA-2112; JA-2075.  The ICC used that address until Yukos EP provided another

one.[11]  Under the ICC Rules, it was Samaraneftegaz's duty to notify the ICC of this

purported change.  SPA-36.

---

[11]  The two treatises cited by Samaraneftegaz do not change this result.  AOB 50-51 (citing Yves Derains & Eric A. Schwartz, *A Guide to the ICC Rules of Arbitration* 36-37 (2005) and W. Laurence Craig, William W. Park & J. Paulsson, *International Chamber of Commerce Arbitration* 152 (3d ed. 2000) ("Craig").  The first merely places the burden upon the Claimant to provide an accurate address for the Respondent, as Yukos Capital did here, and does not create an obligation on the Claimant to notify the tribunal if the Respondent changes its representative.  The second simply does not stand for the proposition that "the burden is on the claimant to ensure that a party who does not appear receives notice of 'every step' of the proceedings at a proper address."  AOB 51 (citing Craig at 152).  The actual text of the treatise states: "*The ICC* is anxious to ensure the enforceability of its awards, and ensures that

*(Cont'd on next page)*

The law is clear that the inquiry is whether the notice the ICC provided was reasonably calculated to inform Samaraneftegaz of the proceedings, *not* whether Samaraneftegaz actually received the notices. *See, e.g.*, *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950); *Parsons & Whittemore Overseas*, 508 F.2d at 975. The District Court properly held that the notices sent by the ICC and the Tribunal were reasonably calculated to provide Samaraneftegaz notice of the proceedings and an opportunity to be heard. SPA-35.

Indeed, the undisputed evidence shows that Samaraneftegaz received actual notice not only of the existence of the arbitration, but of all key events.

For example, Samaraneftegaz feigns ignorance of the "selection and appointment of an arbitrator for Samaraneftegaz *in absentia*," and "appointment of the tribunal's chairman." AOB 48. This assertion is refuted by Samaraneftegaz's concession in its response to Yukos Capital's 56.1 Statement that it received the draft Terms of Reference,[12] which explained that on "5 May 2006, the ICC Court … appointed, pursuant to Art. 9(6) of the ICC Rules, Dr. Ivan Zykin as co-arbitrator upon the proposal of the Russian National Committee on behalf of Respondent which failed to nominate a co-arbitrator" and that on "30 June 2006

---

*(Cont'd from previous page)*
> even defaulting parties continue to receive notice of every step in the proceedings." (emphasis added).

[12]  JA-2434.

the ICC Court … appointed Dr. Bernhard F. Meyer-Hauser as Chairman of the Arbitral Tribunal upon the proposal of the Swiss National Committee."  JA-2294.

Samaraneftegaz likewise claims it was "in the dark" regarding "the ICC's decision provisionally overruling Samaraneftegaz's objection" (AOB 48), yet the draft Terms of Reference states that Yukos Capital responded to Samaraneftegaz's objection on April 24, 2006, and "[i]n consideration of the parties' comments, the ICC Court decided at its session of 5 May 2006 that this arbitration shall proceed in accordance with Art. 6(2) of the ICC Rules."  JA-2294.  The draft Terms of Reference further informed Samaraneftegaz of the "ICC Court's decision that the arbitration shall proceed on a *prima facie* basis and without prejudice despite [Samaraneftegaz's] objections to the Arbitral Tribunal's jurisdiction."  JA-2296.[13]

A respondent with actual notice that an arbitration is pending cannot default and challenge enforcement on due process grounds.  Indeed, the very same page of the *ICCA's Guide to the Interpretation of the 1958 New York Convention: Handbook for Judges* (2011) cited by Samaraneftegaz explains:

---

[13]  Samaraneftegaz's claim that the documents it admits receiving were insufficient because they were written in English is without merit.  AOB 51-52. Samaraneftegaz cannot complain that the Arbitration was conducted in the language that it agreed would be used.  JA-41-147; JA-1278-82. Samaraneftegaz caused its management company, Yukos EP, to respond to the Request for Arbitration in English, refuting its assertion that it lacked the means to comprehend or respond to documents written in English.  JA-2174.

> *Where actual notice of an arbitration has been received by the respondent but the respondent fails or refuses to participate in the arbitration, courts hold that there is no violation of due process under Article V(1)(b).*  If a party chooses not to take part in the arbitration, this is not a ground for refusing enforcement.

*ICCA Handbook* at 90 (emphasis added). [14]

## B. The District Court Properly Exercised its Discretion Not to Defer to the Russian Court

"The district court is generally accorded wide discretion to determine when offensive collateral estoppel should be applied."  *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1486 (2d Cir. 1995).

As the District Court noted, "Samaraneftegaz acknowledges, 'the ultimate issue of the adequacy of notice was governed by Russian law in the prior [Russian] action and by U.S. law here.'" (SPA-32 quoting (D. Rep. at 1-2.)).  The only *facts* found by the Samara court are neither in dispute nor relevant.  The Samara court found:  (1) there was no "actual evidence (DHL receipts)" proving that notices

---

[14]  Samaraneftegaz also quotes Gary B. Born, *International Commercial Arbitration* (2009) ("Born").  AOB 47 n.16.  The U.S. authorities cited by Born in support of the language quoted by Samaraneftegaz serve only to support the District Court's decision.  *See* Born at 2750 n.235, citing, *inter alia*, *Geotech Lizenz AG v. Evergreen Sys., Inc.*, 697 F. Supp. 1248, 1253 (E.D.N.Y. 1988) ("[I]t was Evergreen's choice to fail to appear at the arbitration … [u]nder these circumstances the Court has difficulty comprehending the basis for any argument based on an alleged lack of notice.") and *Ferrara S.p.A. v. United Grain Growers, Ltd*, 441 F. Supp. 778, 783 (S.D.N.Y. 1977) ("Since … there is no question that Ferrara received timely actual notice of the May 27, 1977, hearing before the Association, which it chose to ignore, the requirements of due process have been satisfied."), *aff'd mem.*, 580 F.2d 1044 (2d Cir. 1978).

dated January 20, 2006, February 7, 2006, February 15, 2006 and March 13, 2006 were sent to Samaraneftegaz; and (2) after "March 13, 2006, notices of the proceedings have been sent by the Secretariat … directly to CJSC YUKOS EP." JA-1695. The first finding is simply wrong (*see* DHL detailed delivery reports for Jan. 20, 2006 letter, JA-2133; Feb. 7, 2006 letter, JA-2139; Feb. 15, 2006 letter, JA-2144; and March 13, 2006 letter, JA-2171), and ***Samaraneftegaz admits receiving these notices*** (JA-509-10). As Judge Crotty noted, the second finding "neglected to mention the October 24, 2006 notice entirely." SPA-32. The fact that the draft Terms of Reference—which Samaraneftegaz admits receiving—is omitted from the Samara Court's opinion makes application of collateral estoppel inappropriate because "it is unclear that the Arbitrazh court actually decided the issue." *Id*.

The only relevant inquiry—the application of U.S. law to the facts of this case—was not addressed by the Samara Court. Rather, the Samara Court's decision is based upon its *legal conclusion under Russian law*—including Article 54(2) of the Civil Code of the Russian Federation, Article 13(1) of the Federal Law No. 129-FZ dated August 8, 2001 and the Samara Court's view of "the location of a legal entity … established under the laws of the Russian Federation"—that certain notices had "not been sent to and, therefore, received by OJSC Samaraneftegaz (50 Volzhskiy Prospect, Samara, 443072, the Russian

42

Federation)."  JA-1696.  Accordingly, the District Court properly found that there

was "insufficient identity of issues to support collateral estoppel."  SPA-32.

**C.  The District Court Correctly Rejected Samaraneftegaz's "Public Policy" Defense**

As this Court has explained, a "court's power to invoke public policy to

reject an arbitral award 'is limited to situations where the contract as interpreted

[by the arbitrators] would violate some explicit public policy that is well defined

and dominant, and is to be ascertained by reference to the laws and legal

precedents and not from general considerations of supposed public interests.'"

*Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 264 (2d

Cir. 2003) (brackets in original) (quoting *United Paperworkers Int'l Union, AFL-

CIO v. Misco, Inc.*, 484 U.S. 29, 43 (1987)).  "[T]his public policy exception is to

be construed *very narrowly* and should be applied 'only where enforcement would

violate our *"most basic notions of morality and justice*.""  *Europcar Italia, S.p.A.

v. Maiellano Tours*, 156 F.3d 310, 315 (2d Cir. 1998) (citations omitted) (emphasis

added).

In addressing challenges to the enforcement of an arbitral award under the

Convention on public policy grounds, courts must distinguish between issues

related to the arbitral award such as "a fraudulently obtained arbitration agreement

or award, which might violate public policy and therefore preclude enforcement"

on the one hand, and "whether the underlying contract that is the subject of the

arbitrated dispute was forged or fraudulently induced—a matter to be determined exclusively by the arbitrators" on the other. *Europcar Italia*, 156 F.3d at 315. This distinction is crucial because Supreme Court precedent requires that "the issue of [a] contract's validity is considered by the arbitrator in the first instance." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446 (2006); *see also Rent-a-Center, W., Inc. v. Jackson*, 130 S. Ct. 2772, 2778-79 (2010) (claim that underlying contract was unconscionable does not prevent a court from enforcing agreement to arbitrate). "Nor does the fact that [the court] is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task." *United Paperworkers*, 484 U.S. at 45.

### 1. The District Court properly rejected Samaraneftegaz's attempt to circumvent the arbitration agreement

Samaraneftegaz does not, and cannot, argue that the arbitrators participated in some fraud or that the Award was fraudulently obtained. Samaraneftegaz's entire challenge to confirmation is based upon its challenge to the validity of the Loans.

Samaraneftegaz argues that the District Court should have deferred to the Samara Court's findings regarding "the role of the Loan Agreements in Yukos Oil's tax-evasion scheme" and the findings from the Neft-Aktiv Action that "the Loan Agreements were part of an 'unlawful' scheme of financing." AOB 44-45.

In this case, the parties agreed:

> Any dispute, claim, or controversy arising out of or relating to [the Loan] Agreement[s], or the performance, breach, validity, interpretation, application, or termination thereof ("Dispute"), shall be finally resolved by arbitration."

JA-149; JA-159. Samaraneftegaz's assertion that the Loans are void because of some tax evasion scheme—in addition to being without factual basis—is a "dispute, claim, or controversy" relating to the "validity" of the Loans. As such, the parties agreed to arbitrate it.

The Tribunal correctly found that Yukos Capital agreed to loan Samaraneftegaz 2,415,890,000 rubles and Samaraneftegaz agreed to pay interest and repay the principal. JA-152; JA-162. The Tribunal further found that Yukos Capital provided the funds to Samaraneftegaz based on wire transfer records. JA-60. Samaraneftegaz neither made the required interest payments, nor repaid the principal when Yukos Capital demanded repayment as it was contractually entitled to do. JA-1266-76; JA-1284-1301; JA-1381. The Tribunal did not find that the Loans were sham transactions used to return funds taken from Samaraneftegaz as part of an alleged tax evasion scheme. *See Banco de Seguros*, 344 F.3d at 264.[15]

---

[15] The cases cited by Samaraneftegaz in support of its assertion that courts have held awards unenforceable for reasons that "touch on an underlying contract" (AOB 53) do nothing to undermine the black letter law that the validity of the parties' agreement is the province of the arbitrator. *Buckeye*, 546 U.S. at 446.

*(Cont'd on next page)*

Samaraneftegaz introduced no evidence before the arbitrators disputing the validity of the Loans or that the money was advanced and not repaid, nor any evidence to support the allegation that Yukos Capital engaged in some unspecified tax fraud by lending money to a sister corporation. To the contrary, the record shows the Loans were advanced to allow Samaraneftegaz to continue business operations during the Russian state's campaign against Yukos Oil. JA-1968-69. Accordingly, because Samaraneftegaz "failed to raise the issue … to the arbitrators, the issue is forfeited." *See Europcar*, 156 F.3d at 315.

---

*(Cont'd from previous page)*

For example, in *Sea Dragon, Inc. v. Gebr. Van Weelde Scheepvaartkantoor B.V.*, 574 F. Supp. 367, 372 (S.D.N.Y. 1983), the district court addressed a challenge to an award issued *after* a Dutch court enjoined payment of the parties' contract in an action brought by an unrelated third party. In contrast, Samaraneftegaz attempts to avoid the Award by pointing to a decision issued *after the Award*, in a case brought by its sole shareholder. In any event, "*Sea Dragon* … was decided over two decades ago, and has not been relied upon for the relevant proposition since it was decided." *Telenor Mobile Commc'ns AS v. Storm LLC*, 524 F. Supp. 2d 332, 348 (S.D.N.Y. 2007) (rejecting public policy defense based upon foreign court order), *aff'd*, 584 F.3d 396, 412 (2d Cir. 2009). The two other cases cited by Samaraneftegaz are equally inapposite. *See* AOB 53 citing *Changzhou AMEC E. Tools & Equip. Co. v. E. Tools & Equip., Inc.*, No. EDCV 11-00354 VAP, 2012 WL 3106620, at *19 (C.D. Cal. July 30, 2012) (denying enforcement of arbitral award based upon contract entered "without one party's consent and complied with out of fear of imprisonment") and *Laminoirs-Trefileries-Cableries de Lens, S. A. v. Southwire Co.*, 484 F. Supp. 1063, 1069 (N.D. Ga. 1980) (granting motion to confirm arbitral award but limiting post-judgment interest based on arbitrator's interpretation of the contract).

46

Accordingly, the public policy of the United States is not violated by confirmation of the Award.

> **2.  Samaraneftegaz offered no evidence in support of its tax evasion allegations**

Samaraneftegaz failed to meet the "substantial burden" it faced as the party resisting enforcement of a foreign arbitral award. *Encyclopaedia Universalis*, 403 F.3d at 90. Samaraneftegaz offered no evidence in support of its assertions of tax evasion. Rather, Samaraneftegaz relied entirely upon the collusive Neft-Aktiv Action and a European Court of Human Rights ("ECHR") decision. AOB 54-55. Neither Samaraneftegaz nor Yukos Capital was a party to the ECHR case, which involved Russian tax assessments made *prior* to the 2004 loans and does not reference any loans made by Yukos Capital. *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 400 (2d Cir. 2011) (Collateral estoppel requires that "the identical issue was raised in a previous proceeding" and "the party had a full and fair opportunity to litigate the issue") (quotation omitted).

The "findings" in the collusive Neft-Aktiv Action are likewise not entitled to preclusive effect for at least three independent reasons. First, there was no identity of issues. The Russian court's consideration of whether the Loans violate Russian Tax law as a result of the judgment in a criminal action to which Yukos Capital was not a party has no bearing on whether "the [Loans] as interpreted by the

47

arbitrators would violate some explicit [U.S.] public policy that is well defined and dominant." *Banco de Seguros*, 344 F.3d at 264 (alteration and citation omitted).

Second, Yukos Capital was not a party to, and did not have a full and fair opportunity to contest, determinations in the criminal and tax cases upon which the Russian Court based its conclusion that the Loans were "sham transactions." As the *United States Congress* explained in the Magnitsky Act regarding the criminal case upon which the Samara Court relied:

> The second trial, verdict, and sentence against former Yukos executives Mikhail Khodorkovsky and Platon Lebedev *evoke serious concerns about the right to a fair trial and the independence of the judiciary in the Russian Federation. The lack of credible charges, intimidation of witnesses, violations of due process and procedural norms*, falsification or withholding of documents, denial of attorney-client privilege, and illegal detention in the Yukos case are highly troubling .... Furthermore, senior officials of the Government of the Russian Federation .... *have acknowledged that the arrest and imprisonment of Khodorkovsky were politically motivated*.

Pub. L. No. 112-208, 126 Stat. 1504 (emphasis added). It simply cannot be said that enforcing a prior decided arbitral award violates U.S. public policy on the basis of findings of a Russian court that the legislative and executive branches of the U.S. government determined "lack [] credible charges." *Id*.

Third, giving the Neft-Aktiv judgment preclusive effect would violate the strong federal policy in favor of arbitration. *See Ministry of Def. & Support v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1098 (9th Cir. 2011) ("Our analysis begins with the strong public policy favoring confirmation of foreign arbitration awards").

48

Here, the District Court found that the Neft-Aktiv Action was a "transparent attempt to circumvent" the arbitration. SPA-38. Accordingly, the District Court properly "exercise[d] its discretion in declining to credit Samaraneftegaz's belated policy arguments." *Id*.; *see Telenor*, 584 F.3d at 410 (refusing to recognize collusive litigation between related Ukrainian entities designed to undermine an arbitral award as "contrary to public policy, viz., the well-established federal public policy in favor of arbitration."); *see also Am. Constr. Mach. & Equip. Corp. Ltd v. Mechanised Const. of Pakistan Ltd*, 659 F. Supp. 426, 429 (S.D.N.Y. 1987), *aff'd*, 828 F.2d 117 (2d Cir. 1987).

### 3. Samaraneftegaz failed to identify any public policy contrary to enforcement of the award

In *United Paperworkers*, the United States Supreme Court granted a writ of certiorari "[b]ecause the Courts of Appeals are divided on the question of when courts may set aside arbitration awards as contravening public policy." 484 U.S. at 35. The Supreme Court began its analysis by noting "that a court's refusal to enforce an *arbitrator's interpretation* of such contracts is limited to situations where *the contract as interpreted* would violate 'some explicit public policy' that is 'well defined and dominant, and is to be ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests."'" *Id*. at 43 (quoting *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber*, 461 U.S. 757, 766 (1983)) (emphasis altered).

49

The Supreme Court reversed the Fifth Circuit's affirmance of the district court's order vacating the arbitral award, both because the lower court failed to identify a "well-defined and dominant" public policy based on a "review [of] existing laws and legal precedents," and because the district court improperly made findings of fact beyond those made by the arbitrator. *Id*. at 44.

The Tribunal found the Loans valid, and no U.S. policy is violated by confirmation of the Award.

Moreover, there is no "well defined and dominant" U.S. public policy in favor of enforcing a foreign country's tax laws. Just the opposite is true: attempts to enforce a foreign country's tax claims are prohibited by the Revenue Rule. *E.g.*, *European Cmty. v. RJR Nabisco*, 424 F.3d 175, 179 (2d Cir. 2005) ("Courts of one nation will not enforce final tax judgments or unadjudicated tax claims of other nations.").

Samaraneftegaz's reliance on criminal cases regarding mail and wire fraud is misplaced. *See* AOB 56 (citing *Pasquantino v. United States*, 544 U.S. 349, 357 (2005), *United States v. Trapilo*, 130 F.3d 547, 551-553 (2d Cir. 1997), *United States v. $15,270885.69 Formerly on Deposit in Account No. 8900261137*, No. 99 Civ. 10255 (RCC), 2000 WL 1234593, at *3-4 (S.D.N.Y. Aug. 31, 2000)). *Pasquantino*, unlike the case at bar, was "a criminal prosecution brought by the United States in its sovereign capacity *to punish domestic criminal conduct*." 544

U.S. at 362 (emphasis added).  Both *Trapilo* and *United States v. $15,270885.69* likewise address *domestic* criminal conduct and stand for the unremarkable proposition that the mail and wire fraud statutes criminalize the "use of the telecommunication systems of the United States in furtherance of a scheme whereby one intends to defraud another of property" and that the "'identity and location of the victim … are irrelevant.'"  *Trapilo*, 130 F.3d at 552; *United States v. $15,270885.69,* 2000 WL 1234593, at *4 (quoting *Trapilo*).

Samaraneftegaz's assertion that "United States courts do not enforce contracts 'entered into with a view of violating the laws of another country'" (AOB 56, quoting *Rutkin v. Reinfeld*, 229 F.2d 248, 255 (2d Cir. 1956)) ignores the fact that the Tribunal found the Loans valid and did not find they violated any country's law.  In *Rutkin*, moreover, the contract at issue concerned conduct *in violation of U.S. law*.[16]

### a.    U.S. public policy is clear and expressly supports Yukos Capital here

Fatal to Samaraneftegaz's public policy defense is the fact that this is the rare case in which both the legislative and executive branches of the United States Government have expressly articulated the relevant public policy.  Specifically,

---

[16]  *Nat'l Petrochem. Co. of Iran v. M/T Stolt Sheaf*, 930 F.2d 240, 243 (2d Cir. 1991) (cited in AOB 56) is likewise inapplicable because, as in *Rutkin*, the Court was not addressing the enforcement of an arbitral award and was therefore not bound by an arbitrator's interpretation of the contract at issue.

Section 202(a)(1)(B) of the Magnitsky Act (126 Stat. 1499) requires the United States Trade Representative and the Secretary of State to jointly report to Congress on the measures taken and results achieved with respect to, among other things, "advocating for United States investors in the Russian Federation, including by promoting the claims of United States investors in Yukos Oil Company."

Yukos Capital is ultimately held by Stichting Administratiekantoor Yukos International—a Dutch trust—whose purpose is to further the interests of the subsidiaries, creditors and shareholders of Yukos Oil and to ultimately return funds to these stakeholders. *See* JA-3392; SJA-105.

The Magnitsky Act was signed into law by President Obama on December 14, 2012, ten months after the Russian court invalidated the Loans. The Magnitsky Act is a legislative statement of the United States' commitment to the claims of investors in the former Yukos Oil Company, which are promoted here by Yukos Capital's recovery of the debt owed by Samaraneftegaz.

Even if this were not the case, the well-defined and dominant public policy in favor of enforcing arbitral awards compels confirmation. *See Telenor*, 584 F.3d at 410 (refusal to enforce award would be "contrary to public policy, viz., the well-established federal public policy in favor of arbitration"); *accord Am. Constr. Mach*, 659 F. Supp. at 429 (S.D.N.Y. 1987), *aff'd*, 828 F.2d 117 (2d Cir. 1987).

III.    **THE DISTRICT COURT PROPERLY AMENDED THE JUDGMENT TO STATE THE AWARD IN DOLLARS**

A district court's ruling on a motion to amend or correct a judgment under Fed. R. Civ. P. 59(e) or 60(a) is reviewed for abuse of discretion.  *See Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 150 (2d Cir. 2008) (Fed. R. Civ. P. 59(e)); *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., Inc.*, 804 F.2d 787, 796 (2d Cir. 1986) (Fed. R. Civ. P. 60(a)).

A.    **The District Court Had Authority to Issue the Supplemental Final Judgment**

The District Court's Supplemental Final Judgment corrected an omission by adding the specific amount due under the Award.[17]  The Judgment confirmed the Award but it did not include the terms of the Award in the Judgment.  SPA-42.  In this situation, entry of a supplemental judgment setting forth all amounts due under the arbitral award, including prejudgment interest, is proper under Fed. R. Civ. P. 60(a).  *See Robert Lewis Rosen Assoc., Ltd., v. Webb*, 473 F.3d 498, 505 (2d Cir. 2007) (affirming supplemental judgment).  "The supplemental judgment here

---

[17]  Yukos Capital moved under both Fed. R. Civ. R. 59(e) and 60(a). Samaraneftegaz's brief does not address whether the Supplemental Final Judgment was permissible under Fed. R. Civ. R. 60(a), and this argument is therefore waived.  *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

operated as does the addition of an adjective in a sentence: it provided greater detail about the award in question." *Id.*

Pursuant to Fed. R. Civ. P. 59(e), a district court may alter or amend a judgment "to correct a clear error of law or prevent manifest injustice." *Schwartz*, 539 F.3d at 153 (quoting *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004)). In the six years between the issuance of the Award and the Judgment, the value of the Russian ruble declined by more than twenty percent. *Compare* JA-3486 *with* JA-3507. The District Court therefore prevented manifest injustice by issuing a Supplemental Final Judgment that converted the Award from rubles to dollars as of the date of the Award. *See Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria*, 932 F. Supp. 2d 153, 162 (D.D.C. 2013) (converting arbitral award confirmed as a U.S. judgment into dollars as "necessary to prevent a manifest injustice"). As the court in *Continental Transfer* explained, "denying [plaintiff's] conversion request—or granting it but using the exchange rates in place on the date of the Order and Judgment—would significantly diminish the real value of [plaintiff's] judgment. It also would reward [defendant] both for failing to make good on its payment obligations and for delaying confirmation of the award." *Id.* at 163. Likewise, Samaraneftegaz failed to pay the Award when it was made in 2007, as required pursuant to Article 28(6) of the 1998 ICC Rules, and then delayed the District Court proceedings in New York by seeking a stay.

54

JA-3 (Dkt. 11). Accordingly, the District Court properly converted the Award from rubles to dollars in the interest of justice.

**B.    The District Court's Conversion of Rubles to Dollars was Correct**

Converting the Award to dollars does not exceed the scope of the Award.[18] "[A] judgment in a foreign currency should be issued only when requested by the judgment creditor, and only when it would best accomplish the objective [of making the injured party whole and avoiding rewarding a debtor who has delayed in carrying out the obligation].'" *Mitsui & Co., Ltd. v. Oceantrawl Corp.*, 906 F. Supp. 202, 204 (S.D.N.Y. 1995) (quoting Restatement (Third) of the Foreign Relations Law of the United States § 823(1) (1987)) (alteration in original). Entering a judgment in a foreign currency "has received little support in the United States." *Competex, S.A. v. Labow*, 783 F.2d 333 (2d Cir. 1986); *see also Elite Entm't, Inc. v. Khela Bros. Entm't Inc.*, 396 F. Supp. 2d 680, 694 (E.D. Va. 2005) ("[C]ourts … agree that entering judgment in a foreign currency is strongly disfavored.") (collecting cases). Conversion of the entire Award into U.S. dollars is particularly appropriate where, as here, portions of the Award were already

---

[18]  Samaraneftegaz's own case recognizes that "[f]oreign currency awards are rare in federal courts of the United States." *In re: Oil Spill by the Amoco Cadiz*, 954 F.2d 1279 (7th Cir. 1992) (holding that "the choice of currency is one of forum law" and instructing the district court to enter a judgment in dollars rather than pounds sterling). Samaraneftegaz's so-called "modern rule," AOB 59, relies on an unpublished Fourth Circuit opinion. *See Sea-Roy Corp. v. Parts R Parts, Inc.*, 173 F.3d 851 (4th Cir. 1999) (unpublished).

issued in dollars. SPA-44 (awarding $719,474.54 in U.S. dollars in arbitration fees and legal costs).

Due to the depreciation of the ruble in the six years since the Award was issued, converting the Award to dollars as of the date of the Award makes Yukos Capital whole. *See Cont'l Transfer*, 932 F. Supp. 2d at 158.

### C. Conversion into Dollars as of the Date of the Award was Correct

The Supreme Court has held that foreign currency is converted into U.S. dollars on the date that a debt can be reduced to damages in the United States. *Hicks v. Guinness*, 269 U.S. 71, 80 (1925). "Under the 'breach day' rule, the applicable exchange rate is the one that was in effect on the date that the defendant breached its obligations to the plaintiff." *Cont'l Transfer*, 932 F. Supp. 2d at 159. In the context of a claim to confirm an arbitral award, "it is the New York Convention, by way of the Federal Arbitration Act, that gives rise to the plaintiff's entitlement to judgment, not any underlying transgression by the defendant that the parties contested during the arbitration itself." *Id*. Thus, "it is appropriate to convert [a plaintiff's] foreign currency award using the exchange rates prevailing on the date of the 'breach,' which in the context of an arbitral award confirmation means the day that the award issued." *Id*. at 162.

The same result is urged by the Restatement of Foreign Relations Law: "[T]he conversion from foreign currency to dollars is to be made at such rate as to

make the creditor whole and to avoid rewarding a debtor who has delayed in carrying out the obligation." Restatement (Third) of Foreign Relations Law § 823(1) (1987); *see also Cont'l Transfert*, 932 F. Supp. 2d at 159. The value of the Russian ruble has significantly depreciated since the Award was issued, and the "interests of justice" seek "to prevent a party either from being penalized or from receiving a windfall as a result of currency fluctuations." *Id*.

The "judgment day" rule applies only where the obligation arises from foreign law alone. *See Deutsche Bank Filiale Nurnberg v. Humphrey*, 272 U.S. 517, 519 (1926) (applying judgment day rule when defendant "owed no duty to the plaintiff under our law," was "not subject to our jurisdiction," and "the only liability that it incurred by its failure to pay was that which the German law might impose"); *In re Good Hope Chem. Corp.*, 747 F.2d 806, 811 (1st Cir. 1984) ("The judgment day rule applies only when the obligation arises entirely under foreign law.").[19] This Court has held that the "the so-called judgment-day rule applies to

---

[19] Samaraneftegaz's cases rely on *Deutsche Bank*. *See Tillman v. Russo Asiatic Bank*, 51 F.2d 1023, 1025 (2d Cir. 1931) (judgment day rule applicable when action "is based upon an obligation existing under the foreign law"); *Conte v. Flota Mercante Del Estado*, 277 F.2d 664, 670-71 (2d Cir. 1960) (judgment day rule applies to action "governed by Argentine law"). *Tillman* is otherwise inapposite, as there was whether the "rubles" at issue were valid currency under the new Soviet regime. 51 F.2d at 1025. Moreover, in *Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 865 (2d Cir. 1981), the Court applied the breach day rule under New York law, noting "New York decisions reflect a conviction that the breach-day rule is the best method of making the plaintiff

*(Cont'd on next page)*

unliquidated damages where the cause of action was of foreign origin."  *Shaw, Savill Albion & Co. v. The Fredericksburg*, 189 F.2d 952, 955 (2d Cir. 1951); *see also Liberty Media Corp. v. Vivendi Universal, S.A.*, No. 03 Civ. 2175, 2013 WL 105776, at *3 n.26 (S.D.N.Y. Jan. 9, 2013) ("If this Court were to convert the jury award into U.S. dollars, it would use the breach-day rule as stated in *Shaw*....").[20]

Here, the Award was made in the United States pursuant to New York law and Yukos Capital's cause of action arose under the Federal Arbitration Act. Importantly, New York is the seat of the arbitration and therefore primary jurisdiction for purposes of the New York Convention—although the Award could be enforced elsewhere, it could only be set aside in the U.S.  *See* Federal Judicial Center Int'l Litig. Guide, "International Commercial Arbitration:  A Guide for U.S.

---

*(Cont'd from previous page)*

whole, since it puts him back in the position which he would have occupied had the defendant performed in a timely fashion, giving the plaintiff the value in U.S. dollars of the foreign currency as of the date when he should have been paid."

[20] In *Competex*, the Court observed in dicta that it would have applied the judgment day rule if not constrained by New York law, based on concerns that a judgment creditor would forum shop the enforcement jurisdiction depending on the exchange rate.  783 F.2d at 335 (applying the breach day rule pursuant to New York law).  That concern is not present here, as Yukos Capital cannot enforce the Award in Russia.

Judges," at 64 (2012). Accordingly, the District Court properly applied the breach day rule.[21]

## CONCLUSION

For the forgoing reasons, Petitioner-Appellee respectfully requests that this Court affirm each of the orders of the District Court.

Dated: New York, New York
        April 11, 2014

                                GIBSON, DUNN & CRUTCHER LLP


                                By:___/s/ Robert L. Weigel___
                                    Robert L. Weigel
                                    Anne M. Coyle


                                200 Park Avenue
                                New York, NY 10166-0193
                                Telephone: 212.351.4000
                                Facsimile: 212.351.4035

                                *Attorneys for Petitioner-Appellee*
                                *Yukos Capital S.a.r.l.*

---

[21] Samaraneftegaz conflates post-award interest with post-judgment interest. AOB 61 n.18. The Award ordered Samaraneftegaz to pay "post-award interest of 9% p.a .... as of the day of this Final Award *up to the day of payment*." SPA-44 (emphasis added). The Supplemental Final Judgment clarified this amount and ordered Samaraneftegaz to pay "post-Award interest at the rate of 9 % p.a. from the date of the Award to the date of this Judgment." SPA-45. Samaraneftegaz has not yet paid the Award, and therefore the District Court correctly applied the Award's 9% p.a. rate for post-award interest.

# CERTIFICATE OF COMPLIANCE
# WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,987 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font.

*/s/ Robert L. Weigel*
Robert L. Weigel