# 13-3357-cv

## United States Court of Appeals
### for the
## Second Circuit

▸▸◂◂

YUKOS CAPITAL S.A.R.L.,

*Petitioner-Appellee,*

— v. —

OAO SAMARANEFTEGAZ,

*Respondent-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**REPLY BRIEF OF RESPONDENT-APPELLANT
OAO SAMARANEFTEGAZ**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Matthew D. Slater
2000 Pennsylvania Avenue, NW
Washington, DC 20006
202-974-1500

Attorneys for Respondent-Appellant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

PRELIMINARY STATEMENT ............................................................ 1

ARGUMENT ......................................................................................... 3

I.   THE DISTRICT COURT SHOULD HAVE DISMISSED ON THE BASIS OF FORUM NON CONVENIENS .................................................................... 3

    A.   Yukos Capital's Forum Choice Is Not Entitled To Deference ........... 3

    B.   Russia Is An Adequate Alternative Forum .......................................... 5

    C.   The Balance Of Private And Public Factors Favors Dismissal .......... 5

II.   THE DISTRICT COURT LACKED PERSONAL JURISDICTION .............. 9

    A.   The Power Of Attorney Is Void ........................................................... 9

    B.   The Addenda Are Void ...................................................................... 12

III.   THE AWARD IS UNENFORCEABLE UNDER ARTICLES V(1)(B) AND V(2)(B) OF THE NEW YORK CONVENTION .................................................. 17

    A.   The District Court Erred In Allowing Yukos Capital To Relitigate Key Facts .......................................................................... 17

    B.   The Key Undisputed Facts Demonstrate That Samaraneftegaz Was Not Given Adequate Notice ....................................................... 18

    C.   Enforcement Of The Award Would Violate U.S. Public Policy ....... 21

IV.   THE DISTRICT COURT ERRONEOUSLY INFLATED THE  VALUE OF THE AWARD BY CONVERTING IT FROM RUBLES ..................................... 24

    A.   The Award Should Not Have Been Converted From Rubles ............ 24

    B.   Any Currency Conversion Should Be At The Judgment-Day Rate .................................................................................................... 27

CONCLUSION ................................................................................... 29

CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)(7)(C) ........................ 30

i

# TABLE OF AUTHORITIES

**Cases**

Bank of N.Y. v. First Millennium, Inc.,
607 F.3d 905 (2d Cir. 2010) ...............................................................17

Budejovicky Budvar, N.P. v. Czech Beer Imps., Inc.,
No. 05 Civ. 1246 (JBA), 2006 WL 1980308 (D. Conn. July 12,
2006) .......................................................................................................26

Carlenstolpe v. Merck & Co.,
819 F.2d 33 (2d Cir. 1987) .....................................................................8

Competex, S.A. v. Labow,
783 F.2d 333 (2d Cir. 1986) ...........................................25-26, 28-29

Continental Transfer Technique Ltd. v. Federal Government of
Nigeria,
932 F. Supp. 2d 153 (D.D.C. 2013)............................................. 28-29

DiRienzo v. Philip Servs. Corp.,
294 F.3d 21 (2d Cir. 2002) .....................................................................3

Elite Entertainment, Inc. v. Khela Bros. Entertainment Inc.,
396 F. Supp. 2d 680 (E.D. Va. 2005) ..................................................26

Figueiredo Ferraz Consultoria e Engenharia de Projeto Ltda. v.
Republic of Peru,
No. 08 Civ. 492(WHP), 2009 WL 5177977 (S.D.N.Y. Dec. 15,
2009) .........................................................................................................8

Figueiredo Ferraz e Engenharia de Projecto Ltda. v. Republic of Peru,
665 F.3d 384 (2d Cir. 2011) ...................................................................8

Gonzalez v. Naviera Neptuno A.A.,
832 F.2d 876 (5th Cir. 1987) .................................................................8

Greenlaw v. United States,
554 U.S. 237 (2008)...............................................................................16

In re Arb. between Monegasque de Reassurances S.A.M. v. Nak
    Naftogaz of Ukraine,
    311 F.3d 488 (2d. Cir. 2002) ..................................................4

In re Oil Spill by Amoco Cadiz,
    954 F.2d 1279 (7th Cir. 1992) ..............................................26

Iragorri v. United Techs. Corp.,
    274 F.3d 65 (2d Cir. 2001) ......................................................3

Liberty Media Corp. v. Vivendi Universal, S.A.,
    No. 03 Civ. 2175 (SAS), 2013 WL 105776 (S.D.N.Y. Jan. 9, 2013) ...............26

Mitsui & Co., Ltd. v. Oceantrawl Corp.,
    906 F. Supp. 202, 204 (S.D.N.Y. 1995) ...........................................25

Ortiz-Gonzalez v. Fonovisa,
    277 F.3d 59 (1st Cir. 2002).............................................. 19-20

Pac. Capital Bank, N.A. v. Conn.,
    542 F.3d 341 (2d Cir. 2008) .................................................17

Parklane Hosiery Co. v. Shore,
    439 U.S. 322 (1979).............................................................17

Robert Lewis Rosen Assocs., Ltd. v. Webb,
    473 F.3d 498 (2d Cir. 2007) .................................................27

Schlumberger Tech. Corp. v. United States,
    195 F.3d 216 (5th Cir. 1999) ...............................................27

Sea-Roy Corp. v. Parts R Parts, Inc.,
    173 F.3d 851, 1999 WL 111281 (4th Cir. 1992).............................26

Shaw, Savill, Albion & Co. v. The Fredericksburg,
    189 F.2d 952 (2d Cir. 1951) .................................................27

United States v. Funds Held ex rel. Wetterer,
    210 F.3d 96 (2d Cir. 2000) .................................................17

Van Cauwenberghe v. Biard,
    486 U.S. 517 (1988).............................................................8

iii

Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.,
  126 F.3d 15 (2d Cir. 1997) ...................................................................4

Zim Integrated Shipping Servs. v. PPG Indus., Inc.,
  No. 09 Civ. 10099 (DC), 2010 WL 3001113 (S.D.N.Y. July 29,
  2010) .................................................................................................26

**Statutes**

9 U.S.C. § 207 ......................................................................................21

28 U.S.C. § 1961(a) .............................................................................28

N.Y. Bus. Corp. Law § 1301(b)(1) ......................................................17

N.Y. Jud. Law § 27(b) ..........................................................................26

**Rules**

Fed. R. Civ. P. 55(b)(2) .................................................................. 19-20

Fed. R. Civ. P. 59 .................................................................................25

Fed. R. Civ. P. 60 .................................................................................25

**Other Authorities**

Convention on the Recognition and Enforcement of Foreign Arbitral
  Awards (the "New York Convention"), June 10, 1958, 330
  U.N.T.S. 38 .................................................................. 2, 17, 19-21

## PRELIMINARY STATEMENT

Yukos Capital presents a narrative in which the parties entered a simple arms-length loan agreement that led to a straightforward commercial arbitration on mutually agreed terms in which one side independently and with full knowledge chose to default.  But that story is a self-evident farce.  There was nothing arms-length about the parties' dealings, particularly those that led to the amendment of the loan agreements' arbitration clauses and a manipulated arbitration in New York on terms to which Samaraneftegaz never agreed.  Those amendments, made without any participation of Samaraneftegaz and against its interests, are void as a matter of Russian law and hardly demonstrate purposeful acts by Samaraneftegaz directed toward New York that could justify the exercise of personal jurisdiction.

As both the Russian courts and the European Court of Human Rights have held, Yukos Oil caused Samaraneftegaz and Yukos Oil's other production subsidiaries to sell the oil they produced at far below fair value so that Yukos Oil could evade Russian taxation, which starved Samaraneftegaz of operating cash.  What Yukos Capital characterizes as "loans" were the return to Samaraneftegaz of some of its own wrongfully deprived cash.  When Samaraneftegaz – under Yukos Oil's ownership and control – did not pay back the "loans," Yukos Oil and Yukos Capital's managers manipulated the terms of the "loans" to contrive an arbitration

1

in New York "to make sure the money was repaid." JA-534, Tr. 71:15-19. The Yukos Oil manager who claims to have signed the Addenda for Samaraneftegaz – David Godfrey – decided that Yukos Capital should start the arbitration and hired Yukos Oil's own lawyers to represent it. JA-548, Tr. 125:11-126:2; JA-568, Tr. 205:17-206:23; JA-887.

The District Court found all the factors favoring *forum non conveniens* dismissal, but nonetheless improperly allowed the case to proceed here, following which it erred in confirming the arbitral award. Yukos Oil would never have allowed Samaraneftegaz to appear and explain the truth behind the "loans," and Yukos Capital had no interest in ensuring Samaraneftegaz's participation, which it demonstrated by not even sending its own pleadings directly to Samaraneftegaz and sitting silently while the arbitral tribunal sent notices to the wrong entity. Assuming jurisdiction were present, failure of adequate notice is an independent reason to refuse recognition of the Award under the New York Convention. That the loan agreements were part of Yukos Oil's fraudulent tax evasion and money laundering scheme is a further reason to do so, as enforcing the award would give effect to such criminal conduct.

None of the arguments in Yukos Capital's opposition brief ("Opp'n") change the conclusion that this Court should reverse the Judgment and dismiss the Petition.

# ARGUMENT

## POINT ONE

## THE DISTRICT COURT SHOULD HAVE DISMISSED ON THE BASIS OF *FORUM NON CONVENIENS*

### A.    Yukos Capital's Forum Choice Is Not Entitled To Deference

The District Court correctly gave no deference to Yukos Capital's choice of a forum that is home to neither party.  A foreign plaintiff engaged in forum shopping, as here, warrants no deference.  See Iragorri v. United Techs. Corp., 274 F.3d 65, 72 (2d Cir. 2001) ("the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a *forum non conveniens* motion").  Yukos Capital's reliance on DiRienzo v. Philip Servs. Corp., 294 F.3d 21, 30-31 (2d Cir. 2002), to argue the contrary, Opp'n at 24-25, is misplaced because plaintiffs there were not foreign, while Yukos Capital is.

Yukos Capital did not choose New York because of any special connection between itself and this state, between Samaraneftegaz and this state, or between the underlying "loans" and this state.  Both below and here, Yukos Capital has articulated no interest in or connection to New York "except for the allegations of bias in the Russian forum."  JA-418, Tr. 32:5-8.  There is no basis for these allegations, which ring hollow in light of Yukos Capital's own decision to seek

3

enforcement of the Award in "the Russian forum" and its concession that Russia is an adequate alternative forum. See infra at 5. In any event, given this Court's appropriate "reluctan[ce] to find foreign courts 'corrupt' or 'biased,'" In re Monegasque, 311 F.3d 488, 499 (2d. Cir. 2002) (citing Blanco v. Banco Indus. de Venezuela, S.A., 997 F.2d 974, 981-81 (2d. Cir. 1993)), bare assertions of bias cannot tip the *forum non conveniens* scale in Yukos Capital's favor.

Yukos Capital is wrong to attach significance to New York's being the Award's "primary jurisdiction" – a factor that no case cited by either side identifies as relevant to the *forum non conveniens* analysis. Instead, the significance of the "primary jurisdiction" for a New York Convention award is that the award "could only be set aside" there, Opp'n 58, and that the full panoply of domestic law grounds for doing so can apply there, see Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15, 21 (2d Cir. 1997). But this is not a set-aside case; it is only about recognition and enforcement. Insofar as recognition and enforcement are concerned, there is no special consideration for the primary jurisdiction. It has the same capacity as all other "secondary jurisdictions," as Yukos Capital acknowledges by its reference to the New York Convention defenses as the sole permissible bases for declining enforcement. Opp'n 36; see also Alghanim, 126 F.3d at 23.

**B.      Russia Is An Adequate Alternative Forum**

Yukos Capital does not contest that "the Russian forum is undeniably an adequate alternative forum," JA-417, Tr. 31:12-13.  Yukos Capital vouched for this fact when it sought recognition and enforcement of the Award there.

**C.      The Balance Of Private And Public Factors Favors Dismissal**

Yukos Capital's attempt to recalculate the balance of private and public interests does not square with and cannot overcome the District Court's accurate conclusion that "the balance of private and public interests clearly favor[s] the Russian forum."  JA-417, Tr. 31:17-18.

Yukos Capital's argument is based primarily on arithmetic concerning the countries where the deposed witnesses live and work.  But the question is not one of math; it is where the balance of evidence lies.  The District Court correctly assessed *ex ante* that was Russia – an assessment that proved correct, even before taking account that there was no ability to compel the testimony of unwilling Russian witnesses to be deposed in these proceedings.  Most of the deposed witnesses live outside the United States:  three were U.S. residents, two live in the Netherlands, two in London, and two in Russia.  Four were deposed through interpreters, including one Yukos Capital witness and two Samaraneftegaz

witnesses who testified in Russian.[1]  Yukos Capital's proposed calculus thus could at best be a neutral factor, not one to tip the scale in favor of New York.

Yukos Capital's theory also misses the fundamental point.  Requiring litigation in New York deprived Samaraneftegaz of the opportunity to obtain the testimony of unwilling witnesses in Russia with first-hand knowledge of the events at issue.  Among these is Mr. Grekhov, a third party, who could not be deposed because he would not agree to travel outside Russia and Yukos Capital's counsel would not agree to travel to Russia to take his deposition.  Yukos Capital repeatedly attacks Mr. Grekhov's credibility, but it is punching at a straw man – because the case was litigated in New York, his testimony was not available, and his credibility could never be tested.[2]  In fact, Yukos Capital later persuaded the District Court that even fully voluntary depositions in Russia would be illegal, see JA-489-90 – a further reason that would favor the Russian forum had Yukos Capital made its position known before the District Court denied *forum non conveniens* dismissal.

---

[1]    Samaraneftegaz relied on a further Russian witness, Mr. Bakan, JA-196; JA-492, whom Yukos Capital elected not to depose.

[2]    Yukos Capital wrongly asserts that Mr. Grekhov made false statements in his affidavit, Opp'n 18-19, which he swore for a Russian proceeding and Samaraneftegaz submitted in the earliest stage of this case but could not rely upon for summary judgment under Rule 56.  There is not a shred of evidence that Mr. Grekhov received drafts of the Addenda before they were signed.

Yukos Capital's arguments also overlook the weighty public-interest factors supporting dismissal. Above all, Russian law was and remains central to this dispute. Keeping the case in New York has required the parties to provide no fewer than 12 expert reports on Russian law, which obviously would not have been required in Russia. And the District Court's misapplication of Russian law throughout the case proves that New York was and remains an inappropriate forum. Beyond the threshold issue of the validity of the Addenda, issues of Russian law continue to dominate this case, including an irreconcilable conflict between the District Court's post-judgment order compelling Samaraneftegaz to use Russian assets to pay Yukos Capital and Russian court judgments that prohibit such payment. In short, this case is not about enforcement of the award in the U.S., but an attempt to force enforcement in Russia.[3]

Furthermore, Yukos Capital ignores the relevance of Russian public interest factors. Yukos Capital's mantra that the Award was "made under New York law," see Opp'n 28, ignores that the foundational issue in the case and the sole basis for personal jurisdiction is the validity of the Power of Attorney and Addenda under Russian law, in which New York has no interest. Moreover, the role of the Loan Agreements as part of a fraudulent tax-evasion scheme is fundamentally intertwined with Russia's protection of its public fisc, to say

---

[3] These issues are currently before this Court on appeal number 14-554-cv.

nothing of basic notions of public morality. As in Figueiredo Ferraz e Engenharia de Projecto Ltda. v. Republic of Peru, these public factors are "intimately involved with sovereign prerogative," and must "tip[] the FNC balance decisively against the exercise of jurisdiction in the United States." 665 F.3d 384, 392 (2d Cir. 2011).

Yukos Capital's attempt to avoid Figueiredo as precedent favoring dismissal because "Samaraneftegaz did not seek interlocutory appeal," Opp'n 25, ignores that interlocutory appeal is not generally available for a denial of dismissal for *forum non conveniens*. See Van Cauwenberghe v. Biard, 486 U.S. 517, 529 (1988); Carlenstolpe v. Merck & Co., 819 F.2d 33, 36 (2d Cir. 1987). The issue was addressed in Figueiredo only because the case was appealable as of right on FSIA grounds, and the *forum non conveniens* question was certified alongside. Figueiredo Ferraz Consultoria e Engenharia de Projeto Ltda. v. Republic of Peru, No. 08 Civ. 492(WHP), 2009 WL 5177977 at *2 (S.D.N.Y. Dec. 15, 2009).[4]

Likewise, it is irrelevant that the District Court stayed this proceeding pending Yukos Capital's Russian enforcement proceeding. Opp'n 19. It was an

---

[4]     Yukos Capital's argument that the District Court's decision should be affirmed because "the case has already been decided on the merits after discovery," Opp'n 26, is misplaced. A judgment on the merits when the case should have been dismissed for *forum non conveniens* obviously cannot preclude reversal on appeal. See Gonzalez v. Naviera Neptuno A.A., 832 F.2d 876 (5th Cir. 1987) (finding, after a trial on the merits, that the district court abused its discretion in denying dismissal for *forum non conveniens*).

abuse of discretion for the District Court not to dismiss the case despite finding all of the *forum non conveniens* factors satisfied; that error was not excused by the interim stay, much less by the Russian court judgment declining enforcement on New York Convention grounds.

**POINT TWO**

**THE DISTRICT COURT LACKED PERSONAL JURISDICTION**

**A.      The Power Of Attorney Is Void**

The District Court erroneously held the Power of Attorney valid by ignoring the plain language of Article 186 of the Russian Civil Code, which states that "[a] power [of attorney] that does not indicate the date of its execution is void."  SPA-11.  Yukos Capital defends that error by positing that such plain statutory language may be disregarded so long as Yukos Capital's conception of the provision's "purpose" is otherwise furthered.  It is wrong.

The District Court relied on a single Russian case, distinguishable on its facts, to conclude that "a discrepancy between the execution date listed on a power of attorney, and the date formalize [sic], [does not] void[] a power of attorney."  SPA-13.  In that case, the power of attorney required notarization and bore two undisputed dates – the signature date (a Friday) and the notarization date (the following Monday).  The Russian court therefore merely decided which of those two known dates, each written on the face of the document, and each

9

accurately dating an event necessary for effectiveness, constituted the date of "execution" under Russian law.  JA-917.

Even Yukos Capital cannot explain how this Russian "two consistent and accurate dates" case supports the District Court's conclusion.  It posits that the "case is contrary to Samaraneftegaz's assertion that 'a power of attorney is *void ab initio* if it does not bear the date when it was signed,'" Opp'n 30, but the power of attorney at issue there in fact <u>did bear</u> "the date when it was signed."  Here, in contrast, the Power of Attorney bears only <u>one</u> date that all agree is <u>not</u> the date when it was signed or when any relevant event occurred.

Yukos Capital's other Russian law arguments – which the District Court did not adopt – fare no better.  First, Yukos Capital argues that "'execution' need not mean the date of signing."  Opp'n 31; <u>see also</u> JA-1120-21, ¶ 53.  But it fails to identify any basis for disregarding the express language of the Civil Code. Appellant's Br. 31.[5]

Second, Yukos Capital reasserts that Russian law permits retroactive powers of attorney, Opp'n 31, a rationale even the District Court rejected, <u>see</u> SPA-13.  "Retroactive" does not mean backdated.  A "retroactive" power of

---

[5]      It also offers no viable alternative for what else would constitute "execution" here.  The Power of Attorney therefore does not bear its date of "execution" as the Civil Code requires, under even the loosest interpretation.  Yukos Capital's limitations argument, Opp'n 30 n.7, is refuted in Appellant's Br. 31.

attorney would bear its actual date of execution and by its terms authorize prior acts, see JA-1518, ¶ 24, neither of which the Power of Attorney does, see Appellant's Br. 31.

Third, Yukos Capital's observations that "a power of attorney is valid for a maximum of three years," "a power of attorney that does not state its duration is valid for one year," and "[a] power of attorney that bears no date is void," Opp'n 29-30, have nothing to do with the point at issue. Whether singly or in concert, none supports Yukos Capital's conclusion that a power of attorney containing a date that all parties agree is not the date of execution satisfies the express terms of Article 186.

Finally, Yukos Capital claims that because "Russian law does not permit the use of extrinsic evidence to override the explicit text of a contract," Opp'n 31, the Court must ignore the undisputed fact that the Power of Attorney was not signed on July 26 or anywhere near it and to pretend it was. But this is not a parol evidence issue, as Yukos Capital seems to suggest. Rather, it is an issue of the substantive validity of the Power of Attorney under the law that governs it. Were Yukos Capital's position correct, it would invite fraud by making it impossible to challenge a backdated or otherwise fraudulent document. JA-1519-1520.

11

**B.  The Addenda Are Void**

Even assuming *arguendo* that the Power of Attorney was valid, the Addenda do not provide a basis for personal jurisdiction in New York because they are not valid under Russian law for three independent reasons, all of which contradict any notion of purposeful availment by Samaraneftegaz.

1.  The Execution Of The Addenda Constituted An Abuse Of Right

Yukos Capital's contention that an abuse of right occurs "only where an act was performed with the sole intention of harming another," Opp'n 32 (emphasis added), ignores the plain language of the Russian Civil Code, which also prohibits "an abuse of right in any other form," JA-977, ¶ 15.  An abuse of right occurs whenever a person "exceeds limits on the exercise of his rights in a way that violates the law and has infringed the rights or lawful interests of other persons."  JA-978, ¶ 18.  Causing a subsidiary to enter into a transaction for the benefit of the parent and to the detriment of the subsidiary constitutes such an abuse of right.  JA-978-79, ¶¶ 19-20.  Forcing Samaraneftegaz to arbitrate in a foreign country in an unfamiliar language under unfamiliar laws was an abuse of right, taken for the explicit purpose of creating a "favourable result" for Yukos Capital at the expense of Samaraneftegaz.  JA-707.  See Appellant's Br. 32-37.

Yukos Capital cannot refute the obvious conclusion that the Addenda were at the expense of and conferred no benefit on Samaraneftegaz.  Instead,

Yukos Capital simply restates the District Court's observations that Samaraneftegaz could afford to travel here and that Russian law recognizes international fora. Opp'n 33. But the issue under Russian law is not whether the Addenda rendered Samaraneftegaz unable to defend itself, but whether they burdened Samaraneftegaz to obtain a more favorable result for Yukos Capital. JA-977-79.[6] Because they did so, they are void.

### 2. Mr. Godfrey Breached His Fiduciary Duty

The Addenda are additionally void because, in executing them, Mr. Godfrey breached his fiduciary duty to act on behalf of Samaraneftegaz in two distinct ways. First, as Samaraneftegaz's representative, Mr. Godfrey was required to act in the interests of Samaraneftegaz, see JA-983, but as discussed above, his actions were contrary to Samaraneftegaz's interests. Second, Mr. Godfrey acted while under conflicting obligations; he held a position in every entity in Yukos Capital's chain of ownership, JA-493-94, 504, ¶¶ 8-10, 49-51, and thus was obliged to serve Yukos Capital's interests at the time of signing.[7] Mr. Godfrey

---

[6]  The District Court's finding that Mr. Grekhov would have signed the Addenda himself absent "criminal risks," SPA-15-16, is similarly inapposite. The Addenda violated the rights of Samaraneftegaz for the benefit of Yukos Capital, and had Mr. Grekhov executed the Addenda at the instruction of Yukos Oil's CEO, see Opp'n 10, it would similarly have violated Russian law. JA-1528-29, ¶ 51 n.71.

[7]  Yukos Capital's assertion that "[t]here is no evidence to suggest that Godfrey benefited financially from the amendment of the Loans," Opp'n 34, is

failed to cure this conflict, creating a further, independent breach of his fiduciary duty.

Yukos Capital fails to articulate a plausible basis to refute either of these breaches. It repeats the District Court's statement that "'Samaraneftegaz had an interest in complying with Yukos Oil's directive to execute the Addenda,'" Opp'n 34 (quoting SPA-17), but that is not the inquiry required by Russian law, which concerns the exercise of the represented entity's (Samaraneftegaz's) own will and interests, not those of its parent or shareholders. JA-979-80, ¶ 22.

Contrary to Yukos Capital's arguments, Articles 182(2)-(3) and 183(1) of the Russian Civil Code require a representative to act in good faith and solely in the interests of the represented party. JA-983, ¶ 31. Mr. Godfrey testified expressly that he gave no consideration whatsoever to the interests of Samaraneftegaz in signing the Addenda but instead acted for the "group" of Yukos Oil companies, JA-506-07, ¶¶ 62-63; JA-529, Tr. 51:3-6, in order "to make sure that the money was repaid" to Yukos Capital, JA-534, Tr. 71:15-19. This breach is not cured by the District Court's reliance on Article 105 of the Russian Civil Code, which does not override this obligation, JA-1528-31, ¶¶ 49-56, any more than does

---

irrelevant under Russian law and ignores both that Mr. Godfrey was employed by the entities controlling and profiting from Yukos Capital and his own testimony regarding his entitlement to compensation from some of those entities. JA-525, Tr. 33:6-35:22.

the fact that, in some attenuated sense, Samaraneftegaz may have had an "interest" in acting in accordance with Yukos Oil's directives.

Mr. Godfrey also had a conflict under Article 182(3), which prohibits a representative from acting pursuant to a power of attorney when the representative also has an interest in the other party to the transaction. JA-984-86, ¶¶ 34-38. Yukos Capital tries to counter this by claiming – incorrectly – that a conflict requires "direct" representation of both parties, but see JA-985, ¶ 36, and that such conflicts "typically" involve financial self-dealing, Opp'n 33. But "typically" does not mean "always." In any event, the District Court's conclusion that the relationship between Mr. Godfrey and Yukos Capital was "attenuated," SPA-18, elided the Russian law conflict analysis and relied on cases interpreting a different portion of the Civil Code. Appellant's Br. 35-37.[8] Considering that Mr. Godfrey had legal obligations to Yukos Capital and in fact acted on its behalf at every turn – from being responsible for deciding when to claim against Samaraneftegaz, to deciding that the arbitration agreements should be amended to favor Yukos Capital, to initiating arbitration and hiring counsel for Yukos Capital,

---

[8] The District Court's statement that Mr. Godfrey could not sign the Addenda for Yukos Capital is irrelevant – Mr. Godfrey's testimony shows that he had an interest in Yukos Capital while he purported to represent Samaraneftegaz by virtue of the Power of Attorney. See supra at n.7.

15

to then appearing in the arbitration on behalf of Yukos Capital, see Appellant's Br. 9-14 – the District Court's decision is unsustainable under Russian law.

### 3. The Execution Of The Addenda Did Not Comply With The Loan Agreements' Requirements For Such Amendments

Samaraneftegaz demonstrated in its opening brief that the Addenda were signed and sealed by the parties inconsistently, such that the requirements of neither the Russian nor English version of clause 6.2 were satisfied by both parties. Appellant's Br. 40-42. Yukos Capital's assertion that "the presence of a corporate seal on a contract overrides any alleged defects in the contract's execution," Opp'n 34, misstates Russian law, see JA-1521, ¶ 36 (citing a 2012 Ninth Arbitrazh Appellate Court case holding that the presence of a corporate seal on a disputed document "'per se cannot warrant authenticity of the said document'"). Further, Yukos Capital does not address the right of parties under Russian law to make the amendment of agreements as difficult – or as easy – as they would like. JA-989, ¶ 50. The District Court's opinion that the requirements of clause 6.2 "contradict[] Yukos EP's normal practice," SPA-19-21, is thus beside the point because clause 6.2 was intended to change normal practice and must be respected by finding the Addenda invalid.[9]

---

[9] Yukos Capital's argument for validity under New York law is misplaced. The District Court correctly held that "Russian law will be applied to the question of the addenda's validity," SPA-10 (quoting JA-417), a holding from which neither party has appealed and that cannot now be reversed. See Greenlaw v. United

## POINT THREE

## THE AWARD IS UNENFORCEABLE UNDER ARTICLES V(1)(B) AND V(2)(B) OF THE NEW YORK CONVENTION

### A.   The District Court Erred In Allowing Yukos Capital To Relitigate Key Facts

Yukos Capital mischaracterizes Samaraneftegaz's invocation of the findings of the Russian courts as "offensive collateral estoppel."  Opp'n 41. Samaraneftegaz is entitled to defend itself on the basis that the prior findings of the Russian courts "preclude[] relitigation of issues actually litigated and necessary to the outcome of the first action."  Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979).  This is not a matter of discretion.  Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 919 (2d Cir. 2010) ("We review the district court's application of the principles of claim and issue preclusion de novo.").

---

States, 554 U.S. 237, 244 (2008); Pac. Capital Bank, N.A. v. Conn., 542 F.3d 341, 349 (2d Cir. 2008).

In any event, New York corporate law does not apply to internal corporate affairs – like use of seals – of Samaraneftegaz, a Russian company that does no business in New York.  See United States v. Funds Held ex rel. Wetterer, 210 F.3d 96, 106 (2d Cir. 2000) ("Questions relating to the internal affairs of corporations . . . are generally decided in accordance with the law of the place of incorporation."); N.Y. Bus. Corp. Law § 1301(b)(1).  Even if it did, any "prima facie" validity provided by a corporate seal has no bearing on whether the contractually agreed requirements for an amendment have been satisfied.  And there is no evidence that TMF or Yukos Capital ever saw the Power of Attorney or could have relied on any "apparent authority" under it.  See Samaraneftegaz's Mem. in Opp. to Yukos Capital's Cross-Mot. for Summ. J. 3-4 n.14 (S.D.N.Y. Mar. 5, 2012) (collecting record cites), ECF No. 81.

17

Yukos Capital's statement that the "*facts* found by the Samara court are neither in dispute nor relevant," Opp'n 41-42,[10] constitutes a stunning concession that these facts are true but ignores their central relevance – which include Samaraneftegaz's failure to receive actual notice of the relevant stages of the arbitral proceedings and that the "loans" are part of a tax evasion scheme, Appellant's Br. 44-45.

**B.    The Key Undisputed Facts Demonstrate That Samaraneftegaz Was Not Given Adequate Notice**

Yukos Capital does not dispute that:  (a) Yukos Capital, the ICC, and the arbitral tribunal all knew the address of Samaraneftegaz's headquarters; (b) no correspondence concerning the arbitral proceedings was provided to Samaraneftegaz itself after mid-March 2006, save for a single letter in a language Samaraneftegaz does not read and from a sender Samaraneftegaz would not have recognized; and (c) by the summer of 2006 (if not before) Yukos Capital knew that Yukos EP was not authorized to act for Samaraneftegaz in any respect but failed to tell the tribunal.  <u>Compare</u> Appellant's Br. 48-51 <u>with</u> Opp'n 36-41.

The only decisions Yukos Capital mentions addressing notice in an arbitration, <u>see</u> Opp'n 41 n.14, do not support the District Court's exceptionally

---

[10]    To the extent Yukos Capital nonetheless seeks to challenge some of those factual findings, Opp'n 42, that is exactly what the collateral estoppel doctrine is intended to preclude.

low standard for notice.  SPA-33-35; Opp'n 36-37.  They involved respondents who indisputably received actual, timely, and repeated notice of the evidentiary steps and hearings in their respective arbitrations.  In contrast, Samaraneftegaz received no notice of the hearing, briefing schedule, deadlines, or numerous other interim steps in Yukos Capital's arbitration.  See Appellant's Br. 48-49.  Receipt of the request for arbitration or other preliminaries, Opp'n 37, is insufficient under the New York Convention's standard.

Notably, none of the critical adversarial stages were covered by the draft terms of reference on which the District Court and Yukos Capital rely.  Opp'n 39-40.  As a result, Samaraneftegaz was not apprised of the evidence against it and was never told when its evidence was due or when and where the hearing would be conducted.  As the Paris Court of Appeal held in its case involving Yukos Capital, failure to provide such notice deprives the respondent of its right of defense under Article V(1)(b).  JA-3370-75.  Here, the draft terms of reference promised that these stages would "be notified separately," JA-2311, ¶ 57, but they never were.  The next "notice" Samaraneftegaz received was of the Final Award itself.

Yukos Capital glosses over the fact that the notice given to Samaraneftegaz would not satisfy the notice of hearing required for a comparably situated litigant under Federal Rule of Civil Procedure 55(b)(2).  See Appellant's Br. 52.  Its reliance on Ortiz-Gonzalez v. Fonovisa, 277 F.3d 59 (1st Cir. 2002),

19

Opp'n 37, is misplaced. Rule 55(b)(2) did not apply in <u>Fonovisa</u> because the defendant <u>never</u> appeared before the trial, 277 F.3d at 63, but Yukos Capital's position is that Samaraneftegaz <u>did</u> appear in the arbitration through Yukos EP's letter disputing jurisdiction. And Yukos Capital cannot contend otherwise, else its argument based on notice to Yukos EP would necessarily fall.

Yet notice to Yukos EP was as a factual matter <u>not</u> notice to Samaraneftegaz, as the Russian court applying Article V of the New York Convention conclusively held. <u>See</u> Appellant's Br. 44. Yukos EP never claimed to be Samaraneftegaz's representative in the arbitration, and Samaraneftegaz never designated it as such. JA-510, ¶¶ 82-83; <u>see also</u> JA-1673-76; JA-3269-73.[11] Moreover, it was not reasonable for the arbitrators to assume that notice to Yukos EP could substitute for actual notice; the burden of giving Samaraneftegaz notice was so slight and the prejudice from not doing so was great. Because Samaraneftegaz did not receive actual, meaningful notice that would allow it to present its defense, the Award should not be enforced based on Article V(1)(b).[12]

---

[11] Nor did Samaraneftegaz ever designate Yukos RM as its representative, rendering irrelevant Yukos Capital's suggestion, Opp'n 38, that Yukos RM could have received notices sent to Yukos EP. And, merely sharing an address or fax number would not require Yukos RM to read correspondence addressed to Yukos EP.

[12] Yukos Capital wrongly interprets Mr. Starodubtsev's May 2006 letter, JA-2192, to argue that Yukos EP was designated as Samaraneftegaz's legal representative in the arbitration, Opp'n 37. In that letter, Mr. Starodubtsev wrote

**C.** **Enforcement Of The Award Would Violate U.S. Public Policy**

Enforcing the Award would constitute another chapter of a scheme that the Russian courts and the European Court of Human Rights have condemned as unlawful tax evasion. The Russian courts have rightly found payment to be money laundering – funneling the fruits of fraudulent sales and tax evasion in the guise of "loans." U.S. public policy condemns lending the courts' imprimatur to such profiting from crime; this is not a matter of enforcing foreign taxes and does not implicate the revenue rule.

Yukos Capital feigns ignorance and tries to sidestep the issue by mischaracterizing Samaraneftegaz's defense. As the District Court did, Yukos Capital treats the public-policy defense as a nullity by conflating it with the question of validity of the underlying contract. That is wrong. Congress tasked the courts – not arbitrators – with assessing whether enforcement of an arbitral award would violate public policy. <u>See</u> 9 U.S.C. § 207; New York Convention art. V(2)(b). The related arguments that Samaraneftegaz waived its defenses against enforcement because they were not presented to the tribunal, Opp'n 46, and that a general policy favoring arbitration precludes the defense, Opp'n 48-49, are likewise misplaced. If Yukos Capital's position were correct, U.S. courts would be

only about Yukos EP's own views, concluding that it did not discern any "obligation <u>of its own</u> to participate in any expenses." JA-2192 (emphasis added).

required to enforce arbitral awards granting payment for human trafficking or trade in illicit drugs as long as neither party to such repugnant transactions raised public-policy concerns in the arbitration.[13]

Yukos Capital's attempt to paint the "loan" transaction as ordinary business transactions "advanced to allow Samaraneftegaz to continue business operations," Opp'n 46, is particularly misleading. As the Russian courts and the ECHR have held, part of Yukos Oil's tax evasion scheme involved depriving its operating subsidiaries (including Samaraneftegaz) of cash, then cycling that cash back to them in various guises. JA-1695-99; JA-1716-18; JA-1720-23; JA-1890-91; JA-1911-12. Any lack of operating cash at Samaraneftegaz was thus related to the larger tax evasion scheme and not a legitimate justification for the "loans." Indeed, Mr. Misamore, Yukos Oil's former CFO, testified that the "loans" were not routine commercial transaction but rather that Yukos Oil's managers "used Yukos Capital" to circumvent the Russian government's efforts to collect Yukos Oil's back taxes, which included the "sequestering of funds from Yukos Oil Company." See JA-1968, 50:20-22.

---

[13]    Yukos Capital's position ignores that through the formative stages of the arbitration Yukos Capital and Samaraneftegaz were under common control of those who had perpetrated the fraudulent tax evasion scheme. It defies credibility to suggest that they would have permitted Samaraneftegaz to argue against the "loans" on the basis of their own misconduct. Upon acquiring Samaraneftegaz, Neft-Aktiv – a third party impacted by the sham loans – raised those arguments in the Russian courts, the only venue available to it.

The related assertion that Samaraneftegaz "needed funds to continue its operations as a result of the Russian government freezing certain Yukos assets," Opp'n 8, lacks credibility and cannot help Yukos Capital. The only reason a freezing order against Yukos Oil – not Samaraneftegaz – might have hampered Samaraneftegaz's operations is that Yukos Oil had already improperly drained Samaraneftegaz of its own cash. If Samaraneftegaz's own accounts were frozen, placing "loan" monies in them would not have been likely to help "continue its operations."

Yukos Capital's criticisms of the ECHR and Neft-Aktiv proceedings also do not change the facts. Yukos Capital neglects the uncontested role in pursuing the ECHR case played by Stichting Administratiekantoor Yukos International (the "Stichting"), Appellant's Br. 55,[14] the entity that controls Yukos Capital and whose purported interests Yukos Capital seeks to assimilate to itself in this case, see Opp'n 52. Yukos Capital also ignores that it had full opportunity in the Neft-Aktiv proceeding to produce evidence and arguments against the court's findings but left the evidence before the Russian court unchallenged. And it does not mention that the Samara Court, in the Russian enforcement proceedings Yukos

---

[14] One reason the Stichting was created was to "conduct and maintain" such proceeding. Weigel Decl., Ex. H, Stichting Articles of Association, Art. 2(4), (S.D.N.Y. Nov. 27, 2013), ECF No. 159-4.

Capital itself brought, found that the "loans" were part of Yukos Oil's tax evasion scheme.

The Magnitsky Act does not create a U.S. public policy in favor of profiting from crime. Its narrow legislative directions have nothing to do with this case, which does not concern claims of U.S. investors in Yukos Oil. Yukos Capital is not a U.S. investor and presents no evidence that its controlling entity, the Stichting, will ever pay a cent to such U.S. investors, in particular out of any recovery by Yukos Capital. To the contrary, a sworn affidavit from one of Yukos Capital's directors explains that Yukos Capital must transfer any funds it recovers to other entities not controlled by the Stichting. Decl. of Kari E. Milligan, Ex. B, Statement of D. Feldman ¶ 61 (S.D.N.Y. Nov. 19, 2013), ECF No. 155-2.

## POINT FOUR

### THE DISTRICT COURT ERRONEOUSLY INFLATED THE VALUE OF THE AWARD BY CONVERTING IT FROM RUBLES

**A.    The Award Should Not Have Been Converted From Rubles**

Yukos Capital concedes the dispute in this case concerned an alleged failure to repay a sum of rubles under the Loan Agreements. Opp'n 45. Although the arbitration was conducted in New York, Yukos Capital never sought, and the arbitrators never ordered, repayment in any currency other than rubles. See Opp'n 16. Indeed, Yukos Capital deliberately sought a ruble-denominated award. JA-3496, Tr. 165:2-3 ("We're asking for an award in rubles…"). This was consistent

with the ruble-denominated Loan Agreements, which also provided for repayment to a Moscow bank account, none of which was changed by the Addenda.  See JA-658, 666; see also JA-1277-82.

Yukos Capital's authorities confirm that there was no requirement for currency conversion at all, much less justification to amend a final judgment under Rule 59 on the basis that the failure to convert was an error of law or caused grave injustice, less still that there was any clerical error correctable under Rule 60.  See Opp'n 55-56; Appellant's Br. 58-60.[15]  For example, the court in Mitsui & Co., Ltd. v. Oceantrawl Corp., see Opp'n 55, entered a yen-denominated judgment on an arbitral award, finding yen to be the currency in which "the parties . . . conducted all of their transactions," and observing that "[e]ntry of judgment in the currency of the parties' transactions accords with principles of fairness and with the goal of making injured parties whole because it provides them with payment in the currency for which they bargained."  906 F. Supp. 202, 204 (S.D.N.Y. 1995).  Competex, S.A. v. Labow likewise explicitly rejected the approach Yukos Capital

---

[15]     Contrary to Yukos Capital's argument, Opp'n 53 n.17, Samaraneftegaz specifically referred to Rule 60(a) and thereafter explained why the District Court's decision was in error.  Appellant's Br. at 58.  In any event, the supplemental final judgment made no mention of Rule 60(a), and it is impossible that the lack of currency conversion in the original judgment was a mere clerical mistake, oversight, or omission:  there was no request for conversion before the original judgment, no briefing on conversion before Yukos Capital's motion to alter the judgment, and no order converting the Award to dollars before the supplemental final judgment.

advocates, labeling as "extreme" allowing the judgment creditor "to engage in currency speculation without risk." 783 F.2d 333, 336 (2d Cir. 1986).

In Competex, this Court recognized that entering a judgment denominated in the currency in which the parties structured their transaction was "theoretically superior" and preferable. 783 F.2d at 337. The Seventh and Fourth Circuits have likewise held that judgments should be entered in the currency in which the parties dealt. In re Oil Spill by Amoco Cadiz, 954 F.2d 1279, 1328 (7th Cir. 1992) (courts "should enter the judgment in the currency the parties themselves selected for their dealings, the currency in which the loss is felt"); Sea-Roy Corp. v. Parts R Parts, Inc., 173 F.3d 851, 1999 WL 111281, at *4 (4th Cir. 1992).[16] New York law is the same. See N.Y. Jud. Law § 27(b) ("[A] court shall render or enter a judgment or decree in the foreign currency of the underlying obligation.").[17]

---

[16]  Yukos Capital tries to avoid the Fourth Circuit's reasoning because Sea-Roy is "unpublished," Opp'n 55 n.18, but courts in this Circuit have repeatedly relied on Sea-Roy. See Liberty Media Corp. v. Vivendi Universal, S.A., No. 03 Civ. 2175 (SAS), 2013 WL 105776, at *2 n.20 (S.D.N.Y. Jan. 9, 2013); Zim Integrated Shipping Servs. v. PPG Indus., Inc., No. 09 Civ. 10099 (DC), 2010 WL 3001113, at *4 n.3 (S.D.N.Y. July 29, 2010); Budejovicky Budvar, N.P. v. Czech Beer Imps., Inc., No. 05 Civ. 1246 (JBA), 2006 WL 1980308, at *5 n.1 (D. Conn. July 12, 2006).

[17]  In contrast, Elite Entertainment, Inc. v. Khela Bros. Entertainment Inc., 396 F. Supp. 2d 680, 694 (E.D. Va. 2005), see Opp'n 55, arose under Virginia law.

26

**B.  Any Currency Conversion Should Be At The Judgment-Day Rate**

Were currency conversion necessary, it should have been as of the date of the judgment (which included annual post-Award interest of 9%).  Yukos Capital's insistence on "breach day" conversion rests on the theory that a payment obligation in dollars arose at the instant Yukos Capital could first seek recognition in the U.S.  That is wrong.  The place of performance determines the currency of a payment obligation.  Shaw, Savill, Albion & Co. v. The Fredericksburg, 189 F.2d 952, 955 (2d Cir. 1951); see also Appellant's Br. 60-61.  The Award created no obligation to perform in the United States.  JA-68-69; cf. Opp'n 56 (citing Hicks v. Guinness, 269 U.S. 71, 80 (1925) ("The debt was due to an American creditor and was to be paid in the United States.")).  Samaraneftegaz's sole conceivable obligation was to pay a sum of rubles, JA-67-68, with the Loan Agreements specifying payment to a Moscow bank account, JA-658, 666.  The Award at most gave Yukos Capital an opportunity to pursue an obligation under the Award, and that obligation only became a "debt [that could] be reduced to damages in the United States," Opp'n 56, upon recognition.  See also Robert Lewis Rosen Assocs., Ltd. v. Webb, 473 F.3d 498, 504 (2d Cir. 2007) ("Because arbitration orders are not self-enforcing, they are executed via judicial review and the issuance of a court order."); cf. Schlumberger Tech. Corp. v. United States, 195 F.3d 216, 220 (5th Cir. 1999) (foreign arbitral award not accounted as income under the

27

accrual method until confirmed because "an arbitral award has no legal effect without the stamp of judicial approval").

Yukos Capital's argument that the "depreciation of the ruble" against the dollar requires conversion "as of the date of the Award" in order to "make[] Yukos Capital whole," Opp'n 56, is essentially a demand that Samaraneftegaz compensate Yukos Capital for its lost opportunity to engage in currency speculation during the intervening six years. Such a windfall is precisely what this Court criticized in <u>Competex</u>, 783 F.2d at 338; <u>see also</u> Appellant's Br. 60-61.

Any effects from the passage of time are compensated through the annual 9% post-award interest included in the Award at Yukos Capital's request. <u>Accord</u> <u>Competex</u>, 783 F.3d at 337 ("[P]ost-judgment interest . . . is ordinarily the only 'punishment' for delay in paying judgment debts.").[18]

Finally, the D.C. district court decision on which Yukos Capital principally relies, <u>Continental Transfert Technique Ltd. v. Federal Government of Nigeria</u>, 932 F. Supp. 2d 153, 162 (D.D.C. 2013), is not good law in this Circuit.

---

[18]     Yukos Capital misunderstands Samaraneftegaz's argument about post-award interest. <u>Compare</u> Appellant's Br. 61 n.18 <u>with</u> Opp'n 59 n.21. Samaraneftegaz does not dispute that the Award provides for 9% annual interest, but that this rate of interest ran only until the judgment entered by the District Court on August 9, 2013. The issue is that following entry of the August 9 judgment, post-<u>judgment</u> interest could accrue only at the statutory rate, 28 U.S.C. § 1961(a), and the supplemental final judgment could not extend the period of 9% post-award interest.

That decision based its "breach day" holding on Section 823 of the Restatement, a provision this Court has described as "extreme" and declined to follow. Compare Cont'l, 932 F. Supp. 2d at 159 with Competex, 783 F.2d at 337.

## CONCLUSION

The Judgment should be reversed, and the Petition should be dismissed.

Dated:     April 25, 2014
           Washington, D.C.

                              Respectfully submitted,

                              /s/ *Matthew D. Slater*
                              Matthew D. Slater
                              CLEARY GOTTLIEB STEEN & HAMILTON LLP
                              2000 Pennsylvania Avenue, NW
                              Washington, DC  20006
                              Telephone: (202) 974-1500
                              Facsimile: (202) 974-1999
                              mslater@cgsh.com

                              *Attorneys for Respondent-Appellant OAO*
                              *Samaraneftegaz*

# CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)(7)(C)

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,923 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Microsoft Word Version 14 in 14-point Times New Roman font.

Dated:      April 25, 2014
            Washington, D.C.

                         Respectfully submitted,

                         /s/ *Matthew D. Slater*
                         Matthew D. Slater
                         CLEARY GOTTLIEB STEEN & HAMILTON LLP
                         2000 Pennsylvania Avenue, NW
                         Washington, DC  20006
                         Telephone: (202) 974-1500
                         Facsimile: (202) 974-1999
                         mslater@cgsh.com

                         *Attorneys for Respondent-Appellant OAO Samaraneftegaz*